Tim Davis
WILDEARTH GUARDIANS
301 N. Guadalupe St., Ste. 201
Santa Fe, NM 87501
205-913-6425│tdavis@wildearthguardians.org

*Attorney for Petitioners*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO
## SANTA FE DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, a New Mexico nonprofit corporation; WESTERN WATERSHEDS PROJECT, an Idaho nonprofit corporation; and CALDERA ACTION, a New Mexico nonprofit corporation, | Case No. 24-557 |
| Petitioners, | PETITION FOR REVIEW OF AGENCY ACTION |
| v. | |
| The UNITED STATES FOREST SERVICE, a federal agency; the UNITED STATES FISH AND WILDLIFE SERVICE; a federal agency, RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service; SHAUN SANCHEZ, in his official capacity as Supervisor of the Santa Fe National Forest; and MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife Service, | |
| Respondents. | |

## INTRODUCTION

1.      Petitioners WildEarth Guardians, Western Watersheds Project, and Caldera Action challenge federal Respondents' failure to comply with the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–44, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, with respect to the Santa Fe National Forest's (the National Forest) livestock grazing program and its well-documented adverse effects on the neighboring Valles Caldera National Preserve (the Preserve) and the threatened and endangered species thereon.

2.      The Preserve's diverse landscape—encompassing high-elevation meadows, forested volcanic domes, and lush riparian areas—supports an equally diverse range of wildlife, including the federally-protected endangered Jemez Mountains salamander, threatened Mexican spotted owl, and endangered New Mexico meadow jumping mouse. Historic livestock overgrazing degraded these species' habitats, and only since the National Park Service (the Park Service) assumed responsibility for the area and curtailed livestock use have these species returned to the Preserve.

3.      Each summer, hundreds of cattle from the National Forest unlawfully trespass onto the Preserve, causing severe resource damage and harming these protected species and their habitats.

4.      The U.S. Forest Service (the Forest Service) has long been aware of the ongoing livestock trespass and its substantial impacts on both the Preserve and the listed species that inhabit it, yet it has never consulted with the U.S. Fish and Wildlife Service (the FWS) regarding these well-known effects of its grazing program, as required by the ESA. Nor has the Forest Service taken adequate measures to prevent this recurring and foreseeable livestock trespass. The Forest

Service has, however, continued to authorize grazing on the allotments abutting the Preserve boundary (the Allotments)—despite the resulting harm to protected species there.

5.    The Allotments themselves are also home to multiple ESA-listed species and their respective critical habitats. And the Allotments, too, have been subjected to historic and current overgrazing, which continues to adversely impact these species and their habitats.

6.    By continuing to issue annual grazing authorizations for the Allotments, the Forest Service has violated its duties under the ESA to (1) reinitiate consultation with the FWS regarding impacts to threatened and endangered species; (2) avoid unauthorized take of such species; (3) ensure that its actions do not jeopardize the survival of such species; and (4) take affirmative steps to conserve and recover such species. Because the duty to reinitiate consultation falls equally on the FWS, it has likewise violated the ESA by failing to reconsult with the Forest Service regarding grazing on the Allotments and the highly foreseeable adverse impacts of that grazing on the Preserve.

7.    Petitioners seek declaratory and injunctive relief to redress their injuries caused by these ESA violations and to prevent further irreparable harm to the Jemez Mountains salamander, Mexican spotted owl, and New Mexico meadow jumping mouse and their respective habitats.

8.    Petitioners respectfully request that this Court (1) declare that the Forest Service and FWS have violated the ESA by failing to reinitiate consultation for grazing on the Allotments; (2) declare that the Forest Service has further violated the ESA by causing unlawful take of threatened and endangered species, failing to ensure that its actions do not jeopardize such species, and failing to take necessary steps to conserve such species; (3) vacate any existing AOIs for the Allotments; (4) enjoin the Forest Service from authorizing grazing on the Allotments until the

agency fully complies with the ESA; and (5) grant such other equitable relief as may be necessary to redress Petitioners' injuries.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 16 U.S.C. § 1540, 28 U.S.C. § 1331, and 28 U.S.C. § 1346. The requested declaratory and injunctive relief is proper under 28 U.S.C. §§ 2201 and 2202. The challenged agency actions and failures to act are subject to this Court's review under 5 U.S.C. §§ 701, 702, 704, and 706. Respondents have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Forest and Preserve—where a substantial part of the events giving rise to this complaint occurred—are located in this District, and all Parties maintain offices in this District.

11.     As required by the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(2)(C), Petitioners sent notice of their intent to sue for the violations described here on October 19, 2022 and again on February 6, 2024. More than 60 days have passed since Respondents received these notices and the violations have not been remedied.

## PARTIES

12.     Petitioner WILDEARTH GUARDIANS (Guardians) is a nonprofit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians has over 120,000 members and supporters across the western states, including many who live, work, and recreate in New Mexico, where Guardians maintains its headquarters in Santa Fe. For over 30 years, Guardians has worked to protect and recover imperiled species, including the Jemez Mountains salamander, Mexican spotted owl, and New Mexico meadow jumping mouse.

PETITION FOR REVIEW OF AGENCY ACTION—3

13.     As an organization and on behalf of its members and supporters, Guardians seeks to protect and restore wildlife and wild places throughout the West, including on the Preserve and the surrounding Forest. It has long engaged with the Forest Service and Park Service regarding the harms to endangered species and their habitats caused by livestock grazing on the Allotments and trespassing on the Preserve. Guardians and its members, supporters, and staff have interests in ensuring rigorous adherence to federal laws intended to protect public lands, endangered species, and critical habitat on and around the Preserve.

14.     Petitioner WESTERN WATERSHEDS PROJECT is a nonprofit conservation organization founded in 1993 with the mission of protecting and restoring western watersheds and wildlife through education, public policy initiatives, and litigation. Headquartered in Hailey, Idaho, Western Watersheds Project has over 14,000 members and supporters and works in 11 states across the West, including New Mexico. It has long engaged with the Forest Service and Park Service regarding the continuing harms trespass cattle have caused to endangered species and their habitats on the Preserve as well as the harm grazing on the Allotments causes to the endangered species on their habitats therein. Western Watersheds Project and its members, supporters, and staff have interests in ensuring rigorous adherence to federal laws intended to protect public lands, endangered species, and critical habitat on and around the Preserve.

15.     Petitioner CALDERA ACTION is the only nonprofit organization focused specifically on the public lands of the Jemez Mountains, with a special emphasis on protection of the Preserve. Formed in 2007, Caldera Action advocates for sustainable, preservation-oriented management of the Preserve and works to foster active citizen participation in the restoration, conservation, and public appreciation of the area. Caldera Action has roughly 400 members and supporters, most of whom live, work, and recreate in the Jemez Mountains and nearby Santa Fe,

PETITION FOR REVIEW OF AGENCY ACTION—4

New Mexico, where the organization is headquartered. It has long engaged with the Forest Service and Park Service regarding the harms to endangered species and their habitats caused by cattle grazing on the Allotments and trespassing on the Preserve. Caldera Action and its members, supporters, and staff have interests in ensuring rigorous adherence to federal laws intended to protect public lands, endangered species, and critical habitat on and around the Preserve.

16.     Petitioners' members, supporters, and staff regularly visit and enjoy the Preserve and have concrete plans to continue doing so for the foreseeable future. They intend to return to the Preserve this spring, as they have done in previous years.

17.     Many of Petitioners' members, supporters, and staff live or grew up in and around the Jemez Mountains. They have deep ties to the Preserve, where they hike, bike, ride horses, observe wildlife, hunt, camp, fish, practice nature photography, conduct research, or simply enjoy spending time with friends and family. Petitioners' members, supporters, and staff derive aesthetic, recreational, scientific, educational, and other benefits from their activities on the Preserve, and from working to protect the area and educate the public about its unique ecological values.

18.     Petitioners' members, supporters, and staff enjoy observing, attempting to observe, and studying threatened and endangered species like the Jemez Mountains salamander, the Mexican spotted owl, and the New Mexico meadow jumping mouse, all of which are found on the Preserve and the surrounding National Forest. Their appreciation of the area is enhanced by knowing that it is a refuge for multiple threatened and endangered species, and the opportunity to view such species is of significant value to Petitioners' members, supporters, and staff.

19.     While recreating on the Preserve, Petitioners' members, supporters, and staff have frequently encountered trespass cattle from the National Forest—and the ecological damage left in their wake. Petitioners' members, supporters, and staff have an interest in using and enjoying

PETITION FOR REVIEW OF AGENCY ACTION—5

the Preserve free from livestock damage, and they have actively worked with the Park Service to remove trespass cattle and to restore habitat degraded by heavy livestock grazing. They are deeply concerned with the threat posed by trespass cattle to the immediate survival and long-term conservation of the salamander, spotted owl, and jumping mouse on the Preserve. Petitioners and their members, supporters, and staff have strong interests in knowing that these species are present and recovering on the Preserve and that their habitats are adequately protected.

20.     Petitioners and their members, supporters, and staff also frequently recreate on the National Forest surrounding the Preserve, including on the Allotments where the salamander, spotted owl, and jumping mouse and their respective critical habitats are found. Petitioners have similar concerns regarding the impact of overgrazing on these species and habitats on the Allotments, and similar interests in ensuring their protection and continued existence there.

21.     Petitioners and their members, supporters, and staff have interests in the proper and lawful management of the National Forest and the Preserve. They regularly communicate with Forest Service and Park Service personnel to discuss issues affecting public lands in the Jemez Mountains. In recent years, Petitioners and their members, supporters, and staff have repeatedly contacted the Forest Service regarding livestock from the Allotments trespassing on the Preserve, degrading fragile riparian zones, and harming imperiled wildlife species. The Forest Service's decision to continue authorizing grazing along the Preserve's borders—without analyzing or meaningfully acting to prevent the consequent harms to endangered species—directly and concretely harms the interests of Petitioners and their members, supporters, and staff.

22.     The interests of Petitioners and their members, supporters, and staff have been, are being, and—unless the requested relief is granted—will continue to be injured by Respondents'

PETITION FOR REVIEW OF AGENCY ACTION—6

actions and ongoing failures to act described in this complaint. The requested relief will alleviate these harms.

23.     Respondent U.S. FOREST SERVICE is a federal agency within the U.S. Department of Agriculture entrusted with the management of our national forests. *See* 16 U.S.C. §§ 472a, 1600–1614; 36 C.F.R. § 200.3.

24.     Respondent RANDY MOORE is the Chief of the Forest Service and is charged with ensuring that the agency complies with all applicable laws. 36 C.F.R. § 200.1. Petitioners bring this action against Mr. Moore in his official capacity.

25.     Respondent SHAUN SANCHEZ is the Forest Supervisor for the Santa Fe National Forest, where the relevant decisionmaking occurred as authorized by Mr. Sanchez or his predecessors. As Forest Supervisor, Mr. Sanchez is responsible for ensuring that all Forest projects are consistent with applicable laws and regulations. 36 CFR § 200.2. Petitioners bring this action against Mr. Sanchez in his official capacity.

26.     Respondent U.S. FISH AND WILDLIFE SERVICE is a federal agency within the U.S. Department of the Interior. It is responsible for administering the ESA with respect to terrestrial species, including those at issue here. 16 U.S.C. § 1532(15); 50 C.F.R. § 402.02).

27.     Respondent MARTHA WILLIAMS is the Director of the U.S Fish and Wildlife Service and is responsible for implementing the ESA and ensuring that the FWS complies with all applicable laws. 50 C.F.R. § 1.4. Petitioners bring this action against Ms. Williams in her official capacity.

///

///

///

PETITION FOR REVIEW OF AGENCY ACTION—7

## LEGAL BACKGROUND

### The Endangered Species Act

28.     Enacted in 1973, the Endangered Species Act aims to halt and reverse imperiled species' trends toward extinction, whatever the cost—it clearly expresses congressional intent that endangered species be afforded the highest of priorities. All federal agencies must therefore place conservation of listed species above all other statutory mandates and are commanded "to [e]nsure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of [its] habitat[.]" 16 U.S.C. § 1536. This statutory language admits of no exception.

29.     The ESA is intended not just to forestall extinction, but to allow species to recover to the point where they may be delisted. Federal agencies are thus mandated to work towards recovery of protected species. 16 U.S.C. §§ 1532(3) (defining "conservation" to mean recovery of species), 1536(a)(1) (requiring agencies to work towards species' recovery).

30.     As Congress specifically recognized, this effort entails the protection of species *and their habitat*: "If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat." H.R. Rep. No. 94-887 at 3 (1976).

31.     Critical habitat includes "area[s] occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection" and unoccupied areas "essential for the conservation of the species." 16 U.S.C. § 1532(5); *see also id.* §§ 1533(a)(3)(A)(i); 1533(b)(6)(C). All federal agencies are tasked with protecting and restoring critical habitat, and this shared duty is fundamental to the ESA's overall goal of species conservation.

32.     To effectuate its purposes, the ESA imposes a series of interrelated procedural and substantive obligations on all federal agencies.

33.     To ensure compliance with the ESA's substantive mandates, each federal agency has a procedural duty to consult with the FWS before undertaking any action that "may affect" listed species or their habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The consultation requirement applies to "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies" that may directly *or indirectly* affect protected species or their habitats. 50 C.F.R. § 402.02.

34.     The ESA also explicitly incorporates a broad "but for" standard of causation: An effect is "caused by the proposed action if it would not occur *but for* the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences *occurring outside the immediate area* involved in the action." *Id.* (emphasis added).

35.     If the proposed action may adversely affect any listed species, the agency must formally consult with the FWS, which in turn must prepare a biological opinion (BiOp) analyzing the action's potential impacts to the species and its habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.12, 402.14. If the FWS determines that the proposed action will not jeopardize the species or result in adverse habitat modification, but may harm individual members of the species, the FWS will issue an incidental take statement (ITS). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The ITS specifies the allowable amount of take, recommends conservation measures, and imposes mandatory terms and conditions with which the action agency must comply.

36.     An agency's duties under the ESA do not end with the issuance of a BiOp and ITS. Rather, the agencies have a continuing obligation to ensure that the BiOp remains valid, and must

reinitiate consultation if certain triggers occur. 50 C.F.R. § 402.16. This duty falls on both the action agency and the FWS.

37.     Reconsultation is required if: (a) the amount or extent of take specified in the ITS is exceeded; (b) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; or (c) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion. 50 C.F.R. § 402.16.

38.     The agencies' procedural duty to consult—and, when necessary, to reconsult—is closely tied to a number of substantive duties under ESA Sections 7 and 9.

39.     First, Section 9 of the ESA prohibits unlicensed "take" of listed species, broadly defined to encompass harassing, harming, or killing any members of the species, including through "significant habitat modification or degradation" that impairs an animal's essential behavioral patterns. 50 C.F.R. § 17.3; *see also* 16 U.S.C. §§ 1532(19), 1538(a)(1). This prohibition extends to "incidental take," which results from but is not the purpose of an otherwise lawful activity. 50 C.F.R. § 17.3. Only by completing formal consultation with the FWS, obtaining a valid BiOp, and adhering to the terms and conditions set forth in the ITS may an agency avoid Section 9 liability for any incidental take resulting from its actions. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

40.     Second, when consultation or reconsultation is necessary, Section 7(d) bars the agency from making "any irreversible or irretrievable commitment of resources" until consultation is complete. 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09. Put simply, when reinitiation is triggered, the FWS must issue a new BiOp and ITS before project implementation may continue.

41.     Third, Section 7(a)(2) further requires each agency to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued

PETITION FOR REVIEW OF AGENCY ACTION—10

existence of any endangered or threatened species or result in the destruction or adverse modification of" its critical habitat. *Id.* § 1536(a)(2). To "jeopardize" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. In other words, agencies must avoid not only catastrophic effects, but any significant negative impacts on protected species or habitat.

42.     A species' overall health and distribution may be taken into account when evaluating the impact of an agency action: If the species is confined to a small geographic area, or nearing a threshold beyond which its continued viability is in question, even activities with modest negative impacts will jeopardize its continued existence. Such a slow slide into oblivion is one of the very ills the ESA seeks to prevent.

43.     Fulfillment of the agencies' substantive duties under ESA Sections 7 and 9 depends on full compliance with their procedural consultation duties. Crucially, an agency may not satisfy its Section 7(a)(2) duty to avoid jeopardizing a species' existence through reliance on an inaccurate BiOp, nor may it evade Section 9 liability by relying on an ITS that omits any relevant impact of the proposed action. The agencies must consult on the impact of an action before it occurs, and— just as importantly—they must reconsult on the activity and respond appropriately when new information emerges. If it fails to comply with this duty, an action agency may unwittingly cause, and be held liable for, jeopardy to the species, adverse modification of its critical habitat, and/or unlawful take of the species' individual members.

44.     Section 7(a)(1) of the ESA imposes a further substantive mandate on all federal agencies, including the Forest Service, requiring each agency to work towards the conservation of threatened and endangered species. 16 U.S.C. § 1536(a)(1). The agencies are specifically

PETITION FOR REVIEW OF AGENCY ACTION—11

commanded to use "all methods and procedures which are necessary to bring any endangered species … to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). In short, every agency must affirmatively work towards both the survival *and the recovery* of ESA-protected species.

45.     This final substantive mandate applies at all times, regardless of whether consultation is necessary or has been completed.

**Grazing Authorization on the National Forests**

46.     The Forest Service may authorize private livestock grazing on the National Forests in designated allotments pursuant to grazing permits. When the Forest Service plans to issue or renew a grazing permit that may adversely affect an ESA-protected species or its critical habitat, it first must consult with the FWS. If grazing is incompatible with the continued existence of endangered species, the Forest Service must remove livestock or work with the FWS to mitigate grazing impacts. The agencies must ensure that the analyses remain valid and accurately reflect the agency action and the conditions on the ground.

47.     Grazing permits, which are typically issued for a period of ten years, specify a maximum number of livestock that may be grazed on each allotment and set forth the basic terms and conditions under which grazing may occur.

48.     For each permit, the Forest Service develops an allotment management plan (AMP) setting forth the resource management goals and standards (e.g., vegetation stubble height, forage utilization, and riparian habitat protection) for the permit term. Compliance with the AMP is necessary to ensure compliance with applicable statutes and regulations, including those pertaining to endangered species conservation.

PETITION FOR REVIEW OF AGENCY ACTION—12

49.     The Forest Service also issues annual operating instructions (AOIs) for each allotment prior to each grazing season. Within the broader terms and conditions set by the permit, the AOI specifies, *inter alia*, the maximum number of livestock authorized for that year, which may be lower than the level set by the permit; pasture rotation schedules; and a statement concerning any required monitoring or other activities to be carried out that year. The AOI additionally notes areas of ongoing noncompliance with the permit's terms. The operating details, authorized number of livestock, and grazing rotation schedule may be modified during the season in response to permit noncompliance or changes in range conditions.

**The Administrative Procedure Act**

50.     The Administrative Procedure Act (APA) confers a right of judicial review on any person adversely affected by final agency action or failure to act. 5 U.S.C. §§ 551(13), 701–706.

51.     Under the APA, a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion . . . otherwise not in accordance with the law . . . [or] without observance of procedure required by law." *Id*. § 706(1), (2). A decision is "arbitrary and capricious" if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency.

**FACTUAL BACKGROUND**

**The Valles Caldera National Preserve**

52.     Located at the top of the Jemez Mountains in north-central New Mexico, the Valles Caldera National Preserve was established in 2000 to "protect, preserve, and restore ecosystems and cultural landscapes within an outstanding example of a volcanic caldera for the purpose of

education, scientific research, public enjoyment and use, and cultural continuity." Pub. L. No. 113-291, 128 Stat. 3292 (2014). Since the Park Service assumed management of the Preserve, it has become a popular destination for outdoor recreation; each year, tens of thousands of visitors enjoy wildlife viewing, cross-country skiing, hiking, biking, horseback riding, stargazing, hunting, fishing, and scenic viewing in this unique setting.

53.     The Preserve encompasses 88,900 acres of unique high-elevation ecosystems including wetlands, streams, montane grasslands, woodlands, tree-covered volcanic domes, and coniferous forests, all of which contrast with the more arid regions surrounding the mountain range.

54.     The Park Service describes the Preserve as an "ecosystem in recovery." Prior to the agency assuming management, private owners had intensively grazed the area, resulting in the loss of riparian habitat, degradation of streams and wetlands, and extirpation of many wildlife species.

55.     The Preserve's abundant water sources and diverse plant communities now support an equally diverse array of wildlife, including healthy populations of elk, mule deer, coyotes, bears, mountain lions, fish, and almost 200 species of birds—and, in 2023, a Mexican gray wolf, whose return marked the endangered species' first recorded presence on the Preserve in nearly a century.

56.     Multiple ESA-listed species inhabit the Preserve and the surrounding National Forest, including the endangered Jemez Mountains salamander (*Plethodon neomexicanus*), the threatened Mexican spotted owl (*Strix occidentalis lucida*), and the endangered New Mexico meadow jumping mouse (*Zapus hudsonius luteus*). The Park Service is working to maintain and restore these species' habitats, which had been degraded by many decades of logging, fire suppression, and overgrazing by livestock.

57.     While no livestock grazing is currently authorized on the Preserve, grazing *is* permitted directly along nearly all of the Preserve's boundary, on the neighboring National Forest.[1]

**Livestock Grazing on the Santa Fe National Forest**

58.     Stretching across the Jemez and Sangre de Cristo Mountains of northern New Mexico, the Santa Fe National Forest encompasses a diverse range of ecosystems and supports a host of wildlife species within its 1,545,349 acres of public land.

59.     At present, grazing may be authorized on up to 97 percent of the Forest.

60.     This widespread grazing has had profound environmental consequences. Livestock grazing adversely affects a variety of resources, including soils, plants, cultural heritage sites, water quality and quantity, invasive species prevalence, wildlife, and wildlife habitat.

61.     Grazing also degrades recreational and visual resources by damaging trails, creating large quantities of excrement, and disrupting hiking, hunting, camping, biking, fishing, and other popular activities on public lands. Cattle preferentially graze in riparian areas if not rigorously excluded, causing extensive damage to streambanks and wetlands, and are particularly detrimental to riparian obligate species such as the New Mexico meadow jumping mouse.

62.     The National Forest permits grazing along nearly all of its shared border with the Preserve. Specifically, the Preserve abuts 12 active National Forest grazing allotments: the Alamo, Del Norte, Peralta, Las Conchas, V-Double Slash, Cebolla-San Antonio, Penas Negras, Coyote, Youngsville, Mesa del Medio, and Chicoma allotments.

---

[1] The Park Service has established two smaller grazing allotments on the Preserve, but due to range and climate conditions neither has been active since 2020. These allotments and the Park Service's currently inactive grazing program are not at issue in this case.

PETITION FOR REVIEW OF AGENCY ACTION—15

63.     During the 2022 grazing season the Forest authorized a collective total of 2,197 cattle on the Allotments.



*The Preserve, surrounded by National Forest grazing allotments. Credit: U.S. Forest Service.*

64.     The Allotments are separated from the Preserve by a barbed-wire fence that is frequently in need of extensive repair or replacement. Long sections of the fence are often down for extended periods of time due to fires, fallen trees, animal damage, and/or deliberate vandalism or removal. New gaps appear every grazing season, often soon after the fence has been repaired.

65.     Large numbers of cattle from the Allotments routinely cross the damaged fence and trespass on the Preserve, causing severe resource damage in areas still recovering from past overgrazing. Each summer for the last several years, hundreds of trespass cattle have been reported

to the Forest Service and the Park Service. The livestock typically remain on the Preserve for several days, and often over a week, after they are first reported—and for unknown lengths of time before the agencies are made aware of their presence.

66.    Once on the Preserve, trespass cattle from the Allotments cause extensive damage to natural resources.

67.    The trespass livestock consistently congregate at water sources and intensively graze in riparian zones. The consequent trampling of vegetation and preferential grazing on native riparian vegetation results in degradation of the Preserve's wetlands, water quality, and riparian habitat.

68.    In addition to damaging fragile riparian areas, livestock grazing—lawful or otherwise—contributes to soil compaction, erosion, loss of native vegetation, and negative impacts to wildlife that depend on the vegetation for food and shelter. Heavy grazing alters vegetation structure, both in meadows and in the understory of forested areas. In the longer term, livestock contribute to the spread of invasive plant species to the point that riparian areas become dominated by nonnative weeds. This has significant, detrimental impacts to species that depend on native plant communities for food and shelter and, if not promptly rectified, can lead to long-term or permanent loss of these species' habitat.

69.    The damage caused by trespass cattle on the Preserve is well-documented, widespread, and ongoing—trespass has been reported to the Forest Service on multiple occasions each summer, and the agency has been aware of the issue since 2017 at the latest.

70.    Although the Park Service keeps logs of trespass reports, it acknowledges that these reports do not reflect the full extent of livestock trespass. Even so, the agency states that 50 to 200 cattle at a time have routinely been documented trespassing on the Preserve.

PETITION FOR REVIEW OF AGENCY ACTION—17

71.     In 2019, when the Park Service began logging trespass livestock reports, it recorded a minimum of 243 cattle on the Preserve, where they remained for an average of one week before removal.

72.     In 2020, the number jumped to at least 415 trespass cattle remaining on the Preserve for roughly 12 days each.

73.     In 2021, the Park Service recorded a minimum of 1,026 trespass cattle.

74.     Hundreds of trespass cattle continued to be reported throughout the 2022 grazing season, and Petitioners contacted the agencies with their growing concerns. Petitioners specifically noted the threat posed by unlawful grazing to the Preserve's threatened and endangered species. In October of that year, Petitioners notified the Forest Service, the Park Service, and FWS of their intent to bring suit under the ESA if the situation was not remedied.

75.     Throughout 2023, Petitioners met with the agencies several times in hopes of developing a solution to the trespass cattle problem and avoiding litigation.

76.     That summer the Park Service recorded a minimum of 371 trespass cattle, while Petitioners' records indicate that 970 trespass cattle were observed.

77.     The Forest Service's failure to prevent or substantively address the ongoing livestock trespass has significantly impacted multiple ESA-protected species and their habitats on the Preserve, including the Jemez Mountains salamander, the Mexican spotted owl, and the New Mexico meadow jumping mouse. All three species are present on both the Preserve and the surrounding Allotments, and all are adversely impacted by livestock grazing.





*Harmful effects of trespass livestock on the Preserve, October 26, 2023. Credit: Caldera Action.*

PETITION FOR REVIEW OF AGENCY ACTION—19

**Threatened and Endangered Species Impacted by Grazing on the National Forest**

*The Jemez Mountains Salamander*

78.     The Jemez Mountains salamander—first listed as endangered in 2013—has inhabited the Valles Caldera for as long as 1.2 million years, colonizing the area shortly after its formative volcanic eruption. The species is found only around the rim of and inside the Valles Caldera, with the Preserve falling squarely in the center of its extremely limited range.



79.   Virtually all of the salamander's critical habitat is on either the Preserve or the Allotments.

80.   Salamanders spend most of the year underground, typically only surfacing during late summer monsoon season, which coincides with the height of the Forest Service's livestock grazing season. Salamanders require cool, moist forested areas and uncompacted soils to retain their body moisture and create their burrows.



*The Jemez Mountains salamander. Credit: Chris Cirrincione, National Park Service.*

81.   One of the primary threats to the salamander is the loss, degradation, and fragmentation of its habitat. Because salamanders have small home ranges and cannot move long distances, habitat degradation and loss of connectivity can have profound population-level impacts.

82.   All occupied salamander habitat has been impacted by historic grazing practices, fire suppression, and logging. Grazing can degrade habitat through soil compaction and establishment of livestock trails, and cattle can directly harm salamanders through trampling. Livestock passage through salamander habitat, livestock wrangling, and the use of vehicles to herd or transport cattle also impact salamanders and their habitat.

PETITION FOR REVIEW OF AGENCY ACTION—21

83.    Salamander populations have declined significantly from historical levels. The largest remaining populations persist in and around the Preserve, although salamander numbers have declined there as well.

84.    Recognizing the impacts of livestock grazing on the salamander and its critical habitat, the Forest Service and FWS have previously consulted regarding the Forest Service's ongoing grazing program, as required by the ESA. In 2018, the agencies concluded that livestock grazing was "likely to adversely affect" the salamander on all of the Allotments and likely to adversely affect its critical habitat on each of the seven Allotments containing such habitat.

85.    However, in analyzing potential impacts to the salamander, the agencies limited their analysis to the effects of grazing within the Allotments. The agencies did not discuss livestock trespass outside the Allotments or any potential impacts on the adjacent Preserve.

86.    After completing consultation, the FWS relied on forage utilization levels as a proxy to define permitted levels of incidental take of salamanders. It set a specific cap on grazing intensity for each individual allotment, and another cap for collective grazing intensity across all allotments. Exceeding either limit for two or more consecutive grazing seasons would trigger reconsultation.

87.    The FWS did not, however, discuss the potential for take caused by trespass cattle on the Preserve, consider the impact of such trespass on the species as a whole, or include take resulting from trespass in the salamander ITS.

88.    Further, Forest Service records from 2018 through 2022 indicate that the take limit for the National Forest was repeatedly exceeded on multiple Allotments on the Coyote and Jemez Ranger Districts. But beyond notifying the permittees of the issue, the Forest Service has not taken

effective action to prevent further unlawful take, nor has it reinitiated consultation with the FWS regarding the impacts of the take exceedances to the endangered salamander.

*The Mexican Spotted Owl*

89.     The Preserve also contains habitat for the Mexican spotted owl. This elusive species is found in forested mountains and canyonlands throughout the Southwest, and was listed as threatened in 1993 due to extensive habitat loss and degradation caused by extractive land uses, including livestock grazing.

90.     In wooded areas, spotted owls require mature or old-growth stands with high canopy cover, large snags, and habitat components that support an adequate population of prey species, including adequate vegetative cover. Owls also forage in grasslands near riparian areas and suitable forested areas.



*The Mexican spotted owl. Credit: Don Ulrich/Los Alamos Daily Post.*

91.     Poorly managed livestock grazing in owl habitat can lead to diminished prey availability and abundance, increased susceptibility to uncharacteristic wildfire, degradation of

riparian habitat and water sources, and changed forest structure that impairs future habitat development. These conditions are most likely to affect owls that forage near grazed areas such as montane meadows and riparian corridors, and can contribute to declines in owl populations.

92.    Because the cattle grazing season typically begins just as owl young hatch, and continues until they leave the natal area, the potential threats posed by livestock occur precisely when prey availability is most critical for the owl.

93.    In recognition of these harmful effects, the FWS's spotted owl recovery plan recommends that grazing in owl habitat should be kept at a level that preserves favorable habitat characteristics and vegetation necessary to sustain prey species. Specifically, the recovery plan recommends reducing grazing intensity, shortening the grazing season, reducing the number of livestock, and/or completely excluding cattle from sensitive riparian areas.

94.    The Preserve lies directly between two of the owl's critical habitat units: SRM-NM-1, on the Cebolla-San Antonio allotment to the west, and SRM-NM-4 on a currently inactive allotment to the east. The Preserve itself contains an estimated 36,560 acres of suitable owl habitat. Although spotted owls had vanished from the Preserve for many years, recent surveys documented a pair of owls on its western boundary and FWS has provisionally established a "primary activity center"—the most stringently protected owl habitat designation—on the Preserve.

PETITION FOR REVIEW OF AGENCY ACTION—24



95. The Forest Service and FWS have informally consulted on impacts to Mexican spotted owls from grazing on the Allotments. In 2020, the FWS concurred with the Forest Service's determination that livestock grazing on the Cebolla-San Antonio allotment "may affect," but was "not likely to adversely affect," the owl or its critical habitat. However, this conclusion

relied on assumptions that grazing levels would remain at or below the levels previously analyzed and that this would help retain or increase prey species populations.

96.     Based on this informal consultation, the agencies concluded that ongoing grazing was unlikely to adversely affect spotted owls, and the agencies did not conduct formal consultation for the species. The FWS warned, however, that reconsultation could be required if new information revealed that the Forest Service's grazing program was causing unforeseen impacts or was substantially modified.

97.     The agencies' informal consultation did not address livestock trespass outside the Allotments or potential impacts to owls on the Preserve from trespass cattle.

*The New Mexico Meadow Jumping Mouse*

98.     The New Mexico meadow jumping mouse was federally listed as endangered in 2014 and is considered especially vulnerable to extinction. Livestock grazing on the species' riparian habitat poses the greatest threat to the mouse's continued existence. The species' numbers have declined drastically, and it is found on only small segments of its historical range, including on and around the Preserve.

99.     Habitat conservation is particularly important for the jumping mouse, which has exceptionally specialized habitat requirements and is highly dependent on its habitat for survival. The mouse requires both dense riparian vegetation along perennial streams, which it uses for food and shelter, and adjacent upland habitat for dispersal, day and maternal nesting, and hibernation. Habitat connectivity is crucial for mouse dispersal, gene flow, and population resilience; at least 5.6 to 15 miles of continuous suitable habitat is necessary to maintain population viability, and the species requires at least two populations within each contiguous stretch of habitat to preserve overall viability.

PETITION FOR REVIEW OF AGENCY ACTION—26

100.     Suitable mouse habitat is characterized by tall, dense riparian vegetation. The species requires native wetland vegetation at its full potential height—habitat is lost if vegetation is removed or overall stream conditions and water quality and quantity decline. Healthy, fully grown riparian vegetation is a core resource requirement for the jumping mouse, providing vital food sources as well as the structural material for building day nests that are used for shelter from predators.



*The New Mexico meadow jumping mouse. Credit: Jennifer K. Frey, U.S. Forest Service.*

101.     The jumping mouse is only active during the summer months, from approximately June through September. Rich, abundant food sources during these months are imperative for mice to accumulate the fat reserves they rely on to survive their long hibernation period.

102.     Due to the jumping mouse's brief active period, short life span, small litter sizes, low dispersal ability, and highly specialized habitat requirements, mouse populations are highly vulnerable to extirpation—i.e., local extinction—when even small areas of habitat are altered, fragmented, or eliminated. The size, number, and geographic distribution of mouse populations have declined significantly in recent decades, due in large part to grazing pressures.

PETITION FOR REVIEW OF AGENCY ACTION—27

103.    Livestock grazing has directly caused the extirpation of multiple jumping mouse populations, and grazing in or near riparian areas is incompatible with the persistence of jumping mouse populations. Even light grazing may rapidly destroy mouse habitat as cattle cause extensive trampling, soil compaction, and erosion; degrade the stream channel; and remove native vegetation.

104.    Unfortunately for the jumping mouse, livestock tend to concentrate specifically in the species' fragile riparian habitat and preferentially graze native riparian plants that the species relies on for survival. Moreover, the grazing season generally coincides with the mouse's short active season, compounding these deleterious effects.





*Examples of livestock congregating around riparian zones on the Preserve, July 18 and August 17, 2023. Credit: Caldera Action.*

105. Recognizing the outsized impact of livestock grazing on the jumping mouse, and the critical importance of habitat conservation to the species, the FWS has identified excessive grazing as the primary threat to the mouse's survival, and preventing cattle encroachment in riparian areas as the primary method for the species' conservation. In the jumping mouse recovery plan, the FWS specifically noted that measures to curtail livestock incursions on mouse habitat were needed on the Santa Fe National Forest.

106. The New Mexico meadow jumping mouse is present on both the National Forest and the Preserve, and the species has designated critical habitat on the Cebolla-San Antonio Allotment as well as primary and secondary habitat on the Preserve itself.[2] When the FWS

---

[2] "Primary habitat" describes intact areas containing the species' primary constituent habitat components that meet the FWS minimum size and connectivity requirements for viable and healthy populations. "Secondary habitat" patches are those that do not meet the FWS minimum criteria but may support jumping mouse populations.

PETITION FOR REVIEW OF AGENCY ACTION—29

designated critical habitat in 2016, the mouse population on the Preserve—one of only ten in the

Jemez Mountains—had not yet been discovered, although records indicate that the species

historically existed there.



107.    As jumping mouse populations rarely persist in grazed areas, it is notable that the

mouse returned to the Preserve only after the Park Service began managing the area for its

ecological values rather than livestock grazing.

PETITION FOR REVIEW OF AGENCY ACTION—30

108.    In 2016 and 2020, recognizing the threat grazing poses to jumping mouse populations and habitat, the Forest Service consulted with the FWS regarding impacts to the species resulting from grazing on the Cebolla-San Antonio allotment. In analyzing these impacts, the agencies did not discuss livestock trespass on the Preserve.

109.    Even without considering impacts resulting from trespass cattle on the Preserve, the agencies concluded that ongoing grazing was "likely to adversely affect" the jumping mouse and its critical habitat on the Cebolla-San Antonio allotment. The FWS therefore issued an ITS and imposed mandatory terms and conditions on grazing within this allotment.

110.    As with the salamander, the FWS limited incidental take by proxy: forage utilization must be limited to 20 percent in riparian pastures and 40 percent in upland pastures with mouse habitat. The FWS additionally limited the permissible number and extent of livestock incursions into riparian exclosures on the allotment. The ITS required the Forest Service to actively check fencing to ensure that cattle were not entering closed riparian areas. If fencing is damaged, it must be immediately repaired. The ITS further required the Forest Service to monitor and report on incidental take, fence damage and repair, and levels of forage utilization by cattle.

111.    The ITS did not account for or limit take from trespass cattle on the Preserve, nor did it impose any terms and conditions to prevent trespass.

112.    The Forest Service has surveyed occupied and potentially occupied jumping mouse habitat in the Cebolla-San Antonio allotment for several years. Since 2016, and as recently as 2023, the agency has documented heavy grazing on multiple riparian pastures, multiple damaged or nonfunctioning exclosure fences, and multiple repeated or ongoing intrusions of cattle into habitat exclosures in known jumping mouse sites. These incidents constitute exceedance of allowable take under the operative ITS. By knowledge and belief, the Forest Service has not

PETITION FOR REVIEW OF AGENCY ACTION—31

consistently maintained the exclosures or taken other adequate steps to enforce the terms of its grazing permits and comply with the ITS, nor has it consulted on the jumping mouse since 2020.

**Ongoing Forest Service ESA Violations**

113.    In light of the ongoing impacts to the salamander, spotted owl, and jumping mouse caused by livestock grazing on the Allotments, in 2022, Petitioners sent a Sixty-Day Notice of Intent to Sue for ESA violations to the Forest Service, the FWS, the Park Service, and the agencies' respective officers and supervisors. In a joint response, the Forest Service and the Park Service stated that they would continue to work cooperatively on the matter. The Park Service additionally committed to formal consultation with the FWS regarding the effects of removing and excluding livestock from the Preserve on ESA-listed species.

114.    Petitioners met with the Forest Service and the Park Service repeatedly throughout 2023 in an attempt to resolve this matter without litigation. Petitioners also repeatedly alerted the agencies to the presence of trespass cattle on the Preserve, which livestock continued to enter and remain on in significant numbers throughout the grazing season.

115.    In May 2023, the Park Service issued a biological assessment for its proposed livestock removal and exclusion operations, stating that although these activities are "likely to adversely affect" the Jemez Mountains salamander, Mexican spotted owl, and New Mexico meadow jumping mouse, removing trespass cattle from the Preserve would have overall beneficial effects. In other words, while constructing fences and wrangling cattle will harm the species, the continuing presence of trespass livestock on the Preserve inflicts even greater harms.

116.    The Park Service additionally stated that any trespass livestock the agency removed would "frequently" return to the Preserve, and that "as long as grazing continues adjacent to the [Preserve] it is unlikely that all livestock trespass will be eliminated."

PETITION FOR REVIEW OF AGENCY ACTION—32

117.     The FWS concurred with these determinations.

118.     The Park Service and FWS did not discuss or analyze the direct impacts of trespass livestock to endangered species on the Preserve because the livestock's presence is not the result of a decision or action by the Park Service. Rather, the harms caused to protected species on the Preserve are foreseeable effects of the Forest Service's authorization of grazing on the Allotments. Put simply, but for the grazing authorizations on the National Forest, there would be no livestock trespass on the Preserve, and the Park Service cannot control the Forest Service's grazing program.

119.     The Forest did not, and to date has not, committed to reinitiating consultation that would properly account for the foreseeable impacts of trespass cattle, nor has the agency otherwise upheld its ESA conservation mandate as to the salamander, spotted owl, and jumping mouse.

120.     Concerned by the Forest Service's ongoing failure to analyze, disclose, or meaningfully address the trespass cattle issue, and aware that no significant steps had been taken to prevent continued livestock incursions on the Preserve, on February 6, 2024, Petitioners again notified Respondents of their intent to sue for violations of the ESA.

121.     In response, the Forest Service stated that it was not required to take preventative action or to consult with the FWS regarding the impacts of trespass cattle because "[u]nauthorized or otherwise illegal activities are not part of the Forest Service's proposed action."

122.     The Forest Service further disavowed any responsibility for ensuring that cattle did not enter the Preserve or harm protected species there.

123.     The Forest Service has also repeatedly rejected suggestions to move the fenceline away from the Preserve boundary, construct a more permanent fence, or both—although the agency recently conceded that trespass cannot be eliminated while grazing occurs along the boundary fence.

PETITION FOR REVIEW OF AGENCY ACTION—33

124.    Trespass cattle have previously been observed within days of their arrival on the Forest, but the Forest Service has refused to delay turnout of cattle onto the Allotments until the boundary fence can be repaired or other reasonable measures taken to prevent livestock trespass.

125.    Early grazing for the 2024 season began in May and, true to form, trespass livestock from the Allotments are already present on the Preserve.



*Trespass livestock on the Preserve in the Valle San Antonio, May 29, 2024. Credit: Caldera Action.*

126.    Harm to critically endangered species resulting from the Forest Service's authorization of grazing on the Allotments is currently occurring and likely to continue throughout the 2024 grazing season. If such harm continues, it may irrevocably damage the habitat or foreclose the eventual recovery of the salamander, spotted owl, and jumping mouse.

PETITION FOR REVIEW OF AGENCY ACTION—34

127.    The Forest Service's ongoing authorization of grazing on the Allotments violates the ESA, harms protected species and habitats, causes extensive environmental damage on the Preserve, and injures Plaintiffs and their members, supporters, and staff.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF ESA SECTION 7(a): FAILURE TO REINITIATE CONSULTATION**

128.    Petitioners reallege and incorporate by reference the preceding paragraphs.

129.    The Forest Service and the FWS have jointly violated the ESA, and its implementing regulations, by failing to reinitiate consultation for the Forest Service's authorization of grazing on the Allotments. *See* 50 C.F.R. § 402.16(a).

130.    The Forest Service and FWS have previously formally consulted on the impacts of grazing to the endangered Jemez Mountains salamander, threatened Mexican spotted owl, endangered New Mexico meadow jumping mouse, and their respective critical habitats, repeatedly concluding that grazing—even within the parameters set by the permits, AMPs, and AOIs—is likely to adversely affect these protected species and, as such, the FWS has imposed certain mandatory terms and conditions on the Forest Service's grazing program to prevent jeopardy.

131.    Based on knowledge and belief, none of the completed consultations for grazing on the Allotments discussed potential impacts to protected species or their habitats resulting from trespass cattle on the Preserve.

132.    Additionally, both the Forest Service and the FWS have a continuing duty to ensure that a BiOp and ITS remain valid. To that end, the agencies must reinitiate consultation on an action's impact to ESA-listed species and their habitats if: (a) take exceeds permitted levels; (b) new information reveals unanticipated impacts; or (c) the action is subsequently modified. 50 C.F.R. § 402.16.

133.    The ESA leaves no room for discretion—reinitiation is mandatory when any of these criteria are met. *Id.*

134.    Grazing on the Allotments has triggered reconsultation under all three provisions of 50 C.F.R. § 402.16.

135.    First, the Forest Service is aware that it has exceeded the levels of take permitted for the salamander and jumping mouse on at least two of the relevant Allotments.

136.    The Jemez Mountains salamander BiOp and ITS define and cap allowable take with reference to forage utilization in salamander habitat. If forage utilization exceeds the "very light" grazing levels allowed by the ITS, take of salamanders is assumed to occur.

137.    The ITS limited forage utilization to "light to moderate use" averaged across all allotments which contain critical habitat or are considered high probability occupancy areas for any one year, or "moderate use" within any one allotment for two or more consecutive grazing seasons. If these levels of use are exceeded, the agencies must reinitiate consultation.

138.    The Forest Service acknowledged in 2022 that forage utilization on the Coyote, Mesa del Medio, and Youngsville Allotments had exceeded the levels set by the ITS "for 2 or more consecutive years." Yet, the Forest Service neither reinitiated consultation with the FWS nor took action to prevent further exceedance of the take permitted by the ITS.

139.    By information and belief, these violations have not been remedied, and thus livestock grazing on the Coyote, Mesa del Medio, and Youngsville allotments has caused and continues to cause unlawful take of Jemez Mountains salamanders.

140.    Similarly, take of New Mexico meadow jumping mice is tied to forage utilization and livestock incursions into occupied habitat. The authorized level of take is exceeded, and reinitiation of consultation required, if more than two livestock incursions per year occur in any

exclosure protecting occupied mouse habitat or if more than light grazing occurs in any riparian areas. The Forest Service's records indicate that this level of take has been exceeded in multiple areas of the Cebolla-San Antonio allotment: Riparian areas in jumping mouse habitat have been heavily grazed, and cattle have been routinely documented grazing within certain habitat exclosures.

141.    These incidents constitute an exceedance of permissible take of jumping mice, yet the Forest Service has failed to take appropriate enforcement action or reinitiate consultation with the FWS.

142.    In addition to exceeding the level of permitted take of salamanders and jumping mice on the Forest, authorization of grazing on the Allotments has adversely affected listed species on the Preserve, as trespass cattle routinely congregate and graze in salamander, owl, and jumping mouse habitat there. These impacts are a reasonably foreseeable effect of the Forest Service's grazing authorizations.

143.    Both the Forest Service and the FWS have been aware of the ongoing cattle trespass for several years—yet the recurring presence of trespass cattle from the Allotments, and the well-documented harm caused by their incursions, have never been included in the agencies' consultations.

144.    The recurring livestock trespass and its significant negative impact constitute new information revealing effects greater than, and different from, those previously considered in consultation. *See* 50 C.F.R. § 402.16(a)(2). Not only are trespass cattle impacting a larger, and very different, area than assumed in prior consultation, they are able to do so without the exclosures, monitoring, or restrictions on length and intensity of grazing in place on the Allotments. This new information obligates Respondents to reinitiate consultation. *See id.*

PETITION FOR REVIEW OF AGENCY ACTION—37

145.    Finally, the consistent presence of trespass cattle on the Preserve constitutes a substantial change in the grazing program as authorized and discussed in prior consultation. *See* 50 C.F.R. § 402.16(a)(3). The agencies proposed, analyzed, and authorized the presence of livestock within demarcated allotment boundaries, in limited numbers, subject to monitoring and rotation, and excluded from ecologically sensitive areas. The consistent presence of these same livestock *outside* the Allotments, on the Preserve—an ecologically and legally distinct area where the cattle are not monitored, subject to time and number restrictions, or excluded from sensitive areas—is a substantially different action, with significantly different impacts, than the activities contemplated in prior consultations. Despite the Forest Service's knowledge of the problem, it has refused to reinitiate consultation with FWS regarding these distinct impacts of the Forest's grazing program. The grazing program as implemented is thus substantially different than the grazing program as analyzed in prior consultation, and this *de facto* change in agency action compels reconsultation. *See id*.

146.    Because the BiOps and associated ITSs are no longer valid, the agencies must reinitiate formal consultation on the impacts of grazing to the Jemez Mountains salamander, Mexican spotted owl, and New Mexico meadow jumping mouse. By failing to do so, both agencies are in continuing violation of ESA Section 7.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF ESA SECTION 9: UNLAWFUL TAKE**
**OF THREATENED AND ENDANGERED SPECIES**

147.    Petitioners reallege and incorporate by reference the preceding paragraphs.

148.    The Forest Service has violated the ESA and its implementing regulations through unlawful take of threatened and endangered species resulting from the agency's reauthorization of

grazing on the Allotments without a valid BiOp and ITS. *See* 16 U.S.C. §§ 1532(19), 1538(a)(1); 50 C.F.R. § 17.3.

149.    Under ESA Section 9, a federal agency may not take or cause any take of an endangered or threatened species unless the agency has obtained and complied with the provisions of an ITS. *See* 16 § 1536(2)(B)(3), (4); 50 C.F.R. § 402.14(g)(7). If the agency fails to implement the mandatory terms and conditions set forth in the ITS, it is subject to Section 9 liability.

150.    Similarly, if an agency must reconsult on an action pursuant to 50 C.F.R. § 402.16(a), the agency loses its shield against Section 9 liability until a valid ITS has issued. If the agency continues to implement the action without a valid ITS, any incidental take that results is unlawful.

151.    By continuing to authorize grazing on the Allotments without re-consultation, the Forest Service has caused, and continues to cause, unlawful take of salamanders, spotted owls, and jumping mice on the Allotments and the Preserve.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF ESA SECTION 7(d): IRREVERSIBLE AND IRRETRIEVABLE COMMITMENT OF RESOURCES

152.    Petitioners reallege and incorporate by reference the preceding paragraphs.

153.    The Forest Service has violated Section 7(d) of the ESA by making an irreversible or irretrievable commitment of resources before completing formal consultation with the FWS. *See* 16 U.S.C. § 1536(d).

154.    If an agency action may adversely affect a listed species or its habitat, the agency may not take any step that irreversibly or irretrievably commits resources to the activity until it has completed formal consultation and the FWS has either determined that the action will not jeopardize the species or formulated a reasonable and prudent alternative that would not create

PETITION FOR REVIEW OF AGENCY ACTION—39

jeopardy. Only once a valid BiOp has been issued may the action agency make an irreversible commitment of resources to the action in question.

155.    As detailed above, the BiOps on which the Forest Service has relied to authorize grazing on the Allotments are invalid. The agency is thus barred from making any irreversible or irretrievable commitment of resources—from authorizing livestock grazing—until reconsultation has been completed.

156.    Issuance of an AOI, which authorizes a specific number of cattle to graze an allotment and defines the parameters under which they may do so, constitutes an irreversible and irretrievable commitment of resources. As described above, livestock grazing can rapidly degrade or destroy sensitive habitat in a number of ways; in particular, it poses an immediate threat to New Mexico meadow jumping mouse populations, which can be extirpated by even limited grazing.

157.    By issuing AOIs for the Allotments without completing reconsultation, the Forest Service has violated its duty under ESA Section 7(d) to avoid irreversible commitment of resources until consultation is complete.

158.    The Forest Service may not lawfully authorize grazing on the Allotments until it has completed reconsultation and the FWS has either concluded that the grazing will not jeopardize any of the species at issue or proposed a reasonable alternative that will not cause jeopardy.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF ESA SECTION 7(a)(2): FAILURE TO PREVENT JEOPARDY TO THREATENED AND ENDANGERED SPECIES

159.    Petitioners reallege and incorporate by reference the preceding paragraphs.

160.     The Forest Service has violated its duty to ensure that its actions do not jeopardize the continuing existence of the endangered Jemez Mountains salamander, threatened Mexican spotted owl, and endangered New Mexico meadow jumping mouse. *See* 16 U.S.C. § 1536(a)(2).

PETITION FOR REVIEW OF AGENCY ACTION—40

161.     The Forest Service is obligated to ensure that any action it undertakes or authorizes will not jeopardize the survival and recovery of endangered and threatened species. 16 U.S.C. § 1536(a)(2) (commanding agencies to avoid actions jeopardizing species or habitat). The agency cannot satisfy this strict duty through reliance on an inaccurate or outdated BiOp and ITS.

162.     Because the Forest Service's past consultations with the FWS did not consider the foreseeable impacts of trespass cattle on threatened and endangered species on the Preserve, the agency cannot rely on the existing BiOps. Grazing authorized by the Forest Service has also repeatedly caused take on the Allotments themselves in excess of the levels authorized by the relevant ITSs. The Forest Service thus cannot ensure that its authorization of grazing on the Allotments and the attendant harms to the salamander, owl, and mouse—both on the Allotments and on the Preserve—is not jeopardizing the continued existence of these protected species.

163.     The Forest Service has thus violated its substantive duties under ESA Section 7(a)(2) to ensure that its actions do not jeopardize the continued existence and eventual recovery of these protected species. 16 U.S.C. § 1536(a)(2).

164.     Until it has rectified these violations and fully complied with the ESA, the Forest Service cannot lawfully authorize grazing on the Allotments.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF ESA SECTION 7(a)(1): FAILURE TO**
**CONSERVE THREATENED AND ENDANGERED SPECIES**

165.     Petitioners reallege and incorporate by reference the preceding paragraphs.

166.      The Forest Service has violated its affirmative duty to "conserve" ESA-listed species by failing to prevent widespread and well-documented harm from trespass livestock to the endangered Jemez Mountains salamander, threatened Mexican spotted owl, and endangered New Mexico meadow jumping mouse. *See* 16 U.S.C. § 1536(a)(1).

PETITION FOR REVIEW OF AGENCY ACTION—41

167.    As a federal agency, the Forest Service has an affirmative duty to "conserve" threatened and endangered species, which means taking proper steps to preserve and increase such species' continuing viability. This is not an abstract or generalized duty; instead, the plain language of the ESA requires the Forest to take *whatever actions are required* to ensure the survival and recovery of each listed species. 16 U.S.C. §§ 1532(3) (defining conservation to include recovery), 1536(a)(1) (agencies have affirmative duty to work towards conservation of species). The ESA does not mandate specific actions, but taking insignificant measures cannot satisfy an agency's obligations under Section 7(a)(1).

168.    Here, the Forest has long been aware that livestock it has authorized to graze on the Allotments routinely trespass on the Preserve and cause extensive and significant resource damage, including harm to protected species in the area. Two federal agencies have concluded that even the act of *removing* trespass cattle is likely to adversely affect such species, although to a lesser extent than allowing livestock to remain on the Preserve does.

169.    Preventing future damage that would be caused by continued, unmodified grazing on the Allotments does not satisfy the Forest Service's duty to conserve the salamander, owl, and mouse. *See* 16 U.S.C. § 1536(a)(1). The Forest Service must take further, affirmative steps to repair the harms already caused by its unlawful grazing authorizations or otherwise enhance the species' viability—it is not enough that the agency stop digging itself a hole, it must also climb back out of it.

170.    By failing to take the actions necessary to ensure the survival and recovery of the salamander, spotted owl, and jumping mouse, the Forest Service has violated its substantive duty under ESA Section 7(a)(1).

171.    Until it has rectified these violations and fully complied with the ESA, the Forest Service cannot lawfully authorize grazing on the Allotments.

## **REQUESTED RELIEF**

WHEREFORE, Petitioners respectfully request that this Court:

A.    Declare that the U.S. Fish and Wildlife has violated and continues to violate the ESA by failing to reinitiate consultation for grazing on the Allotments;

B.    Declare that the U.S. Forest Service has violated and continues to violate the ESA by failing to reinitiate consultation for grazing on the Allotments;

C.    Declare that the U.S. Forest Service has violated the ESA by causing unlawful take of threatened and endangered species;

D.    Declare that the U.S. Forest Service has violated and continues to violate the ESA by failing to ensure that its actions do not jeopardize the continued existence of such species;

E.    Declare that the U.S. Forest Service has violated and continues to violate the ESA by irreversibly and irretrievably committing resources prior to completing reconsultation for grazing on the Allotments;

F.    Declare that the U.S. Forest Service has violated and continues to violate the ESA by failing to take necessary steps to conserve threatened and endangered species;

G.    Vacate and set aside any existing AOIs for the Allotments;

H.    Enjoin the U.S. Forest Service from authorizing grazing on the Allotments until the agency rectifies the violations described above and demonstrates full compliance with the ESA;

I.    Enter such other declaratory relief and temporary, preliminary, or permanent injunctive relief as may be requested by Petitioners;

PETITION FOR REVIEW OF AGENCY ACTION—43

J.      Award Petitioners their reasonable attorney fees, costs, and litigation expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable provision of law; and

K.      Grant Petitioners such additional relief as this Court deems just and proper to remedy the violations of law alleged herein and to protect the interests of Petitioners, the public, threatened and endangered species, and the public lands at issue.

DATED this 4th day of June 2024.


Respectfully submitted,

s/ Tim Davis
Tim Davis, Bar No. 19-204
WILDEARTH GUARDIANS
301 N. Guadalupe St., Ste. 201
Santa Fe, NM 87501
205-913-6425 | tdavis@wildearthguardians.org

PETITION FOR REVIEW OF AGENCY ACTION—44