UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
SANTA FE DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, a New Mexico nonprofit corporation; WESTERN WATERSHEDS PROJECT, an Idaho nonprofit corporation; and CALDERA ACTION, a New Mexico nonprofit corporation, <br><br> Petitioners, <br><br> v. <br><br> The UNITED STATES FOREST SERVICE, a federal agency; the UNITED STATES FISH AND WILDLIFE SERVICE; a federal agency, RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service; SHAUN SANCHEZ, in his official capacity as Supervisor of the Santa Fe National Forest; and MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife Service, <br><br> Respondents. | Case No. 1:24-cv-00557-LF-KK <br><br><br> FIRST AMENDED PETITION FOR REVIEW OF AGENCY ACTION |

## INTRODUCTION

1.      Petitioners WildEarth Guardians, Western Watersheds Project, and Caldera Action challenge federal Respondents' failure to comply with the Endangered Species Act (ESA), 16 U.S.C. §§ 1531–44, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, with respect to the Santa Fe National Forest's (the Forest or National Forest) livestock grazing program and its well-documented adverse effects on the neighboring Valles Caldera National Preserve (the Preserve) and the threatened and endangered species therein.

2.      The Preserve's diverse landscape—encompassing high-elevation meadows, forested volcanic domes, and lush riparian areas—supports an equally diverse range of wildlife, including the endangered Jemez Mountains salamander, threatened Mexican spotted owl, and endangered New Mexico meadow jumping mouse. Historic livestock overgrazing degraded these species' habitats, and only since the National Park Service (the Park Service) assumed responsibility for the area and curtailed livestock use have these species returned to the Preserve.

3.      Each summer, hundreds of cattle from the National Forest unlawfully trespass onto the Preserve (trespass cattle or trespass livestock), causing severe resource damage and harming these protected species and their habitats.

4.      The U.S. Forest Service (the Forest Service) has long been aware of the ongoing livestock trespass and its substantial impacts on both the Preserve and the listed species that inhabit it, yet it has never consulted with the U.S. Fish and Wildlife Service (the FWS) regarding these well-known effects of its grazing program, as required by the ESA. Nor has the Forest Service taken adequate measures to prevent this recurring and foreseeable livestock trespass. The Forest Service has, however, continued to authorize grazing on the allotments abutting the Preserve boundary (the Allotments)—despite the resulting harm to protected species.

5.      The Allotments themselves are also home to several ESA-listed species and their respective critical habitats. And the Allotments, too, have been subjected to historic and current overgrazing, which continues to adversely impact these species and their habitats.

6.      By continuing to issue annual grazing authorizations for the Allotments, the Forest Service has violated its duties under the ESA to (1) fully consult with the FWS regarding the impacts of its grazing program on protected species; (2) reinitiate consultation with the FWS regarding such impacts; (3) avoid unauthorized take of such species; (4) ensure that its actions do not jeopardize the survival of such species; and (5) take affirmative, effective steps to conserve and recover such species.

7.      Because the duty to reinitiate consultation falls equally on the FWS, it has likewise violated the ESA by failing to fully consult or reconsult with the Forest Service regarding grazing on the Allotments and the well-documented adverse impacts of that grazing to protected species within the Allotments and on the Preserve.

8.      Petitioners seek declaratory and injunctive relief to redress their injuries caused by these ESA violations and to prevent further irreparable harm to the Jemez Mountains salamander, Mexican spotted owl, and New Mexico meadow jumping mouse and their respective habitats.

9.      Petitioners respectfully request that this Court (1) vacate the biological opinions covering grazing on the Allotments; (2) declare that the Forest Service and FWS have violated the ESA by failing to reinitiate consultation for grazing on the Allotments; (3) declare that the Forest Service has further violated the ESA by causing unlawful take of threatened and endangered species, failing to ensure that its actions do not jeopardize such species, and failing to take necessary steps to conserve such species; (4) vacate any existing annual operating instructions for the Allotments; (5) enjoin the Forest Service from authorizing grazing on the Allotments until the

FIRST AMENDED PETITION FOR REVIEW OF AGENCY ACTION—2

agency fully complies with the ESA; and (6) grant such other equitable relief as may be necessary to redress Petitioners' injuries.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 16 U.S.C. § 1540, 28 U.S.C. § 1331, and 28 U.S.C. § 1346. The requested declaratory and injunctive relief is proper under 28 U.S.C. §§ 2201 and 2202. The challenged agency actions and failures to act are subject to this Court's review under 5 U.S.C. §§ 701, 702, 704, and 706. Respondents have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the National Forest and the Preserve—where a substantial part of the events giving rise to this petition occurred—are located in this District, and all Parties maintain offices in this District.

12.    As required by the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(2)(C), Petitioners sent notices of their intent to sue for the violations described here on October 19, 2022, February 6, 2024, and August 15, 2024. More than 60 days have passed since Respondents received these notices, and the violations have not been remedied.

## PARTIES

13.    Petitioner WILDEARTH GUARDIANS is a nonprofit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians has over 65,000 members and supporters across the western states, including many who live, work, and recreate in New Mexico, where Guardians maintains its headquarters in Santa Fe. For over 30 years, Guardians has worked to protect and recover imperiled species, including the Jemez Mountains salamander, Mexican spotted owl, and New Mexico meadow jumping mouse.

FIRST AMENDED PETITION FOR REVIEW OF AGENCY ACTION—3

14.     As an organization and on behalf of its members and supporters, Guardians seeks to protect and restore wildlife and wild places throughout the West, including on the Preserve and the surrounding Forest. It has long engaged with the Forest Service and Park Service regarding the harms to endangered species and their habitats caused by livestock grazing on the Allotments and trespassing on the Preserve. Guardians and its members, supporters, and staff have interests in ensuring rigorous adherence to federal laws intended to protect public lands, endangered species, and critical habitat on and around the Preserve.

15.     Petitioner WESTERN WATERSHEDS PROJECT is a nonprofit conservation organization founded in 1993 with the mission of protecting and restoring western watersheds and wildlife through education, public policy initiatives, and litigation. Headquartered in Hailey, Idaho, Western Watersheds Project has over 14,000 members and supporters and works in 11 states across the West, including New Mexico. It has long engaged with the Forest Service and Park Service regarding the continuing harms trespass cattle have caused to endangered species and their habitats on the Preserve as well as the harm grazing on the Allotments causes to the endangered species and their habitats therein. Western Watersheds Project and its members, supporters, and staff have interests in ensuring rigorous adherence to federal laws intended to protect public lands, endangered species, and critical habitat on and around the Preserve.

16.     Petitioner CALDERA ACTION is the only nonprofit organization focused specifically on the public lands of the Jemez Mountains, with a special emphasis on protection of the Preserve. Formed in 2007, Caldera Action advocates for sustainable, preservation-oriented management of the Preserve and works to foster active citizen participation in the restoration, conservation, and public appreciation of the area. Caldera Action has roughly 400 members and supporters, most of whom live, work, and recreate in the Jemez Mountains and nearby Santa Fe,

New Mexico, where the organization is headquartered. It has long engaged with the Forest Service and Park Service regarding the harms to endangered species and their habitats caused by cattle grazing on the Allotments and trespassing on the Preserve. Caldera Action and its members, supporters, and staff have interests in ensuring rigorous adherence to federal laws intended to protect public lands, endangered species, and critical habitat on and around the Preserve.

17.    Petitioners' members, supporters, and staff regularly visit and enjoy the Forest and the Preserve and have concrete plans to continue doing so for the foreseeable future. They intend to return to the Preserve this spring, as they have done in previous years.

18.    Many of Petitioners' members, supporters, and staff live or grew up in and around the Jemez Mountains. They have deep ties to the Preserve, where they hike, bike, ride horses, observe wildlife, hunt, camp, fish, practice nature photography, conduct research, or simply enjoy spending time with friends and family. Petitioners' members, supporters, and staff derive aesthetic, recreational, scientific, educational, and other benefits from their activities on the Preserve, and from working to protect the area and educate the public about its unique ecological values.

19.    Petitioners' members, supporters, and staff enjoy observing, attempting to observe, and studying threatened and endangered species like the Jemez Mountains salamander, the Mexican spotted owl, and the New Mexico meadow jumping mouse, all of which are found on the Preserve and the surrounding National Forest. Their appreciation of the area is enhanced by knowing that it is a refuge for multiple threatened and endangered species, and the opportunity to view such species is of significant value to Petitioners' members, supporters, and staff.

20.    While recreating on the Preserve, Petitioners' members, supporters, and staff have frequently encountered trespass cattle from the National Forest—and the ecological damage left in their wake. Petitioners' members, supporters, and staff have an interest in using and enjoying

the Preserve free from livestock damage, and they have actively worked with the Forest Service and Park Service to remove trespass cattle and to restore habitat degraded by heavy livestock grazing. They are deeply concerned with the threat posed by trespass cattle to the immediate survival and long-term conservation of the salamander, spotted owl, and jumping mouse on the Preserve. Petitioners and their members, supporters, and staff have strong interests in knowing that these species are present and recovering on the Preserve and that their habitats are adequately protected.

21.    Petitioners and their members, supporters, and staff also frequently recreate on the National Forest surrounding the Preserve, including on the Allotments where the salamander, spotted owl, and jumping mouse and their respective critical habitats are found. Petitioners have similar concerns regarding the impact of overgrazing on these species and habitats on the Allotments, and similar interests in ensuring the protection and continued existence of imperiled species there.

22.    Petitioners and their members, supporters, and staff have interests in the proper and lawful management of the National Forest and the Preserve. They regularly communicate with Forest Service and Park Service personnel to discuss issues affecting public lands in the Jemez Mountains. In recent years, Petitioners and their members, supporters, and staff have repeatedly contacted the Forest Service regarding livestock from the Allotments trespassing on the Preserve, degrading fragile riparian zones, and harming imperiled wildlife species. The Forest Service's decision to continue authorizing grazing along the Preserve's borders—without analyzing or meaningfully acting to prevent the consequent harms to endangered species—directly and concretely harms the interests of Petitioners and their members, supporters, and staff.

23.    The interests of Petitioners and their members, supporters, and staff have been, are being, and—unless the requested relief is granted—will continue to be injured by Respondents' actions and ongoing failures to act described in this complaint. The requested relief will alleviate these harms.

24.    Respondent U.S. FOREST SERVICE is a federal agency within the U.S. Department of Agriculture entrusted with the management of our national forests. *See* 16 U.S.C. §§ 472a, 1600–1614; 36 C.F.R. § 200.3.

25.    Respondent RANDY MOORE is the Chief of the Forest Service and is charged with ensuring that the agency complies with all applicable laws. 36 C.F.R. § 200.1. Petitioners bring this action against Mr. Moore in his official capacity.

26.    Respondent SHAUN SANCHEZ is the Forest Supervisor for the Santa Fe National Forest, where the relevant decisionmaking occurred as authorized by Mr. Sanchez or his predecessors. As Forest Supervisor, Mr. Sanchez is responsible for ensuring that all Forest projects are consistent with applicable laws and regulations. 36 CFR § 200.2. Petitioners bring this action against Mr. Sanchez in his official capacity.

27.    Respondent U.S. FISH AND WILDLIFE SERVICE is a federal agency within the U.S. Department of the Interior. It is responsible for administering the ESA with respect to terrestrial species, including those at issue here. 16 U.S.C. § 1532(15); 50 C.F.R. § 402.02).

28.    Respondent MARTHA WILLIAMS is the Director of the U.S Fish and Wildlife Service and is responsible for implementing the ESA as to terrestrial species and ensuring that the FWS complies with all applicable laws. 50 C.F.R. § 1.4. Petitioners bring this action against Ms. Williams in her official capacity.

## LEGAL BACKGROUND

I.    **The Endangered Species Act**

29.    Enacted in 1973, the Endangered Species Act aims to halt and reverse species' trends toward extinction, whatever the cost—it expresses clear congressional intent that endangered species be afforded the highest of priorities. All federal agencies must therefore place conservation of listed species above all other statutory mandates and are commanded "to [e]nsure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of [its] habitat[.]" 16 U.S.C. § 1536. This statutory language admits of no exception.

30.    The ESA is intended not just to forestall extinction, but to allow species to recover to the point where they may be delisted. Federal agencies are thus mandated to work towards recovery of protected species. *Id.* §§ 1532(3) (defining "conservation" to mean recovery of species), 1536(a)(1).

31.    As Congress specifically recognized, this effort entails the protection of species *and their habitat*: "If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat." H.R. Rep. No. 94-887 at 3 (1976).

32.    Critical habitat includes "area[s] occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection" and unoccupied areas "essential for the conservation of the species." 16 U.S.C. § 1532(5); *see also id.* §§ 1533(a)(3)(A)(i); 1533(b)(6)(C). All federal agencies are tasked with protecting and restoring critical habitat, and this shared duty is fundamental to the ESA's overall goal of species conservation.

33.     To effectuate its purposes, the ESA imposes a series of interrelated procedural and substantive obligations on all federal agencies.

34.     Section 7(a)(2) imposes a procedural duty on federal action agencies to consult with the FWS before undertaking any action that "may affect" listed species or their habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The consultation requirement applies to "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies" that may directly *or indirectly* affect protected species or their habitats. 50 C.F.R. § 402.02.

35.     The ESA also explicitly incorporates a broad "but for" standard of causation: An effect is "caused by the proposed action if it would not occur *but for* the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences *occurring outside the immediate area* involved in the action." *Id.* (emphasis added).

36.     If the proposed action may adversely affect any listed species, the agency must formally consult with the FWS, which in turn must prepare a biological opinion (BiOp) analyzing the action's potential impacts to the species and its habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.12, 402.14.

37.     The BiOp must consider all potential direct and indirect effects of the action, and determine whether the proposed action is likely to jeopardize the species or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(c)(1), (g), (h).

38.     The FWS may not base this analysis on speculation or surmise; instead, it must use the "best scientific and commercial data available" to assess potential impacts to protected species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

39.     If the FWS determines that the proposed action will not jeopardize the species or result in adverse habitat modification, but may harm individual members of the species, the FWS will issue an incidental take statement (ITS). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

40.     "Take" is broadly defined to encompass harassing, harming, or killing any members of the species, including through "significant habitat modification or degradation" that impairs an animal's essential behavioral patterns. 50 C.F.R. § 17.3; *see also* 16 U.S.C. §§ 1532(19), 1538(a)(1).

41.     "Incidental take" results from, but is not the purpose of, an otherwise lawful activity. 50 C.F.R. § 17.3.

42.     The ITS specifies the allowable amount of take, recommends conservation measures, and imposes mandatory terms and conditions with which the action agency must comply. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

43.     Authorized take is generally expressed as a specific number of individual animals, but if such a numerical measure is impractical, the FWS may instead use a "proxy" such as the allowable extent of habitat disturbance resulting from the proposed action. Crucially, the chosen proxy must mirror reality: It must "reasonably ensure" accurate results. *See* 50 C.F.R. § 402.14(i)(1)(i).

44.     Only after consultation is complete and a valid BiOp and ITS have issued may the proposed action be implemented.

45.     Further, the agencies have a continuing obligation to ensure that a completed BiOp remains valid throughout the life of a project, and must reinitiate consultation if certain triggers occur. 50 C.F.R. § 402.16. This duty falls on both the action agency and the FWS.

46.     Reconsultation is required if: (a) the amount or extent of take specified in the ITS is exceeded; (b) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; or (c) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion. 50 C.F.R. § 402.16.

47.     The agencies' procedural duty to consult—and, when necessary, to reconsult—is strictly construed, as it is necessary to effectuate several substantive duties under ESA Sections 7 and 9.

48.     In addition to imposing procedural duties, Section 7(a)(2) requires each agency to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" its critical habitat. *Id.* § 1536(a)(2). Only by completing and adhering to a valid BiOp and ITS can the agency meet this substantive mandate—if the agencies do not know what an action's full impacts will be, they cannot ensure that the action will not jeopardize the affected species.

49.     A species' overall health and distribution must be taken into account when evaluating the impact of an agency action: If the species is confined to a small geographic area, or nearing a threshold beyond which its continued survival or future recovery is in question, even activities with modest negative impacts will jeopardize its continued existence. Such a slow slide into oblivion is one of the ills the ESA seeks to prevent. Thus, to prevent jeopardy, agencies must avoid not only catastrophic effects, but any significant negative impacts on protected species or habitat. *See* 50 C.F.R. § 402.02 (defining "jeopardize" to include actions likely to "reduce appreciably the likelihood" of a species' recovery).

50.     When consultation or reconsultation is necessary, Section 7(d) bars the agency from making "any irreversible or irretrievable commitment of resources" until consultation is complete. 16 U.S.C. § 1536(d); 50 C.F.R. § 402.09. Put simply, when reinitiation is triggered, the FWS must issue a new BiOp and ITS before project implementation may continue.

51.     Section 9 of the ESA prohibits unlicensed "take" of listed species. Only by completing formal consultation with the FWS, obtaining a valid BiOp, and adhering to the terms and conditions set forth in the ITS may an agency avoid Section 9 liability for any incidental take resulting from its actions. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

52.     Finally, Section 7(a)(1) requires all federal agencies to use their authorities in pursuit of the recovery of listed species. 16 U.S.C. § 1536(a)(1). This recovery mandate takes precedence over the primary mission of federal action agencies. Agencies are specifically commanded to use "all methods and procedures which are necessary" to achieve species' recovery. *Id.* § 1532(3). An agency must take effective measures to recover listed species and their habitat— insignificant or ineffective conservation actions are not enough.

53.     Fulfillment of the agencies' substantive duties under ESA Section 7 and 9 fundamentally depend upon full compliance with their procedural consultation duties, in addition to the other critical substantive duties. Crucially, an agency may not satisfy its Section 7(a)(2) duty to avoid jeopardizing a species' existence through reliance on an inaccurate BiOp, nor may it evade Section 9 liability by relying on an ITS that omits any relevant impact of the proposed action. The agencies must consult on the impact of an action before it occurs, *and* they must reconsult on the activity and respond appropriately when new information emerges. *See* 50 C.F.R. § 402.16. If the agency fails to comply with this duty, it may unwittingly cause, and be held liable for, jeopardy to

the species, adverse modification of its critical habitat, and/or unlawful take of the species' individual members.

## II.    The Administrative Procedure Act and Scope of Review

54.    The Administrative Procedure Act (APA) confers a right of judicial review to any person adversely affected by final agency action or failure to act. 5 U.S.C. §§ 551(13), 701–706. Under the APA, a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed," *id*. § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions found to be [] arbitrary, capricious, an abuse of discretion . . . otherwise not in accordance with the law . . . [or] without observance of procedure required by law." *Id*. § 706(2).

55.    A decision is arbitrary and capricious if the agency has relied on factors which congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency.

56.    The APA defines the *standard* of review but not necessarily the *scope* of review for claims brought under the ESA.

57.    Claims challenging the validity of a BiOp are governed by the APA. When a court reviews a discrete agency decision to determine whether it was "in accordance with law," that review is typically limited to the information before the agency during its decisionmaking process, and the agency's decision must be supported by substantial record evidence. *Id.* § 706(2).

58.    Claims arising under the ESA's citizen suit provision and based upon events occurring in the aftermath of agency decisions, on the other hand, are not limited by the APA scope of review; in these latter cases, a reviewing court often must look beyond the formal administrative record. If an agency has unlawfully withheld action, there is no defined administrative record, because there is generally no single moment at which the agency made an unlawful decision. *See id*. § 706(1).

59.     To determine whether reinitiation of consultation under ESA Section 7 is required due to take beyond the ITS limit, new information, and/or a modification of the agency action, the court must necessarily consider evidence that came into existence after the agency first consulted on the action in question. *See* 50 C.F.R. § 402.16. A challenge to the agency's failure to reconsult is, therefore, not strictly constrained to a formal administrative record.

60.     Similarly, claims brought under ESA Section 9 generally cannot be reviewed properly without materials beyond the formal record. Take necessarily occurs *after* an agency action, and any evidence thereof will likewise come into existence only after the relevant decisionmaking record has closed.

61.     Any evidence Petitioners develop or discover to prove that the agencies have unlawfully withheld action mandated by the ESA, or that unlawful take has occurred on the Preserve and the Allotments, is properly within the scope of this Court's review.

### III.    Grazing Authorization on the National Forests

62.     The Forest Service may authorize private livestock grazing on the National Forests in designated allotments pursuant to grazing permits.

63.     Grazing permits, which are typically issued for a period of ten years, specify a maximum number of livestock that may be grazed on each allotment each year and set forth the basic terms and conditions under which grazing may occur.

64.     The Forest Service also issues annual operating instructions (AOIs) for each allotment prior to each grazing season. The AOI specifies, inter alia, the maximum number of livestock authorized for that year, which may be lower than the level set by the permit; pasture rotation schedules; maximum grazing intensities; and any required monitoring or other activities to be carried out that year. The AOI may also note areas of noncompliance with the permit's terms.

## FACTUAL BACKGROUND

### I.    The Valles Caldera National Preserve

65.    Located at the top of the Jemez Mountains in north-central New Mexico, the Valles Caldera National Preserve was established in 2000 to "protect, preserve, and restore ecosystems and cultural landscapes within an outstanding example of a volcanic caldera for the purpose of education, scientific research, public enjoyment and use, and cultural continuity." Pub. L. No. 113-291, 128 Stat. 3292 (2014). Since the Park Service assumed management of the Preserve, it has become a popular destination for outdoor recreation; each year, tens of thousands of visitors enjoy wildlife viewing, cross-country skiing, hiking, biking, horseback riding, stargazing, hunting, fishing, and scenic viewing in this unique setting.

66.    The Preserve encompasses 88,900 acres of unique high-elevation ecosystems including wetlands, streams, montane grasslands, tree-covered volcanic domes, and coniferous forests, all of which contrast with the more arid regions surrounding the Jemez Mountains.

67.    The Park Service describes the Preserve as an "ecosystem in recovery." Prior to the agency assuming management, private owners had intensively grazed the area, resulting in the loss of riparian habitat, degradation of streams and wetlands, and extirpation of many wildlife species.

68.    The Preserve's abundant water sources and diverse plant communities now support an equally diverse array of wildlife, including healthy populations of elk, mule deer, coyotes, bears, mountain lions, fish, and almost 200 species of birds—and, in 2023, a Mexican gray wolf, whose return marked the endangered species' first recorded presence on the Preserve in nearly a century.

69.    Multiple ESA-listed species inhabit the Preserve and the surrounding National Forest, including the endangered Jemez Mountains salamander (*Plethodon neomexicanus*), the threatened Mexican spotted owl (*Strix occidentalis lucida*), and the endangered New Mexico

meadow jumping mouse (*Zapus hudsonius luteus*). The Park Service is working to restore these species' habitats, which had been degraded by many decades of logging, fire suppression, and overgrazing by livestock.

70.    While no livestock grazing is currently authorized on the Preserve, grazing *is* permitted directly along nearly all of the Preserve's boundary, on the neighboring National Forest.

## II.    Livestock Grazing on the Santa Fe National Forest

71.    Stretching across the Jemez and Sangre de Cristo Mountains of northern New Mexico, the Santa Fe National Forest encompasses a diverse range of ecosystems and supports a host of wildlife species within its 1,545,349 acres of public land.

72.    At present, grazing may be authorized on up to 97 percent of the Forest.

73.    This widespread grazing has had profound environmental consequences. Livestock grazing adversely affects a variety of resources, including soils, plants, cultural heritage sites, water quality and quantity, invasive species prevalence, wildlife, and wildlife habitat.

74.    Grazing also degrades recreational and visual resources by damaging trails, creating large quantities of excrement, and disrupting hiking, hunting, camping, biking, fishing, and other popular activities on public lands. If not rigorously excluded, cattle preferentially graze in riparian areas, causing extensive damage to streambanks and wetlands, and are particularly detrimental to riparian obligate species such as the New Mexico meadow jumping mouse.

75.    The Allotments consist of twelve active National Forest grazing allotments that abut the Preserve: the Alamo, Del Norte, Peralta, Las Conchas, V-Double Slash, Cebolla-San Antonio, Penas Negras, Coyote, Youngsville, Mesa del Medio, and Chicoma allotments.



*The Preserve, surrounded by National Forest grazing allotments. Credit: U.S. Forest Service.*

76.    During the 2022 grazing season the Forest authorized a collective total of 2,197 cattle on the Allotments.

77.    The Allotments are separated from the Preserve by a barbed-wire fence that is frequently in need of extensive repair or replacement. Long sections of the fence are often down for extended periods of time due to fires, fallen trees, animal damage, and/or deliberate vandalism or removal. New gaps appear every grazing season, often soon after the fence has been repaired.

### III.    Threatened and Endangered Species Impacted by Grazing on the National Forest.

78.    At least three ESA-listed species on the Preserve and the Allotments are adversely impacted by overgrazing, trespass livestock, and/or incursions into protected habitat: the

endangered New Mexico meadow jumping mouse, the threatened Mexican spotted owl, and the endangered Jemez Mountains salamander.

### A. The Jemez Mountains Salamander

79.    The Jemez Mountains salamander has inhabited the Valles Caldera for as long as 1.2 million years, colonizing the area shortly after its formative volcanic eruption. The species is found only around the rim of and inside the Valles Caldera, with the Preserve falling squarely in the center of its extremely limited range.

80.    Salamander populations have continued to decline since the species was listed as endangered in 2013. The largest remaining populations persist in and around the Preserve, although salamander numbers have declined there as well.

81.    Virtually all of the salamander's critical habitat is on either the Preserve or the Allotments.

82.    Salamanders spend most of the year underground, typically only surfacing during late summer monsoon season, which coincides with the height of the Forest Service's livestock grazing season. Salamanders require cool, moist forested areas and uncompacted soils to retain their body moisture and create their burrows.

83.    One of the primary threats to the salamander is the loss, degradation, and fragmentation of its habitat. Because salamanders have small home ranges and cannot move long distances, habitat degradation and loss of connectivity can profoundly impact individuals and populations.

84.    All occupied salamander habitat has been impacted by historic grazing practices, fire suppression, and logging. Grazing can degrade habitat through soil compaction and establishment of livestock trails, and cattle can directly harm salamanders through trampling.

Livestock passage through salamander habitat, livestock wrangling, and the use of vehicles to herd or transport cattle also impact salamanders and their habitat.

85.    The Forest Service and FWS consulted in 2018 regarding the impacts of the Forest Service's ongoing grazing program in salamander habitat on the Allotments at issue here. That 2018 consultation determined that livestock grazing was "likely to adversely affect" the salamander and its critical habitat but concluded that grazing would not jeopardize the species' survival or recovery. The FWS therefore issued a BiOp and ITS.

86.    Because setting a take limitation based on individual salamanders is impractical, the FWS instead relied on a proxy—forage utilization—to define permitted levels of incidental take. Per the 2018 ITS, unlawful take of salamanders is assumed if either (1) light to moderate use (roughly 35 percent forage utilization) occurs for any one year, as averaged across all allotment areas containing critical habitat or considered high probability of occupancy areas; or (2) moderate use (roughly 50 percent forage utilization) occurs for more than one year in a row within any one allotment in areas containing critical habitat or considered high probability of occupancy areas.[1]

87.    To ensure against excess take or impacts beyond those contemplated in the BiOp, the ITS required the Forest Service to track and report forage utilization levels on each allotment within likely occupied salamander habitat.

88.    Forest Service records from 2018 through 2022 indicate that livestock grazing caused take of salamanders on the Allotments beyond the permitted level, and that the monitoring requirements imposed by the ITS were not consistently met. But beyond notifying the permittees

---

[1] A 2020 BiOp, which considered the impacts of grazing specifically on the Cebolla-San Antonio allotment, lowered the cap to 40 percent utilization within critical habitat on that allotment.

of this issue, the Forest Service took no effective action to prevent further unlawful take, nor did

it reinitiate consultation with the FWS as required by the ESA and the terms of the ITS.

      89.    In analyzing potential impacts to the salamander, the Forest Service and FWS

considered only the effects of grazing within the Allotments themselves. The agencies did not

discuss livestock trespass outside the Allotments or any potential impacts on the Preserve despite

the cattle's proclivity for trespassing in salamander habitat there, as shown by the following map:



      90.    The FWS "no jeopardy" determination does not reflect the impacts of this trespass.

The FWS did not consider the impact of this trespass on the species, did not include take resulting

from trespass in the ITS, and did not impose any monitoring or other mitigation requirements intended to address the adverse effects of livestock trespass on the salamander.

## B. The Mexican Spotted Owl

91.    The Preserve also contains habitat for the Mexican spotted owl. This elusive species is found in forested mountains and canyonlands throughout the Southwest and was listed as threatened in 1993 due to extensive habitat loss and degradation caused by extractive land uses, including livestock grazing. Populations in New Mexico have not increased in the 31 years since the species' listing.

92.    In wooded areas, spotted owls require mature or old-growth stands with high canopy cover, large snags, and habitat components that support an adequate population of prey species, including adequate vegetative cover. Owls also forage in grasslands near riparian areas and suitable forested areas.

93.    Poorly managed livestock grazing in owl habitat can lead to diminished prey availability and abundance, increased susceptibility to uncharacteristic wildfire, degradation of riparian habitat and water sources, and changed forest structure that impairs future habitat development. These conditions are most likely to affect owls that forage near grazed areas such as montane meadows and riparian corridors, and can contribute to declines in owl populations.

94.    Because the cattle grazing season typically begins just as owl young hatch, and continues until they leave the natal area, the potential threats posed by livestock occur precisely when prey availability is most critical for the owl.

95.    In recognition of these harmful effects, the FWS's spotted owl recovery plan recommends that grazing in owl habitat should be kept at a level that preserves favorable habitat characteristics and vegetation necessary to sustain prey species. Specifically, the recovery plan

recommends reducing grazing intensity, shortening the grazing season, reducing the number of livestock, and/or completely excluding cattle from sensitive riparian areas.

96.    The Preserve lies directly between two of the owl's critical habitat units: SRM-NM-1, on the Cebolla-San Antonio allotment to the west, and SRM-NM-4 on a currently inactive allotment to the east. The Preserve itself contains an estimated 36,560 acres of suitable owl habitat. Although spotted owls had vanished from the Preserve for many years, recent surveys documented a pair of owls on its western boundary and the FWS has provisionally established a "primary activity center"—the most stringently protected owl habitat designation—on the Preserve.

97.    The Forest Service and FWS have informally consulted on impacts to Mexican spotted owls from grazing on the Allotments. In 2020, the FWS concurred with the Forest Service's determination that livestock grazing on the Cebolla-San Antonio allotment "may affect," but was "not likely to adversely affect," the owl or its critical habitat. This conclusion relied on assumptions that grazing levels would remain at or below the levels previously analyzed and that this would help retain or increase prey species populations.

98.    Based on this determination, the agencies did not conduct formal consultation for the species. The FWS warned, however, that reconsultation could be required if new information revealed that the Forest Service's grazing program was causing unforeseen impacts on the owl or was substantially modified.

99.    The agencies' informal consultation did not address livestock trespass outside the Allotments or potential impacts to owls on the Preserve from trespass cattle.

## C. The New Mexico Meadow Jumping Mouse

100.    The New Mexico meadow jumping mouse, first listed as endangered in 2014, is considered especially vulnerable to extinction. The species' numbers have declined drastically,

and it is now found on only small segments of its historical range, including on and around the Preserve. Nearly all current populations are isolated and widely separated, and nearly all are restricted to patches of suitable habitat that are too small to support resilient mouse populations.

101.    Livestock grazing on the species' riparian habitat poses the greatest threat to the mouse's continued existence.

102.    The jumping mouse has exceptionally specialized habitat requirements: It depends on tall, dense riparian vegetation along perennial streams for food and shelter, but nests on drier soils in adjacent upland habitat. Suitable mouse habitat must therefore include large (at least 12 acres) patches of intact riparian habitat and adjacent upland habitat with sufficiently tall, dense vegetation. Habitat connectivity is also crucial for the species' continued viability. To maintain species and population resilience, multiple patches of occupied suitable mouse habitat must be connected by short stretches of intact riparian vegetation, allowing for the movement of individual mice between neighboring populations.

103.    The Cebolla-San Antonio allotment on the Preserve's western boundary contains designated critical habitat for the jumping mouse, including subunits along the San Antonio Creek (two known mouse populations), the Rio Cebolla (six known populations), and the Rio de las Vacas (one known population). After critical habitat was designated in 2016, researchers documented a tenth population on the Preserve itself. As shown on the following map, several riparian zones on the Preserve are now recognized as primary and secondary mouse habitat.[2]

---

[2] "Primary habitat" describes intact areas containing the species' primary constituent habitat components that meet the FWS minimum size and connectivity requirements for viable and healthy populations. "Secondary habitat" patches are those that do not meet the FWS minimum criteria but may still support jumping mouse populations.

FIRST AMENDED PETITION FOR REVIEW OF AGENCY ACTION—23



104.    As jumping mouse populations rarely persist in grazed areas, it is notable that the mouse returned to the Preserve only after the Park Service began managing the area for its ecological values rather than livestock grazing, which quickly degrades mouse habitat.

105.    Suitable habitat, and resident mouse populations, can be quickly lost if vegetation is removed or overall stream conditions and water quality or quantity decline, or if the connective riparian corridor is broken up by such habitat degradation.

106.    Livestock grazing, which can rapidly degrade or remove suitable riparian habitat, is the primary threat to jumping mouse populations. The Forest Service and FWS have recognized that livestock grazing is incompatible with maintaining suitable mouse habitat and viable mouse populations, and even "light" grazing can extirpate the species locally. A few hours of livestock grazing may degrade mouse habitat and reduce population size; grazing for as little as seven days in a riparian area may eliminate suitable habitat altogether.

107.    Livestock in riparian habitats cause extensive and deleterious trampling, soil compaction, and erosion of the streambed, degrading the stream channel such that it can no longer

support the riparian vegetation and wet soils required to maintain suitable habitat for the jumping mouse. Livestock grazing and trampling within jumping mouse habitat reduces the height of riparian vegetation below the level required to maintain suitable habitat. This loss of vegetative cover also places individual jumping mice at a greater risk of predation.

108.    Over the longer term, grazing can also alter the composition and structure of the riparian habitats that are essential to the jumping mouse's survival, allowing for the introduction and spread of invasive species, for which livestock serve as a vector, and converting sites from riparian vegetation-dominated to upland plant species-dominated.

109.    If not consistently excluded from mouse habitat, livestock tend to concentrate specifically in the riparian zones on which the jumping mouse depends, and preferentially graze the native riparian plants the species requires for survival. Compounding these deleterious effects, the grazing season generally coincides with the mouse's short active season, reducing the availability of food at the precise time that the jumping mouse needs it to build the fat reserves required to breed, raise young, and enter the next hibernation period.

110.    By reducing the availability of food resources and shelter, which, in turn, affects overwinter survival, livestock grazing in jumping mouse habitat harms individual mice, reduces mouse population levels, and eventually leads to the species' extirpation.

111.    Recognizing the outsized impact of livestock grazing on the jumping mouse, the FWS has identified excessive grazing as the primary threat to the mouse's survival and preventing cattle encroachment in riparian areas as the primary tool for the mouse's conservation. The agency has explained that the presence of a functioning livestock exclosure is the best predictor of jumping mouse occupancy in suitable habitat, and it has repeatedly stressed that designing, installing, and

maintaining effective barriers to livestock entry is the primary conservation measure for jumping mouse survival and recovery.

112.    In light of the existential threat livestock pose to the species, the Forest Service formally consulted with the FWS in 2020 regarding the impacts of its grazing program. In that consultation, the agencies concluded that grazing on the Cebolla-San Antonio allotment was likely to adversely affect the jumping mouse and its critical habitat.

113.    In its 2020 BiOp, the FWS reiterated that the jumping mouse is highly vulnerable to serious adverse effects from livestock grazing, which can destroy or degrade mouse habitat, creating extremely detrimental population-level effects, and directly injure individual mice through trampling, harassment while fleeing livestock, and increased risk of predation.

114.    The agencies concluded that if specific conservation measures were implemented, including exclusion of livestock from occupied habitat and reduction or elimination of grazing in some riparian pastures, ongoing grazing on the Cebolla-San Antonio allotment would not jeopardize the continued existence of the jumping mouse. The FWS therefore issued an ITS and imposed mandatory terms and conditions on grazing within this allotment.

115.    The FWS set a proxy take limit based on impacts from unauthorized grazing in habitat exclosures. Take would be exceeded if any of the exclosures protecting occupied mouse habitat experienced (1) negligible grazing on over 15 percent of the total acreage, (2) very light grazing on over 5 percent of the total acreage, (3) more than very light grazing on over 1 acre, or (4) more than two livestock incursions per year. Additionally, take would be exceeded if more than very light grazing occurred within riparian pastures outside of exclosures or more than light grazing occurred in upland habitat within pastures with mouse critical habitat.

116.    To comply with the ITS terms and conditions, the Forest Service must actively check fencing around closed riparian areas and repair any damage immediately. The ITS also requires the Forest Service to monitor and report on any incidental take, fence damage and repair, and levels of forage utilization by cattle.

117.    The Forest Service has conducted the required surveys of jumping mouse populations and habitat—but, as those surveys reveal, grazing has repeatedly caused take in excess of authorized levels.

118.    Since 2016, and as recently as 2023, the agency has documented heavy grazing on multiple riparian pastures, multiple damaged or nonfunctioning exclosure fences, and multiple repeated or ongoing cattle incursions into habitat exclosures meant to protect jumping mouse sites.

119.    Despite its knowledge of the issue, the Forest Service has consistently failed to maintain habitat exclosures or take other necessary action to enforce the terms of its grazing permits and comply with the ITS.

120.    Moreover, the Forest Service also has failed to prevent livestock from encroaching on the Preserve and congregating in jumping mouse habitat there, as shown by the following map:



121.    Once trespass livestock enter the Preserve—which has no grazing infrastructure, and where the livestock are not monitored—they are free to congregate in and degrade the sensitive riparian areas the jumping mouse requires for its continued survival.





*Examples of livestock congregating around riparian zones on the Preserve, July 18 and August 17, 2023. Credit: Caldera Action.*

122. The Forest Service and the FWS were both well aware of this ongoing issue, but failed to analyze the impacts of livestock trespass on the Preserve in their 2020 ESA consultation for the jumping mouse. The 2020 ITS did not discuss or set limits on take due to livestock trespass

on the Preserve, did not require the Forest Service to monitor or prevent trespass on the Preserve, and did not impose any terms and conditions aimed at mitigating the effects of livestock trespass on the jumping mouse.

## IV.    The History of Livestock Trespass on the Valles Caldera.

123.    Despite its conspicuous absence from the agencies' ESA consultations, the ongoing issue of livestock from the Allotments trespassing on the Preserve has been well-known and well-documented since at least 2017.

124.    For the past several years, hundreds of trespass livestock on the Preserve were reported to the Forest Service and the Park Service each summer. The livestock typically remained on the Preserve for at least several days, and often over a week, after they were first reported— and for unknown lengths of time before then.

125.    The trespass livestock consistently congregate at water sources and intensively graze in riparian zones. The consequent grazing and trampling of native vegetation results in degradation of the Preserve's wetlands, water quality, and riparian habitat.





*Effects of trespass livestock on the Preserve, October 26, 2023. Credit: Caldera Action.*

FIRST AMENDED PETITION FOR REVIEW OF AGENCY ACTION—31

126.    The damage caused by trespass cattle on the Preserve is widespread, ongoing, well-documented, and regularly reported to the Forest Service each summer.

127.    Although the Park Service keeps logs of trespass reports, it acknowledges that these reports do not reflect the full extent of livestock trespass. Even so, the agency states that 50 to 200 cattle at a time have routinely been documented trespassing on the Preserve.

128.    In 2019, when the Park Service began logging trespass livestock reports, it recorded 243 cattle on the Preserve, where they remained for an average of one week before removal.

129.    In 2020, the Park Service recorded 415 trespass cattle remaining on the Preserve for roughly 12 days each.

130.    In 2021, the Park Service recorded 1,026 trespass cattle.

131.    Hundreds of trespass cattle continued to be reported throughout the 2022 grazing season, and Petitioners contacted the agencies with their growing concerns, specifically noting the threat posed by unlawful grazing to the Preserve's threatened and endangered species.

132.    Alarmed by the agencies' failure to adequately respond to the trespass cattle issue, on October 19, 2022, Petitioners sent a Sixty-Day Notice of Intent to Sue for ESA violations to the Forest Service, the FWS, the Park Service, and the agencies' respective officers and supervisors.

133.    In a joint response, the Forest Service and the Park Service stated that they would continue to work cooperatively on the matter. The Park Service additionally committed to formal consultation with the FWS regarding the effects on ESA-listed species of removing and excluding livestock from the Preserve.

134.    Throughout 2023, Petitioners met with the agencies several times in hopes of developing a solution to the trespass cattle problem and avoiding litigation.

135.    Petitioners also repeatedly alerted the agencies to the presence of trespass cattle, which continued to enter and remain on the Preserve in significant numbers throughout the 2023 grazing season.

136.    In May 2023, the Park Service issued a biological assessment for its proposed livestock removal and exclusion operations, stating that although these activities are "likely to adversely affect" the Jemez Mountains salamander, Mexican spotted owl, and New Mexico meadow jumping mouse, removing trespass cattle from the Preserve would have overall beneficial effects. In other words, while constructing fences and wrangling cattle will harm these imperiled species, the continuing presence of trespass livestock on the Preserve inflicts even greater damage.

137.    The Park Service additionally stated that any trespass livestock the agency removed would "frequently" return to the Preserve, and that "as long as grazing continues adjacent to the [Preserve] it is unlikely that all livestock trespass will be eliminated."

138.    The FWS concurred with these determinations.

139.    The Park Service's 2023 consultation did not discuss or analyze any impacts to the salamander, owl, and jumping mouse resulting from trespass livestock entering and remaining on the Preserve, only the impact of attempting to remove them.

140.    The Forest Service refused to reinitiate consultation regarding impacts of trespass cattle from the Allotments on the Preserve.

141.    By the end of the 2023 grazing season, the Park Service had recorded a minimum of 371 trespass cattle, while Petitioners' records indicate that 970 trespass cattle were observed.

142.    Trespass livestock on the Preserve, and their deleterious effects there, are the direct result and foreseeable outcome of the Forest Service's authorization of grazing on the Allotments.

But for the Forest Service's authorization of grazing on the Allotments, there would be no livestock trespass on the Preserve.

143.    Because the Park Service has no authority or control over the Forest Service's grazing program, it cannot consult on its impacts nor alter the Forest Service's decision to continue to authorize grazing.

144.    On February 6, 2024, Petitioners again notified Respondents of their intent to sue for violations of the ESA, including the Forest Service's refusal to reinitiate consultation.

145.    In response, the Forest Service asserted that it was not required to take preventative action or to consult with the FWS regarding the impacts of trespass cattle because "[u]nauthorized or otherwise illegal activities are not part of the Forest Service's proposed action." The Forest Service further disavowed any responsibility for ensuring that cattle did not enter the Preserve or harm protected species there.

146.    The FWS, for its part, stated that the Forest Service would repair riparian fences and habitat exclosures within the Allotments before the 2024 grazing season began, and noted that the agencies planned to reinitiate consultation regarding grazing on the Cebolla-San Antonio allotment. The FWS did not clarify whether the reconsultation would encompass impacts of trespass livestock on the Preserve; indeed, the FWS response never mentioned trespass cattle.

147.    Petitioners met with the Forest Service and the FWS again in May 2024 to renew their concerns regarding the agencies' failure to reinitiate consultation. The agencies again refused.

V.    **The Valles Caldera Boundary Fence.**

148.    On May 16, 2024, the Forest Service announced that it had secured funding to repair or reconstruct damaged portions of the Preserve boundary fence. Work began that month at the beginning of the grazing season.

149.    On information and belief, the existing fence was almost entirely gone along significant stretches of the northern and southern boundaries.

150.    Nevertheless, the Forest Service refused to delay turnout of cattle onto the Allotments until the boundary fence could be repaired or other reasonable measures taken to prevent livestock trespass.

151.    Grazing began as scheduled in May 2024 and—as in previous years—trespass livestock from the Allotments were reported on the Preserve that same month.

152.    Petitioners filed suit on June 4, 2024.

153.    Work on the fence continued throughout the summer of 2024, but so did reports of trespass livestock on the Preserve. Between May 23, 2024 and the filing of this Petition, Petitioners received 12 reports of trespass livestock, totaling more than 350 cattle, despite fence repairs and the presence of range riders hired by the Park to patrol the Preserve boundary.[3]

154.    In early August 2024, the Forest Service reported that repairs or reconstruction of the existing fence along the entire northern boundary were completed. The Forest Service planned to replace fencing along the western and southern boundary later that same month.

155.    The reconstructed boundary fence follows the same route, uses the same materials, and was built to the same specifications as the old fence.

156.    Failure of, and damage to, the Preserve boundary fence, even to newly repaired fencing, is a well-known and well-documented issue. Long sections of the fence are often down for extended periods of time due to fires, fallen trees, animal damage, and/or deliberate vandalism or removal. New gaps appear every grazing season, often soon after the fence is repaired.

---

[3] This number does not include trespass livestock reported directly to the agencies, and—as the Park Service has explained—the true level of cattle trespass is almost certainly higher than the agency's logs indicate.





*Downed trees across the Preserve boundary fence, August 14, 2024. Credit: Caldera Action.*

157.    In June of 2024, the Preserve Superintendent characterized "investing millions of dollars in this wire fence" as "somewhat of a Sisyphean effort" and stated that he expected the trespass to continue.

158.    On August 15, 2024, Petitioners sent a third notice of their intent to sue for violations of the ESA.

159.    On September 7, 2024, the Forest Service and Park Service formally agreed to share the responsibility for maintaining the boundary fence.[4] Nat'l Park Serv. & U.S. Forest Serv, FENCING AND TRESPASS CATTLE MANAGEMENT COOPERATION - NON-FUNDED AGREEMENT 1–2 (Sept. 7, 2024) (the Agreement).

160.    The "non-funded" Agreement, however, does not fund any projects or commit either agency to taking specific actions beyond developing a plan to maintain the fence, checking the fence "periodically," and informing permittees that the agencies may enforce grazing laws.

161.    The Agreement is also a tacit acknowledgement that the agencies' past actions have failed to stop the trespass livestock. Moreover, the agencies admit that their current plan, including repairing and replacing the old fence with the exact same type of fencing along the exact same route, will not fix the issue: Livestock trespass is expected to persist *even if the agencies repair the fence in a timely manner. See id.* at 7–8 (planning response to future trespass incidents).

162.    To meet its obligations under the ESA, the Forest Service must pursue a path it expects to be successful at preventing unlawful grazing and livestock trespass.

163.    The Forest Service's authorization of grazing on the Allotments in 2024 harmed critically endangered species and their habitats on the Preserve and on the Allotments, perpetuating

---

[4] By information and belief, the Forest Service committed roughly one million dollars to the fence repairs undertaken during the 2024 grazing season, but neither agency has identified or specifically committed any future or long-term funding to the project.

a situation that permitted livestock to trespass on the Preserve and unlawfully graze in the habitat exclosures by allowing cattle onto Allotments when the agency knew that the fences were in disrepair and not functioning as intended.

164.    Authorization of grazing in 2025 will further harm the salamander, spotted owl, and jumping mouse, as the Forest Service admits that its chosen course of action will not prevent livestock trespass.

165.    Continued livestock trespass onto the Preserve and unlawful encroachment onto the Allotment exclosures may irrevocably damage endangered species' habitat and/or permanently foreclose the recovery of the salamander, spotted owl, and jumping mouse.

166.    The Forest Service's ongoing authorization of grazing on the Allotments violates the ESA, harms protected species and their habitats, causes extensive environmental damage on the Preserve and the Forest, and injures Plaintiffs and their members, supporters, and staff.

<u>**FIRST CLAIM FOR RELIEF**</u>
**Violation of APA and ESA Section 7(a): Invalid BiOps**

167.    Petitioners reallege and incorporate by reference all preceding paragraphs.

168.    The 2018 Jemez Mountains salamander BiOp and the 2020 salamander and New Mexico meadow jumping mouse BiOp are unlawful under the ESA and arbitrary and capricious under the APA. In both instances, the FWS failed to consider all relevant factors in making its jeopardy determinations, failed to use the best commercial and scientific data available, and failed to choose appropriate proxies to measure and limit incidental take.

169.    As Petitioners have explained, *see* ECF No. 1 at ¶¶ 130-141, the 2018 and 2020 BiOps entirely failed to consider potential impacts of trespass cattle on the salamander, jumping mouse, and their respective critical habitats on the Preserve. Instead, the FWS limited its analysis to effects within the Allotments—despite its clear obligation to consider "*all* areas to be affected

directly *or indirectly* by the Federal action," including "consequences occurring *outside the immediate area* involved in the action" 50 CFR § 402.02 (emphasis added).

170.    The trespass cattle and their impact on the Preserve were and are a highly foreseeable effect of the Forest Service's grazing program on the Allotments. The cattle consistently cross the boundary fence, and, consequently, so does the FWS's duty to consider their effects on ESA-listed species. It was arbitrary and capricious to omit analysis of the impacts of livestock trespass from the 2018 and 2020 BiOps.

171.    Moreover, by 2018, and certainly by 2020, the persistent encroachment of trespass cattle onto the Preserve was already a well-documented issue of which agency personnel and many members of the public were quite aware. Data reflecting this reality was available to the Forest Service and the FWS, yet the agencies chose to limit their analyses to impacts within the Allotments. By refusing to consider evidence of widespread and ongoing livestock trespass, the FWS failed to use "the best scientific and commercial data available" in issuing the 2018 and 2020 BiOps. *Id.* § 402.14(f).

172.    The FWS's chosen proxies for the salamander and jumping mouse were similarly faulty because they did not account for potential take resulting from trespass livestock on the Preserve. Take from trespass livestock was, therefore, not encompassed by the relevant ITSs. As a result, no level of harm, harassment, or habitat degradation resulting from trespass cattle on the Preserve could trigger reconsultation under the terms of the ITSs and 50 C.F.R. § 402.16(a)(1), and no binding terms or conditions were imposed to mitigate or even monitor such take. The 2018 and 2020 ITSs do not reflect the reality on the ground and are therefore flawed and invalid.

173.    Finally, because the FWS arbitrarily omitted any consideration of trespass cattle on the Preserve from its analyses, its "no jeopardy" determinations in the 2018 and 2020 BiOps are

also arbitrary and unlawful. The agency's conclusion that grazing on the Allotments would not jeopardize the continued survival of the salamander or jumping mouse was based on incomplete and inaccurate information.

174.    The FWS violated the ESA in preparing, issuing, and approving the 2018 and 2020 BiOps. *See* 16 U.S.C. § 1536; 50 C.F.R. § 402.14. The 2018 and 2020 BiOps are arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA. *See* 5 U.S.C. § 706(2)(A). The 2018 and 2020 BiOps should be held unlawful, set aside, and remanded to the FWS. *Id.*

## SECOND CLAIM FOR RELIEF
### Violation of ESA Section 7(a)(2): Reliance on Invalid BiOps

175.    Petitioners reallege and incorporate by reference all preceding paragraphs.

176.    The Forest Service cannot meet its ESA Section 7 obligations for its grazing program by relying on a legally flawed biological opinion. 16 U.S.C. § 1536(a)(2). Because the 2018 and 2020 BiOps are unlawful, the Forest Service's reliance on the 2018 and 2020 BiOps in issuing AOIs and authorizing grazing on the Allotments is similarly arbitrary, capricious, and in violation of the ESA. *See id.*

177.    The Forest Service's decision to continue authorizing grazing on the Allotments is therefore arbitrary, capricious, an abuse of discretion, and contrary to the ESA. *See* 5 U.S.C. § 706(2)(A). The 2024 AOIs and any other operative Forest Service documents that relied on the 2018 and 2020 BiOps should be held unlawful, set aside, and remanded to the Forest Service.

## THIRD CLAIM FOR RELIEF
### Violation of ESA Section 7(1): Failure to Reinitiate Consultation

178.    Petitioners reallege and incorporate by reference all preceding paragraphs.

179.    The Forest Service and the FWS have jointly violated the ESA, and its implementing regulations, by failing to reinitiate consultation for the Forest Service's authorization of grazing on the Allotments. *See* 50 C.F.R. § 402.16(a).

180.     Both the Forest Service and the FWS have a continuing duty to ensure that a BiOp and ITS remain valid. To that end, the agencies "shall" reinitiate consultation on an action's impact to ESA-listed species and their habitats if: (a) take exceeds permitted levels; (b) new information reveals unanticipated impacts; or (c) the action is subsequently modified. 50 C.F.R. § 402.16.

181.     Grazing on the Allotments has triggered reconsultation under all three provisions of 50 C.F.R. § 402.16.

182.     First, the Forest Service is aware that it has exceeded the levels of take permitted for the salamander and jumping mouse on the relevant Allotments.

183.     The Jemez Mountains salamander BiOp and ITS define and cap allowable take with reference to forage utilization in salamander habitat. If forage utilization exceeds the "very light" grazing levels allowed by the ITS, take of salamanders is assumed to occur.

184.     The Forest Service acknowledged in 2022 that forage utilization on the Coyote, Mesa del Medio, and Youngsville Allotments had exceeded the levels set by the ITS "for 2 or more consecutive years." Yet, the Forest Service did not reinitiated consultation with the FWS.

185.     By information and belief, these violations have not been remedied, and thus livestock grazing on the Coyote, Mesa del Medio, and Youngsville allotments—and, quite likely, other allotments containing salamander habitat—has caused and continues to cause unlawful take of Jemez Mountains salamanders.

186.     Take of New Mexico meadow jumping mice is based on both forage utilization and livestock incursions into habitat exclosures. The Forest Service's records indicate that this level of take has been exceeded in multiple areas of the Cebolla-San Antonio allotment: Riparian areas in jumping mouse habitat have been heavily grazed, and cattle have routinely been documented grazing within certain habitat exclosures.

187.    These incidents constitute an exceedance of permissible jumping mice take, yet the Forest Service again failed to reinitiate consultation with the FWS. *See* 50 C.F.R. § 402.16(a)(1).

188.    Second, "new information" regarding the impact of the Forest Service's grazing program has also triggered the Forest Service's reconsultation requirement. *Id.* § 402.16(a)(2). Because the adverse effects of ongoing incursions of trespass cattle onto the Preserve were never analyzed in the existing BiOps, they constitute new information revealing effects greater than, and different from, those previously considered in consultation. *See id.*

189.    As explained above, the 2018 and 2020 consultations were defective because they omitted any discussion of livestock trespass, which had already occurred for multiple grazing seasons; each instance of trespass since the consultations were released constitutes new information, not previously analyzed, that triggers reconsultation.

190.    The cattle that regularly trespass on the Preserve impact a larger and very different area than the Forest Service and the FWS analyzed in the 2018 and 2020 consultations. Moreover, those consultations assumed that the effects of grazing would be mitigated by monitoring, pasture rotation, and habitat exclosures on the Allotments. Once on the Preserve, however, the trespass livestock freely congregate in sensitive riparian areas and wildlife habitat without such protective measures. These new and different impacts obligate Respondents to reinitiate consultation. *See id.*

191.    Finally, the consistent presence of trespass cattle on the Preserve also constitutes a substantial change in the grazing program as authorized and discussed in prior consultation. *See id.* § 402.16(a)(3).

192.    Respondents' 2018 and 2020 consultations analyzed the effects of livestock grazing within demarcated allotment boundaries, in limited numbers, subject to monitoring and rotation, and excluded from ecologically sensitive areas. The consistent presence of these same livestock

*outside* the Allotments, on the Preserve, is a substantially different action, with significantly different impacts, than the proposed action analyzed in prior consultations.

193.    This *de facto* change in agency action compels reconsultation. *See* 50 C.F.R. § 402.16(a)(3).

194.    Because take levels have been exceeded, new information has been revealed, and the original proposed action has been modified, the 2018 and 2020 BiOps and associated ITSs are no longer valid.

195.    The agencies must reinitiate formal consultation on the impacts of grazing to the Jemez Mountains salamander, Mexican spotted owl, and New Mexico meadow jumping mouse. By failing to do so, both agencies are in continuing violation of ESA Section 7(a).

<u>FOURTH CLAIM FOR RELIEF</u>
**Violation of ESA Section 7(d): Irreversible and Irretrievable Commitment of Resources**

196.    Petitioners reallege and incorporate by reference all preceding paragraphs.

197.    The Forest Service has violated Section 7(d) of the ESA by irreversibly and irretrievably committing resources to its grazing program before completing formal consultation with the FWS. *See* 16 U.S.C. § 1536(d).

198.    If an agency action may adversely affect a listed species or its habitat, the agency may not take any implementing step that irreversibly or irretrievably commits resources to that activity until it has completed formal consultation and the FWS has either determined that the action will not jeopardize the species or formulated a reasonable and prudent alternative that would not create jeopardy.

199.    As detailed above, the 2018 and 2020 BiOps on which the Forest Service has relied to authorize grazing on the Allotments are invalid. The agency is thus barred from authorizing livestock grazing until reconsultation has been completed.

200.    Issuance of an AOI, which authorizes a specific number of cattle to graze an allotment for a certain time, constitutes an irreversible and irretrievable commitment of resources. As described above, livestock grazing can rapidly degrade or destroy sensitive habitat; in particular, it poses an immediate threat to New Mexico meadow jumping mouse populations, which can be quickly extirpated by even limited grazing. This is a quintessentially "irretrievable" loss of resources.

201.    The Forest Service's decision to continue authorizing grazing on the Allotments before completing formal consultation regarding grazing's true impacts was therefore arbitrary, capricious, an abuse of discretion, and contrary to the ESA. *See* 5 U.S.C. § 706(2)(A). The 2024 AOIs should be held unlawful and set aside, and the Forest Service should be enjoined from authorizing any further grazing on the Allotments until it has fully complied with the ESA.

### FIFTH CLAIM FOR RELIEF
**Violation of ESA Section 7(a)(2): Failure to Ensure Against Jeopardy**

202.    Petitioners reallege and incorporate by reference all preceding paragraphs.

203.    By relying on the invalid 2018 and 2020 BiOps to authorize grazing on the Allotments, the Forest Service has failed to ensure that its actions do not jeopardize the continuing existence of the endangered Jemez Mountains salamander, threatened Mexican spotted owl, and endangered New Mexico meadow jumping mouse, in violation of its substantive duties under ESA Section 7. *See* 16 U.S.C. § 1536(a)(2). The agency cannot fulfill its strict ESA obligations through arbitrary reliance on inaccurate, outdated, and unlawful BiOps. *See id*.

204.    Until it has rectified these violations the Forest Service cannot ensure that grazing on the Allotments will not jeopardize threatened and endangered species, and the agency must be enjoined from authorizing any further such grazing until it has fully complied with the ESA.

## SIXTH CLAIM FOR RELIEF
**Violation of ESA Section 7(a)(1): Failure to Take Effective Conservation Actions**

205.    Petitioners reallege and incorporate by reference all preceding paragraphs.

206.    The Forest Service has violated its affirmative duty to "conserve" ESA-listed species by failing to implement an effective program to conserve the endangered Jemez Mountains salamander, threatened Mexican spotted owl, and endangered New Mexico meadow jumping mouse. *See* 16 U.S.C. § 1536(a)(1).

207.    As a federal agency, the Forest Service has an affirmative duty to "conserve" threatened and endangered species. This is not an abstract or generalized duty; instead, the plain language of the ESA requires the Forest Service to take *whatever actions are required* to ensure the survival and recovery of each listed species. 16 U.S.C. §§ 1532(3) (defining conservation to include recovery), 1536(a)(1) (agencies have affirmative duty to work towards conservation of species). The ESA does not mandate specific actions, but taking insignificant measures cannot satisfy an agency's obligations under Section 7(a)(1).

208.    The Forest Service is well aware the livestock it authorizes on the Allotments routinely trespass on the Preserve and into the Allotment exclosures, causing extensive and significant resource damage, including harm to protected species in the area.

209.    The Forest Service is also well aware that the type of fence surrounding the Preserve and the Allotment exclosures has a high rate of failure and needs near-constant repairs.

210.    Nonetheless, the Forest Service has chosen to replace the Preserve and Allotment exclosure fences with the exact same type of fence that consistently fails to prevent livestock from harming and harassing the endangered Jemez Mountains salamander, threatened Mexican spotted owl, and endangered New Mexico meadow jumping mouse.

211.    The Forest Service has admitted it does not expect replacement of these fences, even if they are timely repaired, to prevent livestock from entering and damaging habitats vital to the conservation and recovery of these imperiled species.

212.    By failing to take the actions necessary to ensure the survival and recovery of the salamander, spotted owl, and jumping mouse, the Forest Service has violated its substantive duty under ESA Section 7(a)(1).

213.    Until it has rectified these violations and fully complied with the ESA, the Forest Service cannot lawfully authorize grazing on the Allotments.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**Violation of ESA Section 9: Unlawful Take of Protected Species**

214.    Petitioners reallege and incorporate by reference all preceding paragraphs.

215.    The Forest Service has violated the ESA and its implementing regulations through unlawful take of threatened and endangered species resulting from the agency's reauthorization of grazing on the Allotments without a valid BiOp and ITS. *See* 16 U.S.C. §§ 1532(19), 1538(a)(1); 50 C.F.R. § 17.3.

216.    Under ESA Section 9, a federal agency may not cause any take of an endangered or threatened species unless the agency has obtained and complied with the provisions of a valid ITS. *See* 16 § 1536(2)(B)(3), (4); 50 C.F.R. § 402.14(g)(7). If the agency fails to implement the mandatory terms and conditions set forth in the ITS, or reconsult on an action pursuant to 50 C.F.R. § 402.16(a), the agency loses its shield against Section 9 liability.

217.    To effectuate the ESA's purposes, injunctive relief may be issued to prevent reasonably certain unlawful take—the public and the courts need not wait until the harm has been done.

218.    The harm and harassment caused by grazing in salamander, owl, and jumping mouse habitat are well documented, as is the ongoing presence of trespass cattle in such habitat on the Preserve. The Forest Service has acknowledged that the trespass will continue despite its current efforts to prevent it. The unlawful take of salamanders, owls, and jumping mice is reasonably certain if the Forest Service authorizes grazing on the Allotments before addressing the violations detailed above.

219.    Until it has demonstrated full compliance with the ESA, the agency must be enjoined from authorizing any further grazing on the Allotments.

## **REQUESTED RELIEF**

WHEREFORE, Petitioners respectfully request that this Court:

A.    Declare that the U.S. Fish and Wildlife has violated the ESA and APA by issuing the 2018 and 2020 BiOps;

B.    Declare that the U.S. Forest Service has violated and continues to violate the ESA by relying on the 2018 and 2020 biological opinions;

C.    Declare that the U.S. Forest Service and the U.S. Fish and Wildlife Service have violated and continue to violate the ESA by failing to reinitiate consultation for grazing on the Allotments;

D.    Declare that the U.S. Forest Service has violated and continues to violate the ESA by failing to ensure that its actions do not jeopardize the continued existence of such species;

E.    Declare that the U.S. Forest Service has violated and continues to violate the ESA by failing to take necessary steps to conserve threatened and endangered species;

F.    Declare that the U.S. Forest Service has violated the ESA by causing unlawful take of threatened and endangered species;

G.      Vacate and set aside the 2018 and 2020 BiOps;

H.      Vacate and set aside any existing AOIs for the Allotments;

I.       Enjoin the U.S. Forest Service from authorizing grazing on the Allotments until the agency rectifies the violations described above and demonstrates full compliance with the ESA;

J.       Enter such other declaratory relief and temporary, preliminary, or permanent injunctive relief as may be requested by Petitioners;

K.      Award Petitioners their reasonable attorney fees, costs, and litigation expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable law; and

L.      Grant Petitioners such additional relief as this Court deems just and proper to remedy the violations of law alleged herein and to protect the interests of Petitioners, the public, threatened and endangered species, and the public lands at issue.


Respectfully submitted this 30th day of October 2024,

*s/ Erin Hogan-Freemole*
Erin Hogan-Freemole, PHV
971-417-6851 │ ehoganfreemole@wildearthguardians.org
Tim Davis, NM Bar No. 19-204
205-913-6425 │ tdavis@wildearthguardians.org
WILDEARTH GUARDIANS
301 N. Guadalupe St., Ste. 201
Santa Fe, NM 87501

Megan Backsen, PHV
719-207-2493 │ megan@westernwatersheds.org
WESTERN WATERSHEDS PROJECT
P.O. Box 6774
Reno, NV 89513

*Counsel for Petitioners*