UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| WILDEARTH GUARDIANS, a New Mexico nonprofit corporation; WESTERN WATERSHEDS PROJECT, an Idaho nonprofit corporation; and CALDERA ACTION, a New Mexico nonprofit corporation, | Case No. 1:24-cv-00557-LF-KK |
| | PETITIONERS' RESPONSE OPPOSING RESPONDENTS' MOTION TO DISMISS |
| Petitioners, | |
| v. | |
| The UNITED STATES FOREST SERVICE, a federal agency; the UNITED STATES FISH AND WILDLIFE SERVICE; a federal agency, RANDY MOORE, in his official capacity as Chief of the U.S. Forest Service; SHAUN SANCHEZ, in his official capacity as Supervisor of the Santa Fe National Forest; and MARTHA WILLIAMS, in her official capacity as Director of the U.S. Fish and Wildlife Service, | |
| Federal Respondents. | |

TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

GLOSSARY OF TERMS ............................................................................................... v

INTRODUCTION ........................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ..................................................... 1

   I.    THE VALLES CALDERA NATIONAL PRESERVE ...................................... 1

   II.   THREATENED AND ENDANGERED SPECIES ON THE PRESERVE ........ 2

   III.  LIVESTOCK GRAZING ON THE SANTA FE NATIONAL FOREST .......... 2

   IV.  PROCEDURAL BACKGROUND ................................................................... 5

STANDARD OF REVIEW ............................................................................................. 7

ARGUMENT ................................................................................................................... 8

   I.    PETITIONERS' CHALLENGE TO THE 2018 BIOP RELATES BACK TO THEIR ORIGINAL PETITION ......................................................................... 8

   II.   PETITIONERS PROVIDED SUFFICIENT NOTICE OF CLAIMS 2, 5, AND 6. ........... 9

      A.   The NOIs Contained Sufficient Information Regarding Alleged ESA Violations .......... 9

      B.   Petitioners' Third NOI Provided Notice of Their New Section 7(a)(1) Claim. ............ 11

   III.  PETITIONERS PROPERLY STATED THEIR CLAIMS FOR RELIEF UNDER ESA SECTIONS 7(A)(1), 7(A)(2), 7(D), AND 9. .................... 12

      A.   Claim 3 Adequately Alleges that Respondents Must Reinitiate Consultation on All Named Allotments. ...................................... 13

      B.   Claim 4 Adequately Alleges a Violation of ESA Section 7(d) ..................... 18

      C.   Claim 6 Adequately Alleges a Violation of ESA Section 7(a)(1). ............... 19

      D.   Claim 7 Adequately Alleges a Violation of ESA Section 9. ......................... 20

CONCLUSION ............................................................................................................... 24

SIGNATURE BLOCK .................................................................................................. vi

# TABLE OF AUTHORITIES

**Cases**

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229 (9th Cir. 2001) ..................................................................................................... 22

*ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999 (9th Cir. 2014) ............................................. 8

*Ass'n for Restoration of the Env't v. Henry Bosnia Dairy*, 305 F.3d 943 (9th Cir. 2002).............. 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).................................................................... passim

*Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141 (10th Cir. 2013).................................................... 8

*Bryson v. Gonzales*, 534 F.3d 1282 (10th Cir. 2008) ........................................................... 13, 17

*California Trout, Inc. v. United States Bureau of Reclamation*, 115 F. Supp. 3d 1102 (C.D. Cal. 2015) ...................................................................................................................... 22

*Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144 (9th Cir. 2024) ................................... 21

*Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264 (10th Cir. 2023)....................................... 7, 17

*Conner v. Burford*, 848 F.2d 1441 (9th Cir.1988) ............................................................... 15, 18

*Conservation Cong. v. Finley*, 774 F.3d 611 (9th Cir. 2014) .................................................. 9, 12

*Cressman v. Thompson*, 719 F.3d 1139 (10th Cir. 2013) .......................................................... 17

*Ctr. for Biological Diversity v. EPA*, 316 F. Supp. 3d 1156 (N.D. Cal. 2018) ................. 11–12, 24

*Equal Emp. Opportunity Comm'n v. JBS USA, LLC*, 481 F. Supp. 3d 1204 (D. Colo. 2020)...... 23

*Fla. Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008).................................................. 19, 20

*Garcia-Catalan v. United States*, 734 F.3d 100 (1st Cir. 2013) ............................................. 17, 23

*George v. Urb. Settlement Servs.*, 833 F.3d 1242 (10th Cir. 2016).......................................... 7, 24

*Gilles v. United States*, 906 F.2d 1386 (10th Cir. 1990) ............................................................. 8

*Hogan v. Winder*, 762 F.3d 1096 (10th Cir. 2014) .................................................................... 17

*J.D. Heiskell Holdings, LLC v. Willard Dairy, LLC*, No. CV 23-854 JCH/JFR, 2024 WL 4286356 (D.N.M. Sept. 25, 2024) ................................................................................................... 22, 23

*Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012) ........................................................ 14

*Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645 (9th Cir. 2015).......... 8, 10, 11, 24

*Leverington v. City of Colorado Springs*, 643 F.3d 719 (10th Cir. 2011) ...................................... 13

*Marbled Murrelet v. Babbitt*, 83 F.3d 1068 (9th Cir.1996)........................................................ 9, 10

*Mayle v. Felix*, 545 U.S. 644 (2005) ............................................................................................. 8

*Nat. Res. Def. Council v. Zinke*, 347 F. Supp. 3d 465 (E.D. Cal. 2018) ........................................ 23

*Oregon Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982 (D. Or. 2010) ................. 15, 16, 21, 22

*Oregon Natural Res. Council. v. Allen*, 476 F.3d 1031 (9th Cir. 2007) ........................................ 22

*Pac. Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994).................................................... 18

*Pernick v. Computershare Tr. Co., Inc.*, 136 F. Supp. 3d 1247 (D. Colo. 2015) ..................... 8, 24

*Pyramid Lake Paiute Tribe of Indians v. U.S. Department of the Navy*, 898 F.2d 1410 (9th Cir. 1990) ........................................................................................................................... 19–20

*Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022 (10th Cir. 2020) ........................ 7, 12

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 629 F.Supp.2d 1123 (E.D. Cal. 2009) ................................................................................................................................... 22

*Smith v. United States*, 561 F.3d 1090 (10th Cir. 2009)............................................................... 17

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515 (9th Cir. 1998) .... 9

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ..................................................................... 13

*Truman v. Orem City*, 1 F.4th 1227 (10th Cir. 2021) ................................................................. 17

*Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450 (N.D. Cal. 2017) ...... 18

**Statutes**

16 U.S.C. § 1532(19) ................................................................................................ 21

16 U.S.C. § 1532(3) .................................................................................................. 19

16 U.S.C. § 1536(a) ................................................................................................... 3

16 U.S.C. § 1536(a)(1) ...................................................................................... passim

16 U.S.C. § 1536(a)(2) ...................................................................................... passim

16 U.S.C. § 1536(d) .......................................................................................... passim

16 U.S.C. § 1538 ............................................................................................... passim

16 U.S.C. § 1538(a)(1)(B) ........................................................................................ 21

28 U.S.C. § 2401(a) ................................................................................................... 9

Pub. L. No. 113-291, 128 Stat. 3292 (2014) ............................................................. 2

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................... 7, 12, 17, 24

Fed. R. Civ. P. 9(b) .................................................................................................. 17

Fed. R. Civ. P. 12(b)(6) .................................................................................... passim

Fed. R. Civ. P. 15(c)(1)(B) ................................................................................... 8, 24

**Regulations**

50 C.F.R. § 17.3 ....................................................................................................... 21

50 C.F.R. § 402.02 ..................................................................................................... 3

50 C.F.R. § 402.16(a) ............................................................................................ 9, 14

## GLOSSARY OF TERMS

| | |
|---|---|
| 2018 BiOp | Final Biological Opinion for Implementation of Ongoing Term Grazing Permits on the Coyote, Cuba, Espanola, and Jemez Ranger Districts of the Santa Fe National Forest, New Mexico (Exhibit 2) |
| 2020 BiOp | Final Biological Opinion for Livestock Grazing on the San Diego and Cebolla-San Antonio Grazing Allotments, Jemez Ranger District, Santa Fe National Forest, New Mexico (Exhibit 3) |
| 2023 BiOp | Biological Opinion for Trespass Livestock Removal and Exclusion, Valles Caldera National Preserve, New Mexico (Exhibit 4) |
| First NOI | Petitioners' October 19, 2022, Sixty-Day Notice of Intent to Sue for Violations of the Endangered Species Act (Exhibit 5) |
| Second NOI | Petitioners' February 5, 2024, Sixty-Day Notice of Intent to Sue for Violations of the Endangered Species Act (Exhibit 6) |
| Third NOI | Petitioners' August 13, 2024, Sixty-Day Notice of Intent to Sue for Violations of the Endangered Species Act (Exhibit 1) |
| The Agreement | September 7, 2024, Interagency Agreement Between the National Park Service, Valles Caldera National Preserve, and the Forest Service, Santa Fe National Forest (Exhibit 7) |
| The Allotments | The eleven active Forest Service grazing allotments abutting the Preserve to the north, west, and south: the Alamo, Del Norte, Peralta, Las Conchas, V-Double Slash, Cebolla-San Antonio, Penas Negras, Coyote, Youngsville, Mesa del Medio, and Chicoma allotments |
| AOI | Annual operating instructions. Yearly authorizations from the Forest Service that specify the number of cattle, length of grazing season, pasture rotation, and any required maintenance for that grazing season |
| APA | The Administrative Procedure Act, 5 U.S.C. §§ 701–706 |
| ESA | The Endangered Species Act, 16 U.S.C. §§ 1531–44 |
| The Forest | The Santa Fe National Forest |
| The Forest Service | The U.S. Forest Service; Randy Moore, in his official capacity as Chief of the Forest Service; and Shaun Sanchez, in his official capacity as Supervisor of the Forest |
| FWS | The U.S. Fish and Wildlife Service and Martha Williams, in her official capacity as Director of the FWS |
| Grazing allotments (or allotments) | A defined parcel of Forest land on which one or more private individuals graze cattle pursuant to a grazing permit and AOI |
| Jumping Mouse | The endangered New Mexico meadow jumping mouse |
| Owl | The threatened Mexican spotted owl |
| Park Service | The National Park Service |
| Petitioners | WildEarth Guardians, Western Watersheds Project, and Caldera Action |
| The Preserve | The Valles Caldera National Preserve |
| Respondents | The U.S. Forest Service, Randy Moore, in his official capacity as Chief of the Forest Service; Shaun Sanchez, in his official capacity as Supervisor of the Forest; the U.S. Fish and Wildlife Service, and Martha Williams, in her official capacity as Director of the FWS |
| Salamander | The endangered Jemez Mountains salamander |

PETITIONERS' RESPONSE OPPOSING RESPONDENTS' MOTION TO DISMISS—v

**INTRODUCTION**

The Valles Caldera National Preserve (the Preserve) was established in 2000 to protect and restore the area's ecosystems and provide habitat to wildlife, including the threatened and endangered species that live there. Each summer, however, hundreds of cattle from the neighboring Santa Fe National Forest trespass onto the Preserve, causing severe resource damage and harming these protected species and their habitats.

The U.S. Forest Service (the Forest Service) has been aware of the ongoing livestock trespass on the Preserve for years, yet it has never analyzed these well-known effects of its grazing program in its consultations with the U.S. Fish and Wildlife Service (FWS). Nor has the Forest Service taken reliable measures to prevent this recurring and highly foreseeable issue. The Forest Service has, however, continued to authorize grazing on the eleven active grazing allotments abutting the Preserve boundary (the Allotments)—despite the resulting harm to protected species.

The Forest Service and FWS (collectively, Respondents) seek to dismiss the majority of Petitioners' claims. But, as explained below, Respondents ask this Court to stretch the Endangered Species Act (ESA) notice requirement and the notice pleading standard far beyond established precedent, and to delve into the merits of this case before any evidence is even available. This Court should decline to adopt the heightened standards Respondents suggest; hold that Petitioners provided adequate notice of the violations they allege in this case, as required by the ESA, and alleged enough facts to demonstrate that they are entitled to relief; and allow all of Petitioners' claims to be heard on their merits.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    THE VALLES CALDERA NATIONAL PRESERVE**

The Preserve, which is managed by the National Park Service (Park Service), was

established in 2000 to "protect, preserve, and restore ecosystems and cultural landscapes … for the purpose of education, scientific research, public enjoyment and use, and cultural continuity." Pub. L. No. 113-291, 128 Stat. 3292 (2014). The area is still recovering from historical overgrazing, and no grazing is permitted within its borders. However, livestock grazing is permitted within the Santa Fe National Forest, which surrounds the Preserve to the north, west, and south. *See* First Amended Pet. (ECF 21) ¶¶ 70–77.

## II.    THREATENED AND ENDANGERED SPECIES ON THE PRESERVE

This case concerns impacts to three ESA-listed species: the endangered New Mexico meadow jumping mouse, the threatened Mexican spotted owl, and the endangered Jemez Mountains salamander. *Id.* ¶¶ 2–8. All three species are found on the Preserve and the surrounding Allotments, and all three species are harmed by livestock grazing.

The salamander, which is found only in and around the Preserve, can be directly impacted by livestock, for example through crushing by either the livestock themselves or through herding, and indirectly through habitat degradation. Ex. 1 at 11–14. Livestock grazing and associated activities may disturb individual owls and degrade their habitat, additionally reducing prey availability. *Id*. at 9–11. The New Mexico meadow jumping mouse is at a high risk of extinction, largely due to ongoing destruction and degradation of its specialized riparian habitat by livestock grazing, which FWS has recognized as the primary threat to the species. *Id*. at 5–9.

## III.    LIVESTOCK GRAZING ON THE SANTA FE NATIONAL FOREST

The Forest Service manages the Santa Fe National Forest for multiple uses, including livestock grazing by private permittees. A grazing permit issued by the Forest Service grants a license to graze livestock on certain designated allotments, subject to certain parameters set by the agency. The Forest Service must consult with the FWS if its actions, including authorizing and

implementing grazing permits, may affect ESA-listed species. 16 U.S.C. § 1536(a) (ESA Section 7(a)). The consultation must analyze all reasonably foreseeable effects, whether direct or indirect, and including those occurring outside the immediate action area. 50 C.F.R. § 402.02. As Petitioners have explained at length, livestock grazing creates an array of environmental impacts and is particularly harmful to the endangered salamander and jumping mouse, both of which are found on the Allotments at issue here. *See* Ex. 1 at 5–15.

In 2018, Respondents consulted on "the effects of ongoing implementation of term grazing permits for allotments within the Coyote, Cuba, Espanola, and Jemez Ranger Districts on the endangered Jemez Mountains salamander … [and] determined that the proposed action" was likely to adversely affect the species, including on all 11 of the Allotments at issue here. Ex. 2 at 1–7 (2018 BiOp). Respondents further found that the proposed action was likely to adversely affect salamander critical habitat on every allotment containing critical habitat, including seven of the named Allotments. *Id.* at 5–7.

The associated 2018 incidental take statement (ITS) defined and limited allowable take via a habitat proxy, capping collective grazing intensity across all allotments as well as "within any one allotment," and stated that if either of these limits were exceeded, "reinitiation of formal consultation would be required." *Id.* at 37. Respondents ultimately concluded that, with these specific limits in place, the ongoing implementation of term grazing would not jeopardize the salamander. *Id.* at 37–38.

Respondents have also consulted on the endangered jumping mouse, which is found on the Preserve and the Cebolla-San Antonio allotment. ECF 21 at 23–30. In a 2020 consultation, Respondents analyzed the impacts of continued grazing on the San Diego and Cebolla-San

Antonio allotments. Ex. 3 (2020 BiOp).[1] The associated ITS defined and limited take of jumping mice via a habitat proxy: Take would occur "with any overutilization of riparian pasture … or from any intrusion of livestock into closed pastures or [habitat] exclosures." *Id.* at 38–39. Similarly, the 2020 ITS capped incidental take of salamanders with reference to grazing intensity in occupied salamander habitat. *Id.* at 39–41. To comply with the 2020 ITS and avoid ESA Section 9 liability, the Forest Service was obligated to "[a]ctively check fencing" to ensure against cattle entering habitat exclosures, "immediately repair[]" damaged fences, and "immediately remove[]" livestock from closed areas. *Id.* at 41. Respondents concluded that, with these measures in place, grazing was not likely to jeopardize the jumping mouse or salamander. *Id.*

Neither the 2018 nor the 2020 BiOp discussed the potential for or effects from trespass livestock entering the Preserve from the Allotments, although Respondents had been aware of the issue at least since 2017. The Preserve and Allotments are separated by a single barbed-wire fence, long stretches of which are frequently down. ECF 21 ¶¶ 156–57. Each year, large groups of cattle—hundreds of livestock every grazing season—frequently enter the Preserve from the Allotments via these nonfunctional stretches of border fencing, remaining there for extended periods of time and causing significant habitat damage. *See id.* ¶¶ 123–66; Ex. 4 at 8–10, 21–25.

In 2023, the Park Service and FWS consulted on plans for "the removal and exclusion" of trespass livestock from the Preserve. Ex. 4 at 8 (2023 BiOp). The agencies concluded that, although the proposed fence building, cattle wrangling, corral construction, and routine use of horses, dogs, UTVs, trucks, and trailers on and around the Preserve were "likely to adversely affect" the salamander, owl, and jumping mouse, these livestock-removal activities would ultimately benefit

---

[1] The 2020 BiOp also considered impacts to the salamander on these two allotments, imposed stricter grazing limits than on the other allotments covered by the 2018 BiOp, and made a separate "no jeopardy" finding for this action. *See* Ex. 2 at 35–38; Ex. 3 at 39–42.

all three species, as they cause *less* harm than allowing the trespass status quo to continue. *See id.* at 2, 9–10, 21–25.

The 2023 BiOp did not analyze the impacts of trespass livestock on the Preserve, as they are not the result of Park Service action. *See id.* Nor did it specify which of the Allotments the cattle came from or exactly which portions of the "north, west, and south" fenceline needed repair.[2]

## IV.    PROCEDURAL BACKGROUND

On October 19, 2022, Petitioners notified the Forest Service, Park Service, and FWS of their intent to bring suit under the ESA. Ex. 5 (First NOI). The First NOI described incidents of cattle trespass known to Petitioners, noted that previous ESA consultations had never addressed effects of trespass cattle, explained the adverse effects of grazing on protected species, and alleged substantive and procedural violations of ESA Sections 7(a)(2), 7(d), and 9. *Id.* at 12–18, 23–24, 27–31.

On February 5, 2024, Petitioners again notified the Forest Service and FWS of their intent to bring suit. Ex. 6 (Second NOI). The Second NOI reiterated Petitioners' concerns and included new reports of trespass livestock. *See id.* at 10–31. Petitioners again specifically alleged violations of ESA Sections 7(a)(2), 7(d), and 9. *Id.* at 33–36.

Petitioners filed suit on June 4, 2024. Original Pet. (ECF 1). Their original Petition explained the trespass livestock issue and harms caused to protected species, *id.* ¶¶ 3–4, 65–77, 113–27, and described how previous ESA consultations had failed to consider the impacts of livestock trespass despite the agencies' longstanding knowledge of the problem. *Id.* ¶¶ 4, 85–87,

---

[2] Respondents have admitted that the fence requires frequent repair and that trespass cattle regularly cross into the Preserve when the fences are down. *See* Ex. 4 at 8–9, 13, 21–26 ("The majority, if not all, trespass livestock originate from grazing allotments authorized by the Forest."); Ex. 7 at 1–3, 7–8.

31–32, 95–97, 108–31. Petitioners therefore brought multiple claims for relief under the ESA, alleging (1) failure to reinitiate consultation pursuant to Section 7(a)(2); (2) violations of Section 9; (3) violations of Section 7(d); (4) failure to prevent jeopardy to protected species pursuant to Section 7(a)(2); and (5) failure to carry out programs to conserve listed species pursuant to Section 7(a)(1). *Id.* ¶¶ 128–71.

Petitioners subsequently received new information regarding current and planned agency actions. *See* ECF 21 ¶¶ 148–61. They also continued to receive new reports of trespass cattle. *Id.*

In early August, 2024, counsel for Respondents informed Petitioners that they required additional time to respond to the Petition. *See* ECF 16. Petitioners, in turn, informed Respondents that they wished to amend their Petition and thus required additional time to properly notify Respondents of new allegations. *Id.* On August 12, 2024, the parties jointly requested, and this Court granted, a 70-day stay of litigation. *See id.*

On August 13, 2024, Petitioners submitted a third NOI. Ex. 1 (Third NOI). Petitioners again described the ongoing trespass cattle incursions, including multiple new reports received during the summer of 2024, and Respondents' historic and current efforts to repair the fence. *Id.* at 16–21. Petitioners noted that no changes had been made to the fence design or location, that the old fence had not stopped livestock trespass, that the new fence had not stopped livestock trespass, and that the new fence had indeed already been damaged. *Id.* at 20–21. Petitioners alleged that by pursuing the same "conservation measure" that had historically failed to address the problem, the Forest Service was violating its mandatory Section 7(a)(1) duty to conserve. *Id.* at 21.

On September 7, 2024, the Park Service and Forest Service entered a "non-funded agreement" to "work together to manage cattle trespassing from SFNF into VCNP." Ex. 7 at 1, 7 (the Agreement). The agencies plan to "coordinate the construction and maintenance" of the

boundary fence and "to restrict livestock" to the Forest Service Allotments. *Id.* at 1. The implementation of these plans is, however, "[s]ubject to the availability of funds." *Id.* at 2.

After the litigation stay ended, Petitioners filed their Amended Petition on October 30, 2024, reiterating their previous allegations that Respondents had violated Section 7(a)(2) by failing to reinitiate consultation and failing to ensure against jeopardy to listed species; violated Section 7(d); and violated Section 9. ECF 21 ¶¶ 178–204, 214–19. Based on the 2024 fence work, damage to the newly installed fence, continuing incursions of trespass cattle onto the Preserve, and the Agreement, Petitioners brought a new Section 7(a)(1) claim, alleging the Forest Service had failed to take *effective* conservation actions. *See* ECF 21 ¶¶ 205–13.

Petitioners also expanded their Section 7(a)(2) claims, alleging that because Respondents were aware of the trespass problem when they issued the 2018 and 2020 BiOps, the existing BiOps were invalid, and the Forest Service's reliance on them was thus unlawful. *Id.* ¶¶ 167–77.

## STANDARD OF REVIEW

There is a "low bar for surviving a motion to dismiss[.]" *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020). Notice pleading requires "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (requiring "short and plain statement of the claim"). A "claim is facially plausible if the plaintiff has pled 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1247 (10th Cir. 2016) (citation omitted).

A court must "consider the complaint as a whole" to determine whether it contains adequate factual allegations. *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1284 (10th Cir. 2023). "Generally, a court considers only the contents of the complaint," but it may also look to

"documents referred to in and central to the complaint … and matters of which a court may take judicial notice." *Berneike v. CitiMortgage, Inc*., 708 F.3d 1141, 1146 (10th Cir. 2013).

Similarly, when determining whether a petitioner has satisfied the ESA notice requirement, courts look to the overall sufficiency of the notice rather than whether it listed every specific detail of every claim. *Klamath-Siskiyou Wildlands Ctr. v. MacWhorter*, 797 F.3d 645, 651 (9th Cir. 2015). The determinative question is whether the respondent was given adequate notice to identify and address the alleged violations. *Id.*

<u>**ARGUMENT**</u>

## I.    PETITIONERS' CHALLENGE TO THE 2018 BIOP RELATES BACK TO THEIR ORIGINAL PETITION

An amended pleading relates back to an earlier, timely pleading if it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Whether the original and amended pleadings present the same legal theories is irrelevant; the determinative factor is whether they "are tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005); *see also Gilles v. United States*, 906 F.2d 1386, 1390 (10th Cir. 1990); *Pernick v. Computershare Tr. Co., Inc*., 136 F. Supp. 3d 1247, 1273–74 (D. Colo. 2015) ("[A]mendments will relate back if they amplify the facts previously alleged . . . assert a new legal theory of relief, or add another claim arising out of the same facts[.]"). Courts apply this doctrine "liberally," as its purpose "is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *ASARCO, LLC v. Union Pac. R. Co*., 765 F.3d 999, 1004 (9th Cir. 2014).

Here, Petitioners' challenge to the validity of the 2018 BiOp arises from the same conduct and occurrences as their challenge to Respondents' failure to reconsult on that BiOp. As set forth in three NOIs and both Petitions, Respondents "have been aware of the ongoing cattle trespass for

several years—yet the recurring presence of trespass cattle from the Allotments, and the well-documented harm caused by their incursions, have never been included in the agencies' consultations," including the 2018 BiOp. ECF 1 ¶ 143; *see also id.* ¶¶ 69, 84–87.

Whether framed as a failure to reconsult or a failure to adequately consult in the first instance, the gravamen of Petitioners' claims is that the 2018 BiOp lacks any analysis of trespass cattle impacts.[3] The contents of the 2018 BiOp; the incidents of livestock trespass prior to its issuance; and Respondents' knowledge of, and failure to address the problem were at issue, and in fact were described, in the original Petition. *See* ECF 1 ¶¶ 3–4, 64–70, 84–88, 131, 143–46. That same "core of operative facts" gives rise to Claim 1 in the Amended Petition. Petitioners' challenge is thus timely. *See* Partial Mot. Dismiss (ECF 31) at 13–14 (citing 28 U.S.C. § 2401(a)).

## II.    PETITIONERS PROVIDED SUFFICIENT NOTICE OF CLAIMS 2, 5, AND 6.

### A.  The NOIs Contained Sufficient Information Regarding Alleged ESA Violations.

"The purpose of the ESA's notice provision is 'to put the agencies on notice of a perceived violation of the statute' and to give them the 'opportunity to review their actions and take corrective measures if warranted.'" *Conservation Cong. v. Finley*, 774 F.3d 611, 618 (9th Cir. 2014) (quoting *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998).

A sufficient notice "need not provide the exact details of the legal arguments that the plaintiffs intend to eventually make," *id.* at 618 (quoting *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1072–73 (9th Cir.1996); nor is a petitioner "required to list every specific aspect or detail of every alleged violation." *Ass'n for Restoration of the Env't v. Henry Bosnia Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) (citation omitted). Instead, the analysis turns on the overall sufficiency of the

---

[3] Reconsultation is required when "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent *not previously considered*[.]" 50 C.F.R. § 402.16(a)(2) (emphasis added). Contrary to Respondents' suggestions, the contents of an existing BiOp are thus central to both reinitiation claims and direct challenges to that BiOp.

notice. *Klamath-Siskiyou Wildlands Ctr*, 797 F.3d at 651; *see also Marbled Murrelet*, 83 F.3d at 1073 (examining "the letter as a whole" for notice sufficiency). The question is whether the notice provided sufficient information to allow the respondent to detect and address the alleged violation, bearing in mind the respondent's greater access to information about its own activities. *Klamath-Siskiyou Wildlands Ctr.*, 797 F.3d at 651 (holding plaintiffs provided sufficient notice of intent to file suit under ESA, despite not listing every legal violation, considering letter as a whole).

Thus, the inquiry into the sufficiency of Petitioners' multiple NOIs is not, as Respondents contend, whether they provided the exact details of the legal claims Petitioners ultimately made, but rather if they provided "sufficient information to allow [Respondents] to detect and address the alleged violation." *Id.*; *see also Marbled Murrelet*, 83 F.3d at 1072–73 (notice that focused on alleged violations under ESA Section 9 was sufficient even though plaintiffs ultimately sued under Section 7). By this standard, Petitioners' NOIs more than comply with the notice requirement.

All of Petitioners' NOIs contain ample information regarding the recurring issue of trespass livestock on the Preserve resulting from the Forest Service's authorization of livestock grazing on the Allotments and dating from before the 2018 and 2020 BiOps were issued. Ex. 5 at 12–15; Ex. 6 at 10–15; Ex. 1 at 15–20. Additionally, the First and Second NOIs specifically discussed the deficiency of Respondents' existing BiOps (Claim 2), Ex. 5 at 28–30; Ex. 6 at 10, 26–29, 34; the agencies' inability to ensure against jeopardy by relying on such incomplete and inaccurate BiOps (Claim 5), Ex. 5 at 1–2, 6, 30; Ex. 6 at 1–5, 26, 34–35; and the Forest Service's failure to take action to prevent further livestock trespass on the Preserve (Claim 6). Ex. 5 at 11–13, 30; Ex. 6 at 35. This provided sufficient notice of the violations Petitioners ultimately brought suit to address.

Additionally, Respondents' behavior after receiving the NOIs strongly suggests that "they understood or reasonably should have understood the alleged violations." *Klamath-Siskiyou*

*Wildlands Ctr.*, 797 F.3d at 651. Shortly after Petitioners' First NOI, the recipient agencies met "to discuss the removal and exclusion of livestock originating from Forest authorized grazing allotments that trespass onto the [Preserve]." Ex. 4 at 8. After the Second NOI, the agencies announced their intention to reconstruct the boundary fence. *See* ECF 21 ¶ 148. And after the Third NOI, the agencies agreed to coordinate future fence repairs and trespass cattle removal efforts. Ex. 7. Respondents' behavior thus indicates they were well aware of the bases for Petitioners' claims.

### B. Petitioners' Third NOI Provided Notice of Their New Section 7(a)(1) Claim.

Petitioners could not have provided more specific notice of their Section 7(a)(1) claim before the original Petition was filed, as it is based on events that occurred after the original Petition was filed on June 4, 2024: the Forest Service's commitment of resources to an ineffectual "conservation program." *See* Ex. 1 at 20–21; ECF 21 ¶¶ 208–11.

On May 16, 2024, after Petitioners sent their Second NOI, the Forest Service announced that it had secured funding for fence repairs. ECF 21 ¶ 148. The first trespass cattle of the 2024 grazing season (of which Petitioners are aware) were reported in late May, shortly after work began on the boundary fence and one week before the original Petition was filed. *See* Ex. 8 at 2–4. Over the next two months, as the agencies completed repairs on the northern boundary fence and began work on the southern boundary, Petitioners received six more reports of trespass cattle and information that sections of the newly repaired boundary fence were damaged. Ex. 8 at 5, 7, 10, 13; ECF 21 at p.36 (photographs of downed trees across the newly repaired boundary fence taken August 14, 2024). Based on this new information, Petitioners determined that they must amend the Petition to accurately reflect a new Section 7(a)(1) claim: The conservation measures the agencies have chosen to pursue have not been and are not now *effective*. *See* ECF 21 ¶¶ 205–213.

Federal district courts differ as to whether a new notice is required for claims arising out of agency action occurring subsequent to the filing of a petition, *see Ctr. for Biological Diversity*

*v. EPA*, 316 F. Supp. 3d 1156, 1170–71 (N.D. Cal. 2018) (collecting cases), and Petitioners are aware of no case law in the Tenth Circuit directly addressing the question. Therefore, in an abundance of caution, on August 12, 2024, Petitioners moved for a 70-day stay of this litigation, ECF 16, which this court granted, ECF 17. During that time, Petitioners sent their Third NOI, advising the Forest Service of the need to pursue *effective* conservation measures to fulfill its Section 7(a)(1) duty. *See* Ex. 1 at 20–21.

In sum, Petitioners' first and second NOIs provided sufficient notice of Claims 2, 5, and 6 insofar as that claim was originally pled. Petitioners also took the additional step of providing notice of their new Section 7(a)(1) claim, giving the Forest Service further "opportunity to review [its] actions and take corrective measures if warranted." *Finley*, 774 F.3d at 618 (9th Cir. 2014). This Court should therefore decline to dismiss these claims on the basis of insufficient notice.

## III. PETITIONERS PROPERLY STATED THEIR CLAIMS FOR RELIEF UNDER ESA SECTIONS 7(a)(1), 7(a)(2), 7(d), AND 9.

As Petitioners note above, there is a "low bar for surviving a motion to dismiss," *Quintana*, 973 F.3d at 1034—Petitioners need only plead "enough facts to state a claim to relief that is plausible on its face[.]" *Twombly*, 550 U.S. at 570. All that notice pleading under Rule 8(a)(2) requires is "a short and plain statement of the claim showing that the pleader is entitled to relief."

The Rule 12(b)(6) standard is no higher than the Rule 8(a)(2) standard; it "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" defendant misconduct, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 545, 556 (citations omitted). Prior to the introduction of any evidence, the court must accept as true "all well-pleaded facts in the complaint, and draw all

reasonable inferences therefrom in the light most favorable to the plaintiffs." *Leverington v. City of Colorado Springs*, 643 F.3d 719, 723 (10th Cir. 2011).

Respondents challenge the sufficiency of Petitioners' claims, complaining that the Amended Petition lacks sufficiently detailed allegations, but their arguments are incompatible with the Rule 12(b)(6) standard. Respondents seek details not required to provide "fair notice of what the … claim is and the grounds upon which it rests[.]" *Twombly*, 550 U.S. at 555 (citation omitted); *see also id.* at 555 n.3 (discussing purpose of notice pleading) and 570 (rejecting need for "heightened fact pleading of specifics"). The remainder of Respondents' arguments go to the merits of Petitioners' claims rather than the sufficiency of their pleadings, roaming well beyond the appropriate scope of a motion to dismiss. This Court should decline to indulge them.

### A. Claim 3 Adequately Alleges that Respondents Must Reinitiate Consultation on All Named Allotments.

Petitioners have alleged that, due to the Forest Service's continued authorization of grazing on the Allotments, cattle from the Forest routinely trespass on the Preserve and adversely affect listed species there in a manner and to an extent not previously considered in the 2018 and 2020 BiOps. ECF 21 ¶¶ 6, 142, 163–66, 179. Petitioners have additionally alleged that Respondents have not reconsulted on these impacts. *See id.* ¶¶ 24–28, 75, 89–90, 98–99, 122–42, 188–95. These factual allegations, taken as true, are sufficient to provide notice and to establish a plausible claim that Respondents must reinitiate consultation on all named allotments, thus satisfying the "the simple requirements" of Rule 8(a)(2) as to Claim 3.[4] *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002); *see also Bryson v. Gonzales*, 534 F.3d 1282, 1286–87 (10th Cir. 2008).

---

[4] Petitioners do not oppose the dismissal of Claim 3 against FWS, specifically, because a rule change effective shortly before the original Petition was filed placed the legal duty to reinitiate consultation solely on the action agency (here, the Forest Service). *See* 50 C.F.R. § 402.16(a) (2024); *id.* (2023). Petitioners maintain Claim 3 against the Forest Service.

Respondents assert that Petitioners failed to identify which agency actions caused the trespass and thus require reinitiation of consultation. ECF 31 at 16–17. This is simply untrue. The Amended Petition repeatedly explains that "[b]y continuing to issue annual grazing authorizations for the Allotments," ECF 21 ¶ 6; and "failing to reinitiate consultation for the Forest Service's authorization of grazing on the Allotments," *id.* ¶ 179; the Forest Service had violated its duties under ESA Section 7(a)(2). *See id.* ¶ 142 ("Trespass livestock on the Preserve, and their deleterious effects there, are the direct result and foreseeable outcome of the Forest Service's authorization of grazing on the Allotments. But for the Forest Service's authorization of grazing on the Allotments, there would be no livestock trespass on the Preserve."), 163–66.

Respondents further erroneously contend that the Amended Petition improperly bundles the authorization of ongoing term grazing on the Allotments into one "grazing program" on which Respondents should reconsult. ECF 31 at 15–16. But this argument misconstrues the elements of Petitioners' claim and Respondents' own ESA consultation process.

"While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191–92 (10th Cir. 2012). Here, Petitioners allege that the trespass cattle and their impacts constitute "new information reveal[ing] effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered[.]" 50 C.F.R. § 402.16(a)(2); ECF 21 ¶¶ 188–90. The question is whether a previously-consulted upon "action" is having effects not considered by Respondents in that consultation, and the relevant "action" is necessarily defined by the relevant consultation. *See* 16 U.S.C. § 1536(a)(2) (consultation required only for "agency action").

Grazing on the Allotments is covered by the 2018 and 2020 BiOps, each of which describes

the "agency action" to which it applies. The 2018 BiOp defines the relevant "proposed action" as the "ongoing implementation of term grazing permits for allotments within the Coyote, Cuba, Espanola, and Jemez Ranger Districts." Ex. 2 at 1; *see also id.* at 4–6, 27–33.[5] That is "the action" on which Respondents consulted, and on which Petitioners allege that they now must reconsult because new information indicates that "implementation of term grazing permits for allotments within the Coyote, Cuba, Espanola, and Jemez Ranger Districts" is having impacts not previously considered. *Id.* at 1; *see also Oregon Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1007 (D. Or. 2010) ("[I]n the context of the ESA, the term 'agency action' is defined broadly and the 'ESA requires the [BiOp] to analyze the effect of the entire agency action.' Here, *the entire agency action includes grazing on all thirteen allotments, and reinitiation of formal consultation necessarily includes all thirteen allotments*.") (emphasis added) (quoting *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir.1988)).

The 2020 BiOp considers the impacts of "livestock grazing on the San Diego and Cebolla/San Antonio grazing allotments" on the salamander, owl, and jumping mouse. Ex. 3 at 1–6. New information pertaining to the effects of this livestock grazing would therefore only trigger reconsultation for one of the named Allotments. By alleging that trespass cattle were causing effects not considered in the 2020 BiOp, Petitioners necessarily alleged that reconsultation was required for continued livestock grazing on the Cebolla-San Antonio.[6]

---

[5] The 2018 BiOp contains one broad description of the "proposed action," one analysis of its expected effects, one ITS—which caps incidental take both *across all allotments* and within each allotment—and one jeopardy determination for implementation of term grazing permits. This framework applies to every allotment covered by the 2018 BiOp. Put simply, Respondents chose to consult on the implementation of grazing permits on multiple allotments as one action, and issue one single opinion as to its impacts. *See id.* If it was proper for Respondents to fulfill their 7(a) obligations in this manner, it is proper for Petitioners to frame their 7(a) challenges accordingly.

[6] It is not entirely clear whether Respondents actually challenge the sufficiency of Petitioners' allegations regarding the Cebolla-San Antonio, as they concede that the 2020 BiOp pertains only

In sum, Petitioners have alleged that trespass cattle from the Allotments impact listed species on the Preserve, that neither BiOp contains any discussion of these impacts, and that therefore neither BiOp is adequate. ECF 21 ¶¶ 88–90, 99, 120–31, 136–38, 142, 163–66, 169–70, 188–93. The BiOps analyzed the impacts of the relevant actions as a whole; if those actions are having previously unanalyzed effects, the BiOps are invalid and therefore cannot cover *any* of the Allotments, regardless of whether specific trespass cattle can ultimately be traced back to each specific Allotment. *Cf. Oregon Nat. Desert Ass'n*, 716 F. Supp. 2d at 1007. Taking these allegations as true, Petitioners have alleged sufficient facts to state a plausible claim that Respondents must reinitiate consultation pursuant to the ESA.

Finally, Respondents' theories misconstrue Rule 12(b)(6). Respondents acknowledge that Petitioners "attribut[ed] livestock presence in the [Preserve] to all adjacent allotments," but then bewilderingly assert that the Petition failed to "allege that livestock from all eleven allotments have ever entered the [Preserve]." ECF 31 at 15. At best, this is a distinction without a difference. Respondents' true contention appears to be that Petitioners did not provide detailed *evidence* of trespass from all Allotments, not that Petitioners failed to properly *allege* trespass from all Allotments. But at this stage in the proceedings, this Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to" Petitioners. *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013); *see also Bryson*, 534 F.3d at 1286 ("This is not to say that the factual allegations must themselves be plausible; after all, they are assumed to be true."). The truth of Petitioners' factual allegations is not yet at issue. Respondents are improperly advancing an argument on the merits, which cannot be resolved by

---

to one named Allotment and note that Petitioners identified it as a major source of trespass cattle. *See* ECF 31 at 16.

this Court on a Rule 12(b)(6) motion.

Rules 8(a)(2) and 12(b)(6) do not require pleadings to set forth a detailed, prima facie case before any record has been produced or discovery conducted; instead, Rule 12(b)(6) "simply calls for enough fact to raise a reasonable expectation that *discovery will reveal evidence*" that respondents are liable for the misconduct alleged and petitioners are entitled to the relief requested. *Twombly*, 550 U.S. at 557 (emphasis added); *see also Smith v. United States*, 561 F.3d 1090, 1105–06 (10th Cir. 2009); *Garcia-Catalan v. United States*, 734 F.3d 100, 104 (1st Cir. 2013) ("'[S]ome latitude may be appropriate' in applying the plausibility standard … [where] a material part of the information needed is likely to be within the defendant's control.") (citation omitted). The heightened specificity Respondents demand would require precisely the sort of information likely to be within Respondents' control and revealed only later in the litigation.

As explained above, Petitioners have made sufficient factual allegations to put Respondents on notice of the claims against them and, if assumed to be true, "to state a claim to relief that is plausible on its face." *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014); *see also Clinton*, 63 F.4th at 1280 (holding that even under Rule 9(b)'s heightened pleading standard, "not all of the plaintiffs' allegations" must be pleaded with particularity if "allegations are sufficiently particularized when taken as a whole" to "sufficiently apprise" defendant of its misconduct) (cleaned up). Respondents would have Petitioners go further and allege with particularity the Allotment of origin for each trespass cow and specifically how cattle from each Allotment have harmed listed species and habitat. Petitioners readily admit that they cannot do so at this stage in the proceedings, "but to require such specificity is unreasonable considering no discovery has occurred[,]" or administrative record produced, "at this stage of litigation." *Truman v. Orem City*, 1 F.4th 1227, 1238 (10th Cir. 2021). Petitioners have met their burden of stating a

plausible claim for relief with regards to Claim 3.

### B. Claim 4 Adequately Alleges a Violation of ESA Section 7(d).

As a practical matter, it makes no difference whether Petitioners bring an independent claim under 7(d), or merely invoke it as the basis for an injunction pending ESA compliance. *See Yurok Tribe v. U.S. Bureau of Reclamation*, 231 F. Supp. 3d 450, 480 (N.D. Cal. 2017), *order clarified sub nom. Tribe v. U.S. Bureau of Reclamation*, 319 F. Supp. 3d 1168 (N.D. Cal. 2018). Section 7(d) works with Section 7(a)(2) to bar the Forest Service from implementing its grazing program in the absence of a valid BiOp and ITS—if an agency's previous consultation is invalid, 7(a)(2) obligates the agency to re-consult before it takes further action, while 7(d) prohibits implementation until that consultation is complete. *See Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994); *cf. Conner*, 848 F.2d at 1455 n.34.

Respondents assert that Petitioners failed to specifically allege "that ongoing grazing 'has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures[.]'" ECF 31 at 18 (quoting 16 U.S.C. § 1536(d)). But, once again, this argument goes to the merits of Petitioners' challenge rather than the adequacy of their pleading.

As alleged in the Amended Petition, "[c]ontinued livestock trespass onto the Preserve and unlawful encroachment onto the Allotment exclosures may irrevocably damage endangered species' habitat and/or permanently foreclose the recovery of the salamander, spotted owl, and jumping mouse," ECF 21 ¶ 165, and jumping mouse populations in particular can be "quickly extirpated by even limited grazing." *Id.* ¶ 200. Taking these allegations as true, continued grazing would necessarily foreclose the implementation of reasonable and prudent measures to avoid violating Section 7(a)(2). If livestock extirpate a population, or permanently foreclose a species' recovery, Respondents cannot retroactively impose measures to prevent this outcome. *See Yurok Tribe*, 231 F. Supp. 3d at 480.

Petitioners have sufficiently alleged that implementing the Forest Service's grazing program constitutes an irretrievable commitment of resources. The merits of their claim cannot be decided by a Rule 12(b)(6) motion, which should therefore be denied as to Claim 4.

### C.  Claim 6 Adequately Alleges a Violation of ESA Section 7(a)(1).

Relying on two unpublished, extra-circuit decisions, Respondents assert that any nominal conservation action will automatically satisfy an agency's 7(a)(1) duties. *See* ECF 31 at 21–24. This theory is foreclosed by both text and precedent.

The text of Section 7(a)(1) commands all federal agencies to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered [] and threatened species[.]" 16 U.S.C. § 1536(a)(1). The ESA further defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered [] or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3). The cases cited by Respondents directly conflict with this language, requiring not the rigorous pursuit of recovery by "all methods and procedures," but rather only some de minimis action, even if shown to be ineffective. The ESA demands more.

Other circuits have rejected Respondents' low bar for Section 7(a)(1), instead requiring agencies to take some *meaningful* action. As the 11th Circuit has explained, agencies

> must in fact carry out a program to conserve, and not an "insignificant" measure that does not, *or is not reasonably likely to*, conserve endangered or threatened species. To hold otherwise would turn the modest command of section 7(a)(1) into no command at all by allowing agencies to satisfy their obligations with what amounts to total inaction.

*Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1147 (11th Cir. 2008) (emphasis added) (citing *Pyramid Lake Paiute Tribe of Indians v. U.S. Department of the Navy*, 898 F.2d 1410 (9th Cir. 1990)

(holding agencies have "some" discretion in deciding how best to fulfill 7(a)(1) duties)). The mere existence of a putative conservation program is not enough to fulfill an agency's Section 7(a)(1) duty. Rather, that program must be reasonably likely to conserve listed species.

Respondents' theory, in contrast, would afford agencies boundless discretion and allow them to rely on programs that "conserve" in name only. This outcome is supported by neither the weight of relevant case law nor the language of the ESA itself, and this Court should decline to adopt the rationale of the unpublished district court decisions cited by Respondents.

The remainder of Respondents' argument for dismissal of Petitioners' Section 7(a)(1) claim is based on its merits, and is therefore inappropriate for a Rule 12(b)(6) motion. The Amended Petition alleges that Respondents have long been aware of the harms caused by trespass livestock to threatened and endangered species on the Preserve, ECF 21 ¶¶ 123–32, 134–35, 141–44, 147; that the Forest Service's primary method of preventing such harm—fencing—has historically failed to do so, *id.* ¶ 156; that the Forest Service's only response has been to reinstall the same type of fence in the same location as before, *id.* ¶ 155; and that newly installed sections of fence have, indeed, already been damaged, enabling continued livestock trespass. *Id.* at pg. 36, Ex. 1 at 20. In sum, Petitioners have alleged enough facts to state a plausible Section 7(a)(1) claim. *See Fla. Key Deer*, 522 F.3d at 1147. Whether the Forest Service's choice to pursue a demonstrably ineffective "conservation strategy" fulfills its Section 7(a)(1) duty falls squarely within the merits of this case. ECF 21 ¶ 161; *see also* Ex. 7 at 7–8. This Court should reject Respondents' invitation to answer that question at this early stage, and instead allow Petitioners' Claim 6 to proceed with the benefit of a record.

### D. Claim 7 Adequately Alleges a Violation of ESA Section 9.

Finally, Respondents seek to dismiss Petitioners' Section 9 claim, but their arguments again betray a misunderstanding of the ESA and the proper scope of a motion to dismiss. Rule 12(b)(6)

is not an appropriate vehicle to argue the merits of a case or demand proof of Petitioners' factual allegations "by a preponderance of the evidence." ECF 31 at 26.

Respondents first misconstrue Section 9's "actual harm" requirement, suggesting that habitat destruction cannot be used to establish unlawful take. *Id.* at 25–27. But—as courts have routinely held—this cramped reading is contrary to the ESA's text and purpose.

"Take" is explicitly defined to encompass "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *see also* 16 U.S.C. §§ 1532(19), 1538(a)(1)(B); *Cascadia Wildlands v. Scott Timber Co*., 105 F.4th 1144, 1156 (9th Cir. 2024). Contrary to Respondents' arguments, this "actual harm" standard merely means that not *every instance* of habitat modification is significant enough to constitute take, not that habitat modification alone cannot cause or be used to establish take.[7] *See Oregon Nat. Desert Ass'n*, 716 F. Supp. 2d at 1005–06; *contra* ECF 31 at 25–27. Here, Respondents have concluded that the alleged habitat modifications can and do actually harm the species at issue. *See* Ex. 2 at 37; Ex. 3 at 38–41. Indeed, Respondents' entire consultation regime is premised on the assumption that defined levels of grazing "actually kill or injure" protected species. *See Oregon Nat. Desert Ass'n*, 716 F. Supp. 2d at 1005–06; *cf. Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt*., 273 F.3d 1229, 1237 (9th Cir. 2001) ("[T]he definition of 'taking' in Sections 7 and 9 of the ESA are identical in meaning and application.").

Respondents also confusedly suggest that because the 2018 and 2020 BiOps define and limit take with reference to habitat proxies, Petitioners cannot rely on those same proxies to

---

[7] Respondents also suggest in passing that Section 9 can only be applied retroactively, but elsewhere concede that it prohibits, and can be invoked to enjoin, "reasonably certain" future harm. *See* ECF 31 at 26–27; *see also Cascadia Wildlands*, 105 F.4th at 1156.

demonstrate that *unlawful* take has occurred. *See* ECF 31 at 26. But under Respondents' theory, if an ITS was in place, no take would ever violate Section 9—no matter how invalid the consultation was, how egregiously take exceeded the ITS, or whether the mechanism of unlawful take was covered by the ITS at all. This absurd result is foreclosed by text and precedent, including the case on which Respondents' argument relies.

Respondents quote *ONDA v. Tidwell* for the proposition that "where the ITS utilizes a habitat proxy for take … the exceedance of the ITS in and of itself does not establish a violation of [Section] 9." 716 F. Supp. 2d at 1005. But the *ONDA* court went on to find take had in fact occurred "due to significant habitat degradation" demonstrated by "inordinate exceedances" of the ITS standards. *Id.* at 1006. Exceeding or violating an ITS subjects an agency to liability under both Section 7 *and* Section 9. *See, e.g.*, *Oregon Natural Res. Council. v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007); *California Trout, Inc. v. U.S. Bureau of Reclamation*, 115 F. Supp. 3d 1102, 1115–16 (C.D. Cal. 2015); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 629 F. Supp. 2d 1123, 1132–33 (E.D. Cal. 2009) ("[W]hen the terms of an ITS are violated, the agency is liable under Section 9[,]" and "an agency's violation ... may also cause an actionable violation of [Section 7].") (collecting cases). Petitioners have properly pled both. *See* ECF 21 ¶¶ 167–95, 215–18.

Moreover, even if Respondents were correct about the ESA, which Petitioners do not concede, they would be incorrect about Rule 12(b)(6). Per Respondents' own brief, Section 9 requires plaintiffs to demonstrate "*by a preponderance of the evidence*, that the challenged activity is reasonably certain to imminently harm, kill, or wound the listed species." ECF 31 at 26 (citations omitted, emphasis added). Respondents do not explain how to apply this standard in a motion to dismiss—prior to any evidence whatsoever being submitted. Even under Respondents' theory, this is manifestly an issue for later resolution. *See J.D. Heiskell Holdings, LLC v. Willard Dairy, LLC*,

No. CV 23-854 JCH/JFR, 2024 WL 4286356, at *4–5 (D.N.M. Sept. 25, 2024); *see also Equal Emp. Opportunity Comm'n v. JBS USA, LLC*, 481 F. Supp. 3d 1204, 1218 (D. Colo. 2020); *cf. Nat. Res. Def. Council v. Zinke*, 347 F. Supp. 3d 465, 523–25 (E.D. Cal. 2018) ("Whether or not Federal Defendants have violated the ITS is a fact question that must be resolved at trial.").

Respondents also renew their demand for specific facts showing trespass from each Allotment, asserting that Petitioners "fail to specify what allotment-specific agency action(s) the trespass is attributed to[.]" ECF 31 at 27. As explained in Section C1, *supra*, Petitioners have sufficiently alleged that trespass cattle from each Allotment enter the Preserve, and have identified the agency actions causing this trespass: the authorization and implementation of grazing on the Allotments. *See* ECF 21 ¶¶ 6, 142, 163–66, 215.

Respondents now ask Petitioners to go even further and establish exactly which trespass cattle have caused take of listed species on the Preserve. *See* ECF 31 at 25, 27. This is far more specificity than required in initial pleadings, particularly here, "where a material part of the information needed is likely to be within [Respondents'] control." *Garcia-Catalan*, 734 F.3d at 104; *see also J.D. Heiskell Holdings*, 2024 WL 4286356 at *5 ("[W]ithout the benefit of discovery … it is unreasonable to expect that plaintiff always to be in a position to allege specific facts[.]"). Petitioners have explained how trespass cattle on the Preserve and overgrazing on the Allotments cause take, with reference to findings from the FWS, Park Service, and Forest Service. ECF 21 ¶¶ 84–90, 105–15, 123–25, 136, 214–18; *see also* Ex. 2 at 37; Ex. 3 at 38–41. Petitioners have alleged that this unlawful take has occurred and will continue to occur until Respondents fully comply with their duties under the ESA, as described in the Amended Petition. *See* ECF 21 ¶¶ 215–19. This is enough to give Respondents "fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted, alteration in original). Respondents do

not need allotment-specific details, much less the cow-specific details they demand here, at this stage of the litigation.

Petitioners have alleged unlawful take in excess of ITS limits *and* through actions not contemplated in the relevant BiOps. *See* ECF 21 ¶¶ 167–95, 215–18. These are factual allegations that, if taken as true, constitute a violation of ESA Section 9 *in addition to* Section 7. This is all that Rule 8(a)(2) requires. *See Twombly*, 550 U.S. at 555; *George*, 833 F.3d at 1247.

## <u>CONCLUSION</u>

Petitioners' challenge to the 2018 BiOp relates back to the original Petition as it arises out of the same conduct Petitioners originally challenged. Fed. R. Civ. P. 15(c)(1)(B). Claim 1 is therefore timely. *See Pernick*, 136 F. Supp. 3d at 1273–74. Additionally, Petitioners' NOIs amply met the ESA's notice requirement by providing sufficient information for Respondents to detect and address the alleged violations. *See Klamath-Siskiyou Wildlands Ctr.*, 797 F.3d at 651; *Ctr. for Biological Diversity*, 316 F. Supp. 3d at 1170-71. Claims 2, 5, and 6 should not be dismissed. Finally, Petitioners have plead enough facts to show their entitlement to relief under Claims 3, 4, 6, and 7. *Twombly*, 550 U.S. at 570. This Court should therefore deny Respondents' Motion to Dismiss.

Respectfully submitted this 13th day of January, 2025,

*s/ Erin Hogan-Freemole*
Erin Hogan-Freemole, PHV
971-417-6851 | ehoganfreemole@wildearthguardians.org
Tim Davis, NM Bar No. 19-204
205-913-6425 | tdavis@wildearthguardians.org
WILDEARTH GUARDIANS
301 N. Guadalupe St., Ste. 201
Santa Fe, NM 87501

Megan Backsen, PHV
719-207-2493 | megan@westernwatersheds.org
WESTERN WATERSHEDS PROJECT
P.O. Box 6774
Reno, NV 89513

*Counsel for Petitioners*