IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WILDEARTH GUARDIANS, et al.,

    Petitioners,

vs.                                      No. 1:24-cv-00557-LF-KK

UNITED STATES FOREST SERVICE, et al.,

    Respondents.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the partial motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) by respondents the U.S. Forest Service; the U.S. Fish and Wildlife Service (the "FWS"); Forest Service Chief Randy Moore; Santa Fe National Forest Supervisor Shaun Sanchez; and FWS Director Martha Williams.  Doc. 31.  For the reasons below, the motion is granted in part and denied in part.

## BACKGROUND[1]

This is a dispute under the Endangered Species Act ("ESA") and Administrative Procedure Act ("APA") concerning unauthorized cattle grazing on Valles Caldera National Preserve (the "Preserve"), a "dormant crater of a supervolcano located at the center of the Jemez Mountains" in New Mexico, *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 (10th Cir. 2015), and a "popular destination for outdoor recreation," Doc. 21 ¶ 65.

---

[1] The Court draws this case's background from the allegations in petitioners' amended petition for review of agency action, Doc. 21—which the Court "must take … as true" at the motion to dismiss stage, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)—and from documents attached to respondents' motion to dismiss that are central to petitioners' claims and whose authenticity is unquestioned, *see Invictus Unlimited v. Fed. Ins. Co.*, No. 1:24-cv-00421-LF-GBW, 2025 WL 1208201, at *1 (D.N.M. Apr. 25, 2025).

Petitioners WildEarth Guardians, Western Watersheds Project, and Caldera Action are nonprofit organizations seeking to protect the Preserve. *Id.* ¶¶ 13–22. As detailed below, petitioners allege that respondents have not upheld their duties under the ESA to shield three protected species—the Jemez Mountains Salamander (the "Salamander"), the Mexican Spotted Owl (the "Spotted Owl"), and the New Mexico Meadow Jumping Mouse (the "Jumping Mouse")—from the harmful impacts of cattle trespass on the Preserve. *Id.* ¶¶ 3–8.

### A.     Cattle trespass on the Preserve and its environmental impacts

"The Forest Service may authorize private livestock grazing on the National Forests in designated allotments pursuant to grazing permits," Doc. 21 ¶ 62, "which are typically issued for a period of ten years, specify a maximum number of livestock that may be grazed on each allotment each year," and "set forth the basic terms and conditions" for grazing, *id.* ¶ 63.

"While no livestock grazing is currently authorized on the Preserve, grazing *is* permitted" by the Forest Service "directly along nearly all of the Preserve's boundary, on the neighboring [Santa Fe] National Forest." *Id.* ¶ 70. Specifically, "twelve active National Forest grazing allotments … abut the Preserve: the Alamo, Del Norte, Peralta, Las Conchas, V-Double Slash, Cebolla-San, Antonio, Penas Negras, Coyote, Youngsville, Mesa del Medio, and Chicoma allotments" (the "Allotments"). *Id.* ¶ 75. "The Allotments are separated from the Preserve by a barbed-wire fence that is frequently in need of extensive repair or replacement." *Id.* ¶ 77. "Long sections of the fence are often down for extended periods of time due to fires, fallen trees, animal damage, and/or deliberate vandalism or removal," and "[n]ew gaps appear every grazing season." *Id.* By May 2024, the "existing fence was almost entirely gone along significant stretches of the northern and southern boundaries." *Id.* ¶ 149. Although the Forest Service "reported that repairs or reconstruction of the existing fence along the entire northern boundary

were completed" in "early August 2024," *id.* ¶ 154, the "reconstructed boundary fence follows the same route, uses the same materials, and was built to the same specifications as the old fence," *id.* ¶ 155, meaning it is unlikely to stop cattle trespass, *id.* ¶ 161.

As a result of these issues, "hundreds of cattle from the National Forest unlawfully trespass onto the Preserve" each summer, "causing severe resource damage and harming … protected species and their habitats." *Id.* ¶ 3. Cattle "consistently congregate at water sources and intensively graze in riparian zones," "trampling [the] native vegetation" and causing "degradation of the Preserve's wetlands, water quality, and riparian habitat." *Id.* ¶ 125. Cattle trespass has been "well-known and well-documented since at least 2017," *id.* ¶ 123, and the "damage caused by trespass cattle on the Preserve" is "widespread, ongoing, well-documented, and regularly reported to the Forest Service each summer," *id.* ¶ 126.

Petitioners allege that cattle trespass on the Preserve harms the Salamander, Spotted Owl, and Jumping Mouse, three species protected under the ESA. For the Salamander, cattle grazing degrades their habitat through, for example, "soil compaction," "establishment of livestock trails," and "trampling." *Id.* ¶ 84. For the Spotted Owl, grazing leads to "diminished prey availability and abundance, increased susceptibility to uncharacteristic wildfire, degradation of riparian habitat and water sources, and changed forest structure that impairs future habitat development." *Id.* ¶ 93. For the Jumping Mouse, "[l]ivestock grazing … can rapidly degrade or remove suitable riparian habitat," making it the "primary threat to [their] populations." *Id.* ¶ 106.

Respondents have acknowledged that cattle grazing may impact these protected species, but petitioners allege that they have not upheld their duties under the ESA to protect them, *see id.* ¶¶ 85–90, 97–99, 111–22, and that continued trespass "may irrevocably damage endangered species' habitat and/or permanently foreclose the recovery" of these species, *id.* ¶ 165.

3

Petitioners assert that, "[b]y continuing to issue annual grazing authorizations for the Allotments, the Forest Service has violated its duties under the ESA to (1) fully consult with the FWS regarding the impacts of its grazing program on protected species; (2) reinitiate consultation with the FWS regarding such impacts; (3) avoid [the] unauthorized take of such species; (4) ensure that its actions do not jeopardize the survival of such species; and (5) take affirmative, effective steps to conserve and recover such species." *Id.* ¶ 6. Petitioners also assert that, "[b]ecause the duty to reinitiate consultation falls equally on the FWS, it has likewise violated the ESA by failing to fully consult or reconsult with the Forest Service regarding grazing on the Allotments and the well-documented adverse impacts of that grazing to protected species within the Allotments and on the Preserve." *Id.* ¶ 7.

**B.    Petitioners' attempts to work with respondents to address impacts on protected species**

"Alarmed by the agencies' failure to adequately respond to the trespass cattle issue, on October 19, 2022, [p]etitioners sent a Sixty-Day Notice of Intent to Sue" under 16 U.S.C. § 1540(g) "for ESA violations to the Forest Service, the FWS, the Park Service, and the agencies' respective officers and supervisors" (the "First NOI"). Doc. 21 ¶ 132; *see* Doc. 31-5. "In a joint response, the Forest Service and the Park Service stated that they would continue to work cooperatively on the matter," and the "Park Service additionally committed to formal consultation with the FWS regarding the effects on ESA-listed species of removing and excluding livestock from the Preserve." Doc. 21 ¶ 133. "Throughout 2023, [p]etitioners met with the agencies several times in hopes of developing a solution to the trespass cattle problem and avoiding litigation" and "repeatedly" reported cattle trespass to the agencies. *Id.* ¶ 134.

On February 6, 2024, petitioners again notified respondents "of their intent to sue for violations of the ESA" under 16 U.S.C. § 1540(g), "including [for] the Forest Service's refusal to

reinitiate consultation" with the FWS under the ESA (the "Second NOI"). *Id.* ¶ 144; *see* Doc. 31-6. The Forest Service responded that it was "not required to take preventative action or to consult with the FWS regarding the impacts of trespass cattle because '[u]nauthorized or otherwise illegal activities are not part of the Forest Service's proposed action,'" and the "Forest Service further disavowed any responsibility for ensuring that cattle did not enter the Preserve or harm protected species there." Doc. 21 ¶ 145. "The FWS, for its part, stated that the Forest Service would repair riparian fences and habitat exclosures within the Allotments before the 2024 grazing season began, and noted that the agencies planned to reinitiate consultation [under the ESA] regarding grazing on the Cebolla-San Antonio allotment." *Id.* ¶ 146. "The FWS did not clarify whether the reconsultation would encompass impacts of trespass livestock on the Preserve; indeed, the FWS response never mentioned trespass cattle." *Id.*

Petitioners met with respondents "again in May 2024 to renew their concerns regarding the agencies' failure to reinitiate [ESA] consultation," but the agencies "refused" to reinitiate consultation. *Id.* ¶ 147.

### C.    This lawsuit's procedural history

Petitioners initiated this lawsuit against respondents on June 6, 2024, by filing their initial petition for review in this Court. *See* Doc. 1. Seeking declaratory and injunctive relief, petitioners raised five claims under the ESA's citizen-suit provision.[2] *Id.* ¶¶ 128–71. Petitioners, however, "continue[d] to receive new reports regarding alleged trespass cattle on the Preserve,"

---

[2] The ESA's citizen-suit provision provides that "any person may commence a civil suit … to enjoin any person, including the United States and any other governmental instrumentality or agency … who is alleged to be in violation of any provision of [the ESA] or regulation issued under the authority [of the ESA]." 16 U.S.C. § 1540(g)(1)(A); *see Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1106 n.3 (10th Cir. 2010).

and they "intend[ed] to seek leave to amend their Petition to include these new reports."  Doc. 16

at 2.  The parties therefore jointly requested a 70-day stay so that petitioners could "properly

notify" respondents about "these new reports as required by the ESA."  *Id.* (citing 16 U.S.C.

§ 1540(g)).  The Court granted the parties' request for a 70-day stay.  Doc. 17.  Petitioners served

their third notice of intent to sue under the ESA on respondents (the "Third NOI"), Doc. 31-3,

and petitioners filed their amended petition on October 30, 2024, Doc. 21.

Again seeking declaratory and injunctive relief, petitioners raised seven claims under the

ESA's citizen-suit provision and the APA in their amended petition:

1.  Invalid Biological Opinions ("BiOps") under ESA § 7 and the APA's arbitrary and
    capricious standard ("Claim 1");

2.  Reliance on invalid BiOps under ESA § 7 ("Claim 2");

3.  Failure to reinitiate consultation under ESA § 7 ("Claim 3");

4.  Irreversible, irretrievable commitment of resources under ESA § 7 ("Claim 4");

5.  Failure to ensure against jeopardy under ESA § 7 ("Claim 5");

6.  Failure to take effective conservation actions under ESA § 7 ("Claim 6"); and

7.  Unlawful take of protected species under ESA § 9 ("Claim 7").

*Id.* ¶¶ 167–219.

On December 19, 2024, respondents filed the partial motion to dismiss now before the

Court, seeking to dismiss "part of Claims 1 and 3 and the entirety of Claims 4, 6, and 7 for

failure to state a claim under Rule 12(b)(6)" and the "entirety of Claims 2, 5, and 6 for failing to

provide the requisite notice of violations before filing suit."  Doc. 31 at 27.[3]  The parties agree

---

[3] Page citations to the parties' submissions (Docs. 31, 32, and 35) refer to the internal page
number at the bottom of each page, not the CM/ECF page number.

that the FWS should be dismissed from Claim 3, but petitioners otherwise oppose the motion. Doc. 31 at 1. Petitioners filed their brief opposing the motion on January 13, 2025, Doc. 32, and respondents filed their reply on February 11, 2025, having received one extension, Docs. 33–35.

## ANALYSIS

"The APA governs judicial review of agency action challenged through the ESA citizen-suit provision," *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1106 n.3 (10th Cir. 2010), and "APA-based claims can, if appropriate, be summarily dismissed" under Rule 12(b)(6), *Kane Cty. Utah v. Salazar*, 562 F.3d 1077, 1086 (10th Cir. 2009). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For the reasons below, the partial motion to dismiss is granted in part and denied in part. Respondents' raise five arguments for dismissal. The Court addresses each argument in turn.

### I.    Claims 2, 5, and 6 Violate the ESA's 60-Day Notice Requirement.

Respondents first argue that Claim 2 (reliance on invalid BiOps), Claim 5 (failure to ensure against jeopardy), and Claim 6 (failure to take effective conservation actions) should be dismissed because petitioners "failed to provide the Forest Service with sixty-days' notice of their allegations" in these Claims "before bringing suit, as is required under the ESA's citizen-suit provision, 16 U.S.C. § 1540(g)(2)(A)(i)." Doc. 31 at 10; *see also id.* at 20–21. The Court agrees and dismisses Claims 2, 5, and 6 in their entirety without prejudice under Rule 12(b)(6). The Court first addresses Claims 2 and 5, followed by Claim 6.

A.       **Improper notice of Claims 2 and 5**

As background for Claims 2 and 5, "[a]n agency's decision whether to take a discretionary action that may jeopardize endangered or threatened species is strictly governed by ESA-mandated inter-agency consultation procedures." *Rio Grande Silvery Minnow*, 601 F.3d at 1105 (citation omitted). If an "action agency" (the Forest Service here) determines that "its proposed discretionary action may affect a listed species or a critical habitat" under ESA § 7(a)(2), the agency must "consult[] with the FWS" (the agency that administers the ESA) "to determine the effects of its action on endangered species and their critical habitat." *Id.* (citing 50 C.F.R. § 402.14(a), (c)). "During consultation, the FWS evaluates the effects of the proposed action on the survival of the species and any potential destruction or adverse modification of critical habitat and, based on the best scientific and commercial data available, formulates" a BiOp at the "conclusion of consultation." *Id.* (citations and alterations omitted). A BiOp is a "written statement determining whether the proposed action 'is likely to jeopardize the continued existence of listed species.'" 50 C.F.R. § 402.14(g)(4).

Here, after consulting with the Forest Service, the FWS issued a BiOp in 2018 concluding that, while "livestock grazing was 'likely to adversely affect' the [S]alamander and its critical habitat," "grazing would not jeopardize the species' survival or recovery" (the "2018 Salamander BiOp"). Doc. 21. ¶ 85; *see* Doc. 31-1. Similarly, after consulting with the Forest Service, the FWS issued a BiOp in 2020 concluding that, while "grazing on the Cebolla-San Antonio allotment was likely to adversely affect the [J]umping [M]ouse and its critical habitat," implementing "specific conservation methods" would ensure that "ongoing grazing" on this allotment "would not jeopardize the continued existence" of the species (the "2020 Jumping Mouse BiOp"). Doc. 21 ¶ 114; *see* Doc. 31-2.

In Claim 2 of their amended petition, petitioners allege that because both BiOps are "unlawful," the "Forest Service's reliance on [these BiOps] in issuing [grazing permits] and authorizing grazing on the Allotments is similarly arbitrary, capricious, and in violation of the ESA." Doc. 21 ¶ 176. In Claim 5, petitioners allege that, "[b]y relying on the invalid 2018 [Salamander] and 2020 [Jumping Mouse] BiOps to authorize grazing on the Allotments, the Forest Service has failed to ensure that its actions do not jeopardize the continuing existence of the endangered [Salamander], [Spotted Owl], and [Jumping Mouse], in violation of its substantive duties under ESA Section 7." *Id.* ¶ 203.

The Court agrees with respondents, however, that "nothing in [p]etitioner's First, Second, or Third NOIs ever notified the Forest Service of allegations that the agency was in violation of the ESA by relying on allegedly invalid BiOps to authorize grazing" on the Allotments. Doc. 31 at 15. This is fatal to Claims 2 and 5 under the ESA's 60-day notice rule, under which "Congress expressly conditioned suit on the private party providing" the relevant government officials "with prior written notice of the alleged violations" "no later than sixty days prior to filing suit." *Forest Guardians v. U.S. Bureau of Reclamation*, 462 F. Supp. 2d 1177, 1182 (D.N.M. 2006) (citing 16 U.S.C. § 1540(g)(2)(A)(i)). The 60-day rule is an "absolute bar" to suit, *New Mexico Cattle Growers v. U.S. Fish & Wildlife Serv.*, No. 1:98-cv-00367-ELM-JHG, 1999 WL 34797509, at *14 (D.N.M. Oct. 28, 1999), and the statute's plain text mandates "written notice *of the violation*" alleged, meaning that claim specificity is required to give time for alleged violators to comply with the law before litigation is initiated, 16 U.S.C. § 1540(g)(2)(A)(i) (emphasis added); *see, e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citation omitted)).

Petitioners cite out-of-circuit decisions interpreting the ESA's 60-day rule liberally.  *See* Doc. 32 at 9–11 (citing only Ninth Circuit decisions).  But as *Forest Guardians* explains, Supreme Court and Tenth Circuit precedent construes nearly identical 60-day language from other statutes "strictly," and this Court thus does the same.  462 F. Supp. 2d at 1182; *see Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 25–32 (1989) (holding that the language of a nearly identical 60-day rule "could not be clearer" in creating a "mandatory condition[] precedent to commencing suit" and rejecting a "flexible or pragmatic construction" of the statute); *New Mexico Citizens for Clean Air & Water v. Espanola Mercantile Co.*, 72 F.3d 830, 832–34 (10th Cir. 1996) ("[S]trict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." (quoting *Hallstrom*, 493 U.S. at 31)).

Under this construction of the ESA's 60-day rule, petitioners failed to provide respondents with proper written notice of the ESA violations they allege in Claims 2 and 5.  After carefully examining the First, Second, and Third NOIs—including the NOI provisions that petitioners cite in their opposition brief—the Court agrees with respondents that petitioners framed their claims as seeking to reinitiate the consultation process under ESA § 7 and as § 9 violations—not as direct challenges to the BiOps' legality and the agencies' reliance on those BiOps to take official action under the ESA, including authorizing grazing on the Allotments. *See* Docs. 32-5 (First NOI), 32-6 (Second NOI), 32-1 (Third NOI); *see also* Doc. 32 at 10 (citing various NOI provisions to argue that proper notice was given).  The only discussion of unlawful reliance appears in the "Legal Background" sections of the First and Second NOIs, where petitioners quote case law stating that agencies cannot arbitrarily or capriciously rely on BiOps. *See* Docs. 32-5 at 6, 32-6 at 5.  But neither NOI references this case law or legal theory again,

much less asserts the reliance-based claims raised in Claims 2 and 5 of the amended petition. The Court therefore will dismiss these claims for lack of notice under the ESA.[4]

Dismissal of Claims 2 and 5 is without prejudice.  Petitioners "remain free to give notice and file their suit" based on these claims "in compliance with the [ESA] to enforce pertinent environmental standards."  *Hallstrom*, 493 U.S. at 32 (rejecting the argument that compliance with the statute after dismissal will "unnecessarily waste judicial resources" because the "statute itself put petitioners on notice of the requirements for bringing suit," and enforcing the statute "further[s] the congressional purpose of giving agencies and alleged violators a 60-day nonadversarial period to achieve compliance" with the law); *see also Forest Guardians*, 462 F. Supp. 2d at 1186 ("Plaintiff remains free to give notice and file its suit in compliance with the statute to enforce the pertinent provisions of the ESA.").

## B.    Improper notice of Claim 6

As background for Claim 6, the ESA requires federal agencies to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered species and threatened species."  16 U.S.C. § 1536(a)(1).  In Claim 6, petitioners allege that the "Forest Service has violated its affirmative duty" under 16 U.S.C. § 1536(a)(1) "to 'conserve' ESA-listed species by failing to implement an effective program to conserve" the Salamander, Spotted Owl, and Jumping Mouse by continuing to rely on ineffective fencing to stop cattle trespass on the Preserve.  Doc. 21 ¶¶ 206–13.

_____

[4] Petitioners cite nonbinding Ninth Circuit decisions analyzing the alleged violators' "behavior after receiving the NOIs" to find notice under the ESA's 60-day rule.  *See* Doc. 32 at 10.  But the Supreme Court and Tenth Circuit precedent cited above, along with the statute's plain text, focus on the "*written* notice of the violation" alleged, not on post-notice conduct.  16 U.S.C. § 1540(g)(2)(A)(i) (emphasis added).  The Court therefore does not find these decisions persuasive.

Petitioners, however, did not raise these allegations until serving their Third NOI on respondents on August 13, 2024, Doc. 31-3 at 21, more than two months after this lawsuit was filed, Doc. 1.  This does not constitute proper notice under the plain text of the ESA's 60-day rule, which states that "[n]o *action* may be commenced … prior to sixty days after written notice of the violation has been given" to government officials.  16 U.S.C. § 1540(g)(2)(A)(i) (emphasis added).  Here, the "action" (this lawsuit) was already "commenced" when petitioners served their Third NOI and sought to amend their petition to add Claim 6.  *Id.*; *see, e.g.*, *Action*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A civil … judicial proceeding; esp., LAWSUIT."); *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 454 (2012) (holding that courts must give undefined statutory terms their "ordinary meaning," as defined by, for example, dictionaries).  Under this statutory language, a claimant cannot "cure its defective notice" under the ESA "by providing [an] NOI after the original complaint was filed and then waiting sixty days to file a motion to file a supplemental complaint," as petitioners did here.  *Forest Guardians*, 462 F. Supp. 2d at 1185 (collecting decisions).  That is because "[p]rohibiting parties from sending [an] NOI after commencing an action and then filing a supplemental complaint advances Congress' goal of creating a sixty-day nonadversarial period during which the parties might reach a resolution without need for judicial intervention"—"after the complaint is filed[,] the parties assume an adversary relationship that makes cooperation less likely."  *Id.* (citation omitted).  Notice of Claim 6 was therefore improper under the ESA.

Petitioners argue that they "could not have provided more specific notice of [Claim 6] before the original Petition was filed, as it is based on events that occurred after the original Petition was filed on June 4, 2024"—namely, the Forest Service's repairing and reconstructing of the boundary fence separating the Allotments from the Preserve, agency action that petitioners

allege is ineffectual.  Doc. 32 at 17.  The amended petition, however, states that the Forest

Service began repairing and reconstructing the fence in May 2024, before the original petition

was filed, and that "trespass livestock from the Allotments were reported on the Preserve that

same month," "despite fence repairs."  Doc. 21 ¶¶ 148, 151, 153.  Petitioners therefore could

have included Claim 6 in an NOI served before they filed suit, as the 60-day rule requires, but

instead, they chose to file suit on June 4, 2024, without doing so.  Claim 6 therefore violates the

ESA's 60-day rule, and the Court dismisses this claim without prejudice under Rule 12(b)(6).  *Id.*

at 1186 (holding that "[p]laintiff remains free to give notice and file its suit in compliance with

the statute to enforce the pertinent provisions of the ESA"); *cf. Hallstrom*, 493 U.S. at 32

(holding that the "statute itself put petitioners on notice of the requirements for bringing suit"

and that enforcing the statute "further[s] the congressional purpose of giving agencies and

alleged violators a 60-day nonadversarial period to achieve compliance" with the law).

## II.    Claim 1 is Time-Barred in Part.

Respondents next argue that part of Claim 1 should be dismissed as time-barred under

Rule 12(b)(6) because petitioners "failed to raise their [APA] challenge to the validity of the

2018 Salamander BiOp within the six-year statute of limitations for challenges to federal action,

28 U.S.C. § 2401(a)."  Doc. 31 at 17.  The Court agrees and dismisses Claim 1's APA attack on

the 2018 Salamander BiOp with prejudice as time-barred under Rule 12(b)(6).[5]

"[E]very civil action commenced against the United States shall be barred unless the

complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a);

---

[5] Respondents do not argue that Claim 1's attack on the validity of the 2020 Jumping Mouse
BiOp should be dismissed under any legal theory.  *See* Doc. 21 ¶¶ 167–74; Doc. 31 at 17
(conceding that Claim 1 is "timely" as to the 2020 Jumping Mouse BiOp).  The Court therefore
does not address this part of Claim 1 and allows it to proceed past the motion to dismiss stage.

*see Chance v. Zinke*, 898 F.3d 1025, 1030 (10th Cir. 2018).  The 2018 Salamander BiOp was issued on July 25, 2018, Doc. 31-1 at 2, yet petitioners did not challenge its validity under the APA until filing their amended petition more than six years later, on October 30, 2024, *see* Doc. 21 ¶¶ 167–74.  Claim 1 therefore is time-barred in part as to the 2018 Salamander BiOp.

Petitioners argue that their challenge is timely under Federal Rule of Civil Procedure 15's relation-back principles for amended pleadings because it "arises from the same conduct and occurrences as their challenge to respondents' failure to reconsult on that BiOp," which petitioners raised in their original petition filed on June 4, 2024, *see* Doc. 32 at 8–9.

The Court disagrees.  An "amendment to a pleading relates back to the date of the original pleading" for timeliness purposes "when … the amendment asserts a claim … that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fᴇᴅ. R. Cɪᴠ. P. 15(c)(1)(B).  But an amendment "does not relate back 'when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'"  *Montoya v. Jacobs Tech., Inc.*, No. 2:17-cv-00081-WJ-SMV, 2018 WL 704931, at *3 (D.N.M. Feb. 2, 2018) (quoting *A Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1018 (10th Cir. 2013)).  Petitioners' attack on the 2018 Salamander BiOp in the amended petition does not relate back to the original petition under these standards.

As respondents explain, the original petition focuses on *the Forest Service's* conduct *after* the FWS issued the BiOp, while the amended petition's direct APA attack on the BiOp's validity focuses on *the FWS's* conduct *before* the FWS issued the BiOp, as the APA claim will necessarily turn on the documents and rationales that the FWS relied on to issue the BiOp.  *See* Doc. 35 at 8. These different legal theories involve different agencies and different administrative records, and the BiOp challenge thus "asserts a new ground for relief supported by facts that differ in both

14

time and type from those the original pleading set forth.'" *Montoya,* 2018 WL 704931, at *3

(quoting *A Full Life Hospice, LLC v. Sebelius*, 709 F.3d at 1018).  Accordingly, the Court

dismisses petitioner's APA attack on the 2018 Salamander BiOp in Claim 1 with prejudice as

time-barred under Rule 12(b)(6).  *See, e.g.*, *Rodriguez v. Colorado*, 521 F. App'x 670, 671 (10th

Cir. 2013) (dismissals under the statute of limitations are with prejudice).

### III.    Claim 3 States a Plausible Claim for Failure to Reinitiate ESA Consultation.

Third, respondents argue that Claim 3 should be dismissed in part against the remaining

respondents[6] for failure to state a claim under Rule 12(b)(6) because this claim overbroadly seeks

reinitiation of ESA consultation for the Salamander, Spotted Owl, and Jumping Mouse for "all

eleven [A]llotments," "which represent eleven distinct and ongoing agency actions."  Doc. 31 at

18.  The Court disagrees and allows Claim 3 to proceed past the motion to dismiss stage.

As background, an action agency (the Forest Service here) must reinitiate ESA

consultation with the FWS concerning protected species when, for example, "new information

reveals effects of the action" at issue "that may affect listed species or critical habitat in a manner

or to an extent not previously considered" or the "identified action is subsequently modified in a

manner that causes an effect to the listed species or critical habitat that was not considered in the

[BiOp] or written concurrence."  50 C.F.R. § 402.16(a)(2)–(3); *see also Rio Grande Silvery

Minnow*, 601 F.3d at 1112 n.13; *WildEarth Guardians v. United States Forest Serv.*, No. 1:14-cv-

00828-MV-KK, 2018 WL 4627087, at *3 (D.N.M. Aug. 30, 2018) ("An agency … has a duty to

---

[6] Again, the parties agree that the FWS should be dismissed from Claim 3.  *See* Doc. 31 at 1, 14;
Doc. 32 at 13 n.4.  The Court therefore dismisses the FWS from Claim 3 with prejudice.
Respondents also concede that Claim 3 states a claim in part by "alleging specific reinitiation
triggers have been met based on [Incidental Take Statement] exceedances on the specific
allotments themselves."  Doc. 31 at 15.  The Court therefore does not address that aspect of
Claim 3 and allows it to proceed.  *See* Doc. 21 ¶¶ 182–87.

'reinitiate' consultation with FWS when certain triggers occur, as set out in 50 C.F.R. § 402.16," and an "action agency that must reinitiate consultation must engage in formal consultation with FWS"), *PF&RD adopted*, 2018 WL 4621732 (D.N.M. Sept. 26, 2018).

Under these regulations, petitioners allege that the Forest Service must reinitiate consultation with the FWS concerning the Salamander, Spotted Owl, and Jumping Mouse because (1) the "adverse effects of ongoing incursions of trespass cattle onto the Preserve were never analyzed in the existing BiOps" and thus "constitute new information" under § 402.16(a)(2), and (2) the "consistent presence of trespass cattle on the Preserve … constitutes a substantial change in the grazing program" under § 402.16(a)(3).  Doc. 21 ¶¶ 188–95.

Respondents contend that these allegations in Claim 3 should be dismissed because they overbroadly "lump[] together eleven distinct agency actions"—the Forest Service's decisions to grant grazing permits on each Allotment—and improperly "attribute[] trespass cattle to eleven grazing authorizations simply by virtue of the [A]llotments' proximity" to the Preserve.  Doc. 35 at 7.  "This blanket allegation," respondents argue, "does not account for the possibility that trespass cattle may originate from allotments that do not border [the Preserve], or from other nearby lands, or only from bordering allotments where the boundary fence requires repair."  *Id.*

The Court rejects this argument, as it demands too much at the pleadings stage and before any administrative record has been produced in this case.  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the … claim is and the grounds upon which it rests," and factual allegations need only "be enough to raise a right to relief above the speculative level," "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555.

Petitioners satisfy this standard in Claim 3.  The amended petition alleges in detail that the Forest Service authorizes grazing on the Allotments each year and that cattle from the Allotments trespass onto the Preserve each summer and cause harm to the Salamander, Spotted Owl, and Jumping Mouse in ways that were not considered in the 2018 Salamander BiOp and 2020 Jumping Mouse BiOp, thus requiring reinitiation of consultation.  *See, e.g.*, Doc. 21 ¶¶ 6, 142, 163–66, 179–95.  These allegations, taken as true at the pleadings stage, are enough to survive a motion to dismiss.  *Cf., e.g.*, *Oregon Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1007 (D. Or. 2010) ("[T]he entire agency action includes grazing on all thirteen allotments, and reinitiation of formal consultation necessarily includes all thirteen allotments.").  The Court rejects respondents' argument that, in effect, petitioners must "go further and allege with particularity the Allotment of origin for each trespass cow and specifically how cattle from each Allotment have harmed listed species and habitat."  Doc. 32 at 17.  These arguments can be addressed later in this litigation, with briefing on a full administrative record.

## IV.    Claim 4 Fails to State a Plausible ESA § 7(d) Claim.

Next, respondents argue that Claim 4 should be dismissed for failure to state a claim under Rule 12(b)(6) because petitioners "fail to identify any ongoing consultation to which ESA Section 7(d)'s requirements would attach."  Doc. 35 at 11; *see* Doc. 31 at 21.  The Court agrees and dismisses Claim 4 without prejudice under Rule 12(b)(6).

In Claim 4, petitioners allege that the Forest Service "has violated Section 7(d) of the ESA" (16 U.S.C. § 1536(d)) "by irreversibly and irretrievably committing resources to its grazing program before completing formal [ESA] consultation with the FWS."  Doc. 21 ¶ 197.

The plain statutory text makes clear that § 7(d) imposes substantive requirements on action agencies (such as the Forest Service) only "*[a]fter* initiation of consultation" with the

FWS.  16 U.S.C. § 1536(d) (emphasis added); *see also* 50 C.F.R. § 402.09 (providing that § 7(d) applies "*[a]fter* initiation or reinitiation of consultation" and that its prohibitions are "in force *during* the consultation process" (emphasis added)); *Forest Guardians v. United States Forest Serv.*, No. 1:01-cv-00504-MCA-KBM, 2002 WL 35649549, at *3 (D.N.M. Dec. 31, 2002) (citing this statutory and regulatory text).

Here, petitioners specifically allege that no formal ESA consultation is currently active. Indeed, petitioners plead that the Forest Service has "*never* consulted with" the FWS under the ESA "regarding the[] well-known effects of its grazing program" on the three protected species at issue, Doc. 21 ¶ 4 (emphasis added), and petitioners specifically seek to compel respondents to "reinitiate consultation" in Claim 3, *id.* ¶¶ 6, 179–95.  Based on petitioners' own allegations, § 7(d) does not apply to this case at this stage.

Without citing § 7(d)'s text, petitioners counter that Claim 4 should proceed because petitioners "merely invoke it as the basis for an injunction pending ESA compliance."  Doc. 32 at 24.  But the two decisions that petitioners cite for support specifically state that a § 7(d) "violation can only occur *after* formal consultation is initiated," *Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450, 480 (N.D. Cal. 2017), and that the "ESA's plain language makes clear" that "§ 7(d) applies only *after* an agency has initiated consultation," *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056 (9th Cir. 1994) (emphasis added).  Neither decision holds that an ESA claimant may bring a § 7(d) claim, for injunctive relief or otherwise, without first demonstrating that the factual circumstances align with the statutory text.  The Court therefore rejects petitioners' arguments concerning Claim 4.

Claim 4 is dismissed for failure to state a claim under Rule 12(b)(6).  *See, e.g.*, *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 871 F. Supp. 2d 1312, 1326 & n.13 (S.D. Ala. 2012)

(stating that the "purpose of § 7(d) is to ensure that the status quo is maintained *during* consultation" and collecting cases (emphasis added)).  Dismissal is without prejudice.  If the Forest Service and FWS ultimately engage in formal ESA consultation, petitioners remain free to bring a lawsuit based on § 7(d)'s requirements.

## VI.    Claim 7 States a Plausible ESA § 9 Claim.

Last, respondents argue that Claim 7 should be dismissed under Rule 12(b)(6) for failure to state a plausible ESA § 9 claim because petitioners overbroadly "equate any livestock presence" in the Preserve to "confirmed and unauthorized 'take' of all three species stemming from all eleven grazing authorizations."  Doc. 31 at 25.  The Court disagrees and allows Claim 7 to proceed past the motion to dismiss stage.

As background, ESA § 9 "prohibits a 'take' of any species listed as" protected, and the "term 'take' is defined broadly to mean 'harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.'"  *Rio Grande Silvery Minnow*, 601 F.3d at 1106 (quoting 16 U.S.C. §§ 1532(19), 1538(a)(1)(B)).  "Incidental take" is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity." 50 C.F.R. § 402.02.  If the FWS determines in its BiOp at the conclusion of formal ESA consultation that "jeopardy" to protected species "is not likely and that there will not be adverse modification of critical habitat, or that there is a reasonable and prudent alternative to the agency action that avoids jeopardy and adverse modification and that the incidental taking of endangered or threatened species will not violate section 7(a)(2), [the FWS] can issue an 'Incidental Take Statement,'" or "ITS."  *Rio Grande Silvery Minnow*, 601 F.3d at 1105–06 (citations and alterations omitted).  An ITS "constitutes a permit authorizing the action agency to take the endangered or threatened species so long as it respects" the ITS's "terms and conditions."  *Id.*

19

(quoting *Bennett v. Spear*, 520 U.S. 154, 170 (1997)); *see also Bennett*, 520 U.S. at 170 ("Any taking that is in compliance with [the ITS's] terms and conditions 'shall not be considered to be a prohibited taking of the species concerned.'" (quoting 16 U.S.C. § 1536(o)(2)).  An action agency violates an ITS "at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial" penalties. *Bennett*, 520 U.S. at 170 (quoting 16 U.S.C. § 1540(a)–(b)).

Under these standards, the Court concludes that petitioners allege plausible § 9 violations concerning all three protected species.  Petitioners assert that, after issuing the 2018 Salamander BiOp, the FWS issued an ITS for the Salamander setting terms and conditions governing incidental take on the Allotments and that "Forest Service records from 2018 through 2022 indicate that livestock grazing caused take of [S]alamanders on the Allotments beyond the permitted level, and that the monitoring requirements imposed by the ITS were not consistently met." Doc. 21 ¶¶ 85–88.  Likewise, while petitioners do not allege that an ITS is in place for the Spotted Owl, petitioners assert that cattle grazing and trespass have caused "severe resource damage" that has "harm[ed]" the Spotted Owl and its habitat.  *Id.* ¶ 3; *see also id.* ¶¶ 5, 78, 91–99, 136, 163–66, 218.  Finally, petitioners assert that, after issuing the 2020 Jumping Mouse BiOp, the FWS issued an ITS for the Jumping Mouse setting terms and conditions governing incidental take on the Cebolla-San Antonio allotment and that the Forest Service's authorization of grazing and failure to enforce the ITS have "repeatedly caused take in excess of authorized levels." *Id.* ¶¶ 114–20.  These allegations, accepted as true, survive respondents' motion to dismiss.

Respondents effectively "ask [p]etitioners to go even further and establish exactly which trespass cattle have caused take of listed species on the Preserve" in Claim 7.  Doc. 32 at 23.  The

Court rejects respondents' challenge to Claim 7, as it again demands more than what is required at the pleading stage. *See, e.g.*, *Twombly*, 550 U.S. at 555 (holding that factual allegations need only "be enough to raise a right to relief above the speculative level," "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"). Respondents' demands for "specific instance[s] of take … tied to specific grazing authorizations where ITS safe harbor shields allegedly no longer apply" can be addressed later in these proceedings, with briefing on a full administrative record. Doc. 31 at 25; *see also id.* at 27 (demanding that petitioners "specify what allotment-specific agency action(s) the trespass is attributed to" under § 9); Doc. 35 at 15 (demanding allegations that "(1) a grazing authorization for a particular allotment has caused or is reasonably certain to cause take, and (2) there is no valid ITS covering the authorization protecting the agency from Section 9 liability").

## CONCLUSION

Respondents' motion to dismiss (Doc. 31) is granted in part and denied in part. The motion is granted in part in that (1) Claim 1's attack on the validity of the 2018 Salamander BiOp is dismissed with prejudice as time-barred; (2) Claims 2, 5, and 6 are dismissed without prejudice for failure to comply with the ESA's 60-day notice rule; (3) Claim 3 is dismissed with prejudice as to the FWS only, based on the parties' agreement; and (4) Claim 4 is dismissed without prejudice for failure to state a claim. The motion is denied in part in that Claim 3 as to the Forest Service only and Claim 7 state plausible claims for relief and are therefore permitted to proceed past the motion to dismiss stage.

IT IS SO ORDERED.

_____
Laura Fashing
United States Magistrate Judge
Presiding by Consent

21